# Exhibit B

| Approved, SCAO | Original - Court<br>1st copy - Defendant | | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|---|

| **STATE OF MICHIGAN**<br>**JUDICIAL DISTRICT**<br>17TH     **JUDICIAL CIRCUIT**<br>**COUNTY** | **SUMMONS** | CASE NO.<br>23- **0 7 1 2 3** -CZ |
|---|---|---|

| Court address | Court telephone no. |
|---|---|
| 180 Ottawa Ave. NW, Grand Rapids, MI 49503 | 616-632-5220 |

| Plaintiff's name, address, and telephone no. | | Defendant's name, address, and telephone no. |
|---|---|---|
| PETER AVERY, ESTATE OF BARBARA R. NAVARRO, by Personal Representative, LARRY HALL, ESTATE OF VIOLA LANCIONI, by Personal Representative, ELITA RICE, CHERYL BARRETT, et al<br>c/o Visser and Associates, PLLC | V | KENT COUNTY, 300 Monroe Ave. NW #1, Grand Rapids, MI 49503<br><br>and<br><br>PETER MACGREGOR, 300 Monroe Ave. NW #1, Grand Rapids, MI 49503<br><br>and<br><br>KENNETH D. PARRISH, c/o Kent County Treasurer 300 Monroe Ave. NW #1, Grand Rapids, MI 49503 |
| Plaintiff's attorney, bar no., address, and telephone no. | | |
| Donald R. Visser (P27961)<br>VISSER AND ASSOCIATES, PLLC<br>2480 44th Street SE, Suite 150<br>Kentwood, MI 49512<br>(616) 531-9860 | | |

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☑ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☑ this court, ☐ _____ Court, where

it was given case number 20-09502-CZ _____ and assigned to Judge Paul J. Denenfeld _____

The action ☑ remains ☐ is no longer pending.

Summons section completed by court clerk.     **SUMMONS**

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside of Michigan).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>**JUL 2 6 2023** | Expiration date **OCT 2 5 2023** | Court clerk<br>**LISA POSTHUMUS LYONS** |
|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE 17th CIRCUIT COURT,
COUNTY OF KENT

JURY FEE PAID

\* \* \* \* \*

PETER AVERY, an individual; ESTATE OF
BARBARA R. NAVARRO, by Personal
Representative, LARRY HALL; ESTATE OF
VIOLA LANCIONI, by Personal
Representative, ELITA RICE; ESTATE OF
ILENE L. POST, by Personal Representative,
CHERYL BARRETT; CHRISTINE COLE, an
individual; DONG LIN, an individual; ALAN
NOTENBAUM, an individual; KELLIE
SINKE, a/k/a KELLIE CAMPOS, an
individual; DEBORAH J. PARKER, f/k/a
DEBORAH J. WHILDEN, f/k/a DEBORAH J.
BELBOT, an individual; HARRY
CAMPBELL, an individual; MARCO
MORALES, an individual; LINDA BUFORD,
an individual; FAUSTO ROSARIO, an
individual; DAVID VANDERVEEN, an
individual; JOSE LUZON, an individual;
ESTATE OF GWENDOLYN M. GORMAN,
by Personal Representative, COURTNIE
VAUGHN; WILLIE DAWSON, an individual;
SUPERIOR REAL ESTATE INVESTMENT
COMPANY II, a Michigan Corporation; and
PATRICIA TERPSTRA, by RICHARD
TERPSTRA, Power of Attorney,

Plaintiffs,

-vs-

KENT COUNTY, a Governmental Unit,
PETER MACGREGOR, in his individual and
official capacity; and KENNETH D. PARRISH,
in his individual and official capacity,

Defendants.

Case No. 23- **0 7 1 2 3** -CZ

HON. MARK A. TRUSOCK
(P-38156)

**COMPLAINT**

**(JURY DEMAND)**



23 JUL 26 AM 11: 58

REC'D & FILED
KENT COUNTY
CIRCUIT COURT

9G



Donald R. Visser (P27961)
Daniel O. Myers (P49250)
Donovan J. Visser (P70847)
VISSER AND ASSOCIATES, PLLC
*Attorneys for Plaintiffs*
2480 - 44th Street, S.E., Suite 150
Kentwood, MI 49512
(616) 531-9860

E. Powell Miller (P39487)
Christopher D. Kaye (P61918)
Sharon S. Almonrode (P33938)
THE MILLER LAW FIRM, PC
*Attorneys for Plaintiffs*
950 W. University Drive, Suite 300
Rochester, MI 48307
(248) 841-2200

Philip L. Ellison (P74117)
OUTSIDE LEGAL COUNSEL, PLC
*Attorney for Plaintiffs*
PO Box 107
Hemlock, MI 48626
(989) 642-0055

Matthew E. Gronda (P73693)
GRONDA PLC
*Attorney for Plaintiffs*
4800 Fashion Square Boulevard, Suite 200
Saginaw, MI 48604
(989) 249-0350



JURY FEE PAID

23 JUL 26 AM 11: 58
REC'D & FILED
KENT COUNTY
CIRCUIT COURT

## COMPLAINT

COME NOW, Plaintiffs PETER AVERY, ESTATE OF BARBARA R. NAVARRO, by Personal Representative, LARRY HALL, ESTATE OF VIOLA LANCIONI, by Personal Representative, ELITA RICE, ESTATE OF ILENE L. POST, by Personal Representative,

CHERYL BARRETT, CHRISTINE COLE, DONG LIN, ALAN NOTENBAUM, KELLIE SINKE, a/k/a KELLIE CAMPOS, DEBORAH J. PARKER, f/k/a DEBORAH J. WHILDEN, f/k/a DEBORAH J. BELBOT, HARRY CAMPBELL, MARCO MORALES, LINDA BUFORD, FAUSTO ROSARIO, DAVID VANDERVEEN, JOSE LUZON, ESTATE OF GWENDOLYN M. GORMAN, by Personal Representative, COURTNIE VAUGHN, WILLIE DAWSON, SUPERIOR REAL ESTATE INVESTMENT COMPANY II, and PATRICIA TERPSTRA, by RICHARD TERPSTRA, Power of Attorney (collectively "Plaintiffs") by and through counsel, and for Plaintiffs' cause of action against Defendants KENT COUNTY, PETER MACGREGOR, and KENNETH D. PARRISH (collectively "Defendants"), state as follows:

## PARTIES

1.      Plaintiff Peter Avery is a resident of Kent County and owned real property in Kent County, Michigan.

2.      Barbara R. Navarro, at the time of her death, was a resident of Kent County and owned real property in Kent County, Michigan. Larry Hall is a resident of Kent County.

3.      Viola Lancioni, at the time of her death, was a resident of Kent County and owned real property in Kent County, Michigan. Elita Rice is a resident of Barry County.

4.      Ilene L. Post, at the time of her death, was a resident of Kent County and owned real property in Kent County, Michigan. Cheryl Barrett is a resident of Madison, Alabama.

5.      Plaintiff Christine Cole is a resident of Newago County, who owned real property in Kent County, Michigan.

6.      Plaintiff Dong Lin is a resident of Kent County and owned real property in Kent County, Michigan.

7.    Plaintiff Alan Notenbaum is a resident of Grand Traverse County, who owned real property in Kent County, Michigan.

8.    Plaintiff Kellie Sinke, a/k/a Kellie Campos, is a resident of Kent County and owned real property in Kent County, Michigan.

9.    Plaintiff Deborah J. Parker, f/k/a Deborah J. Whilden, f/k/a Deborah J. Belbot, is a resident of Osceola County, who owned real property in Kent County, Michigan.

10.   Plaintiff Harry Campbell is a resident of Kent County and owned real property in Kent County, Michigan.

11.   Plaintiff Marco Morales is a resident of Kent County and owned real property in Kent County, Michigan.

12.   Plaintiff Linda Buford is a resident of Kent County and owned real property in Kent County, Michigan.

13.   Plaintiff Fausto Rosario is a resident of Kennesaw, Georgia who owned real property in Kent County, Michigan.

14.   Plaintiff David Vanderveen is a resident of Kent County and owned real property in Kent County, Michigan.

15.   Plaintiff Jose Luzon is a resident of Somerset, New Jersey who owned real property in Kent County, Michigan

16.   Gwendolyn M. Gorman, at the time of her death, was a resident of Kent County and owned real property in Kent County, Michigan. Courtnie Vaughn is a resident of Kent County.

17.   Plaintiff Willie Dawson is a resident of Kent County and owned real property in Kent County, Michigan.

4

18.     Plaintiff Superior Real Estate Investment Company II is a Michigan Corporation who owned real property in Kent County, Michigan.

19.     Patricia Terpstra is a resident of Kent County and owned real property in Kent County, Michigan. Richard Terpstra is a resident of Allegan County (Collectively "Plaintiffs").

20.     Defendant KENT COUNTY is a governmental unit in the State of Michigan governing the political body known as Kent County ("COUNTY").

21.     Defendant PETER MACGREGOR ("MACGREGOR") is a public official currently serving as the Treasurer of Kent County and is sued in his individual and official capacities.

22.     Defendant KENNETH D. PARRISH ("PARRISH") was the Treasurer of Kent County for all periods relevant to this Complaint up and until December 31, 2020 and is sued in his individual and official capacities.

23.     Upon information and belief, MACGREGOR and PARRISH were the only public officials who served as Kent County Treasurer during the time period relevant to this Complaint.

24.     Prior to the foreclosures referenced below, Plaintiffs owned real property in Kent County ("Subject Property" collectively, "Subject Properties") as set forth in **Exhibit A**.

## JURISDICTION

25.     This is a civil action seeking, among other requested relief, recognition of a constructive trust, and unpaid "just compensation" against Defendants for violations of Article 10 of the Michigan Constitution and the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution.

26.     This court has jurisdiction pursuant to MCL §600.601(1), MCL §600.6605, and MCL § 600.151.

5

27.     Venue is proper in this County pursuant to MCL § 600.1615, MCL § 600.1621(a), and MCL § 600.1627 because Defendants, collectively, conduct or have conducted business in Kent County, and the Subject Properties involved are physically located within Kent County. Moreover, the Defendants are either a municipal unit of government located in the County or were an officer of that municipal unit.

## THE TAX FORECLOSURE

28.     Prior to July 17, 2020, the collection of delinquent taxes was set out in the General Property Tax Act, sections MCL § 211.78 to MCL § 211.79A ("GPTA").[1]

29.     The GPTA allowed Counties to voluntarily choose to act as the Foreclosing Governmental Unit ("FGU") in lieu of designating the State of Michigan (the "State") to serve as the FGU for their Counties. *See* MCL 211.78(3).

30.     Defendant COUNTY and Defendants MACGREGOR and PARRISH chose to make Kent County the FGU pursuant to the General Property Tax Act ("GPTA"), under MCL § 211.78, thus making affirmative, voluntary, and discretionary decisions for the County based on its and/or their own policy.

31.     Under the GPTA, Defendant COUNTY had multiple opportunities to choose to act as the FGU or have the State act as the FGU.

32.     Defendant COUNTY chose to act as the FGU.

33.     Defendants caused Plaintiffs' interests in the Subject Properties to be foreclosed pursuant to the GPTA as a result of delinquent taxes, unpaid assessments, fees, penalties, and/or interest ("Tax Foreclosure" or "Tax Foreclosures").

---

[1] On July 17, 2020, the Michigan Supreme Court ruled some provisions of the GPTA were unconstitutional under the Michigan Constitution. Effective December 22, 2020, the GPTA was modified by 2020 Public Act 255 and 2020 Public Act 256.

34.     Upon information and belief, at the time of the Tax Foreclosures, Plaintiffs owed amounts to the County for delinquent taxes and/or assessments, interest, penalties, and fees reasonably related to the foreclosure and sale of the Subject Properties ("Tax Delinquency" or "Tax Delinquencies") as shown in **Exhibit A**.

35.     Following the Tax Foreclosures, the Defendants retained ownership or directed, implemented, or gave instructions that the Subject Properties be sold at auction to third parties or that the Subject Properties be conveyed to the State of Michigan, a County, a township, a village, a city, a land bank, or government entity ("Tax Sale" or "Tax Sales").

36.     Upon information and belief, the Defendants received proceeds from the Tax Sales.

37.     Upon information and belief, the Defendants received proceeds from the Tax Sales that exceeded the Tax Delinquencies ("Surplus Proceeds").

38.     The amounts of the Tax Delinquencies at the time of foreclosure sales, the State Equalized Value (or "SEV"), the foreclosure "Sale Price", and "Surplus Proceeds" for the Subject Properties are reflected on **Exhibit A**.

39.     Upon information and belief, the Defendants invested the Surplus Proceeds deriving income (the Surplus Proceeds and the income derived therefrom shall be referred to as "Accrued Surplus Proceeds").

40.     Defendants' actions, as described herein, were undertaken pursuant to an official rule, statute, policy and/or custom, thereby permitting Plaintiffs' claims for liability against the County and others claiming immunity, as set forth in *Monell v New York City Dep't of Social Servs*, 436 US 658; 98 S Ct 2018 (1978) and *Carlton v Dep't of Corr*, 215 Mich App 490; 546 NW2d 671 (1996).

7

## *RAFAELI* AS THE FOUNDATION FOR THE CLAIMS

41. On July 17, 2020, the Michigan Supreme Court issued its opinion in *Rafaeli, LLC v. Oakland County*, 505 Mich. 429; 952 N.W.2d 435 (2020) ("*Rafaeli*"), in which the Court held that the Surplus Proceeds from Tax Sale retained by the FGU must be returned to Plaintiffs. The Rafaeli opinion is attached hereto as **Exhibit B**.

42. *Rafaeli* held that Plaintiffs have a common law right to the Surplus Proceeds and held the County's retention of Surplus Proceeds violated Article X, § 2 of the Michigan Constitution. Specifically, the Michigan Supreme Court opined that:

> To the extent the GPTA permits defendants to retain these surplus proceeds and transfer them into the county general fund, the GPTA is unconstitutional as applied to former property owners whose properties were sold at a tax-foreclosure sale for more than the amount owed in unpaid taxes, interest, penalties, and fees related to the forfeiture, foreclosure, and sale of their properties.

*Rafaeli*, 505 Mich. at 474-75; 952 N.W.2d at 461.

43. The *Rafaeli* court's decision recognized Plaintiffs' vested right to return of the Surplus Proceeds as being protected by the Takings Clause of Michigan's Constitution. *Rafaeli*, 505 Mich. at 456.

## *HALL v. MEISNER* AND *TYLER v. HENNEPIN COUNTY* AFFIRM THAT FEDERAL PROTECTIONS APPLY IN ADDITION TO STATE CLAIMS

44. On October 13, 2022, the Sixth Circuit Court of Appeals issued its opinion in *Hall v Meisner*, 51 F.4th 185 (2023) ("*Hall*"), in which the Court held that Fifth Amendment protections apply to Tax Foreclosures. The *Hall* opinion is attached hereto as **Exhibit C**.

45. On May 25, 2023, the United States Supreme Court issued its opinion in *Tyler v Hennepin County*, 598 US (2023) (Docket No. 22-166) which held that Fifth Amendment protections apply to owner's equity and that such rights are inherent and thus not subject to being modified by legislative action. The *Tyler* opinion is attached hereto as **Exhibit D**.

8

46. Before *Rafaeli*, Plaintiffs were statutorily disabled from filing claims for the return of Surplus Proceeds because the GPTA expressly required the FGU to retain the Surplus Proceeds pursuant to MCL § 211.783(8)(h) and MCL § 211.78n.

47. Therefore, Plaintiffs were precluded from making a claim for Proceeds prior to issuance of the Michigan Supreme Court's opinion in *Rafaeli*.

48. The *Rafaeli* court held that Plaintiffs have a common law right to the Surplus Proceeds and held the provisions of the GPTA which required the FGU to retain Surplus Proceeds violated the Michigan Constitution.

49. The *Rafaeli* decision established Plaintiffs' vested right to return of the Surplus Proceeds.

50. In Michigan, a claim does not accrue until every element of the cause of action including damages exists. *See Henry v Dow Chem Co*, 319 Mich App 704, 720; 905 NW2d 422 (2017).

51. Plaintiffs' state and federal taking claims against Defendants accrued at the earliest on July 17, 2020 (hereinafter the "Date of Accrual").

52. The Defendants have failed to turn over the Surplus Proceeds to Plaintiffs following the Date of Accrual.

53. The Surplus Proceeds are and have been subject to a constructive, involuntary, and/or *ex delicto* trust.

54. Pursuant to the decision of the Michigan Supreme Court in *Rafaeli*, as of July 17, 2020, Plaintiffs are entitled to immediate recovery/return of the Surplus Proceeds the Defendants currently hold in constructive trust for the benefit of the Plaintiffs.

9

55.     After issuance of the *Rafaeli* decision, Defendants' retention of Plaintiffs' Surplus Proceeds was outside the scope of activity authorized by the Constitution, statute, local charter charger or ordinance, or other law.

56.     Defendants' conduct after July 17, 2020 falls outside the "exercise of governmental function."

57.     Defendants' conduct before July 17, 2020 falls outside the "exercise of governmental function."

58.     Defendants' actions and/or inactions were undertaken in willful and wanton disregard of Plaintiffs' property rights guaranteed under the Michigan and United States Constitutions.

59.     Defendants' retention of and/or failure to return Plaintiffs' property is outside the scope of governmental immunity.

60.     Upon information and belief, some of Plaintiffs' Surplus Proceeds were deposited into the County's General Fund.

61.     Upon information and belief, Defendant County has derived investment income from the retention of the Surplus Proceeds.

62.     Defendants' retention of Plaintiffs' Surplus Proceeds is done so that the County can use the Surplus Proceeds for the County's own use and for the purpose of earning interest and/or investment income.

63.     The earning of interest and/or investment income is an activity that is conducted primarily for the purpose of producing a pecuniary profit for the County.

64.     In addition to the Surplus Proceeds, the County continues to hold the interest and/or investment income earned from the Surplus Proceeds.

65.     The Defendants have refused to turn over the Accrued Surplus Proceeds to Plaintiffs on the Date of Accrual or at any time thereafter.

66.     Pursuant to the decision of the Michigan Supreme Court in *Rafaeli*, as of July 17, 2020, Plaintiffs are entitled to the return or turnover of the Surplus Proceeds and, consequently, the return or turnover of the interest and/or investment income earned on the Surplus Proceeds.

67.     After issuance of the *Rafaeli* decision, Defendants' retention of Plaintiffs' Accrued Surplus Proceeds was clearly not within the scope of activity authorized by the Constitution, statute, local charter charger or ordinance, or other law.

68.     Before issuance of the *Rafaeli* decision, Defendants' retention of Plaintiffs' Accrued Surplus Proceeds was clearly not within the scope of activity authorized by the Constitution, statute, local charter charger or ordinance, or other law.

69.     On or after the date of accrual, the Defendants did not afford the Plaintiffs any adequate process, plan, or legal mechanism to seek or achieve the turn-over of the Accrued Surplus Proceeds Defendants received for the Subject Properties.

70.     Defendants' retention of Plaintiffs' Surplus Proceeds and interest earned thereupon after the date of accrual and after the Defendants become aware of the *Rafaeli* decision constitutes either intentional misconduct or gross negligence, which is the proximate cause of Plaintiffs' damages.

71.     Defendants converted the difference between the fair market values and Tax Delinquencies (the "Equity" or "Equities") in each of the Subject Properties.

## THE *WAYSIDE* CLASS ACTION

72.     *Wayside v Van Buren County*, United States District Court for the Western District of Michigan Case No. 1:14-cv-01274, was filed December 11, 2014 as a putative class action,

11

alleging a defendant class of Michigan Counties, including Defendant County, violated federal law by retaining surplus proceeds from a sale of foreclosed property for unpaid taxes.

73.     On March 24, 2023, the United States District Court for the Western District of Michigan Case preliminarily certified a proposed settlement class. As part of the order, the Court ordered that pending final determination of the proposed Settlement Agreement, "putative Settlement Class Members, other than those who timely and properly have opted out of the Class" could not "directly or indirectly prosecute, institute, or commence any individual or class action with respect to the subject matter of this Action."

74.     Any Plaintiffs that were putative class members in the *Wayside* class action have timely and properly submitted a notice opting out of the class prior to the filing of this Complaint.

## COUNT I
## CONSTRUCTIVE TRUST
## (AGAINST ALL DEFENDANTS)

75.     Plaintiffs incorporate the allegations above as if fully restated herein.

76.     Prior to the Michigan Supreme Court's issuance of its Opinion in *Rafaeli*, Plaintiffs were prevented from seeking the turnover of the Surplus Proceeds.

77.     Defendants acquired custody of Plaintiffs' property under such circumstances that Defendants may not in good conscience retain the beneficial interest of the Accrued Surplus Proceeds.

78.     A constructive Trust arises by operation of law. The Michigan Supreme Court in *Weir v Union Trust Co*, 188 Mich 452, 463; 154 NW2d 357 (1915) stated:

> Constructive trusts arise by operation of law. The following is found in 39 Cyc. p. 169:
>
> 'Constructive trusts do not arise by agreement or from intention, but by operation of law; and fraud, active or constructive, is their essential element. Actual fraud is not necessary, but such a trust will arise whenever the circumstances under which property was acquired make it inequitable that

12

> it should be retained by him who holds the legal title. Constructive trusts have been said to arise through the application of the doctrine of equitable estoppel, or under the broad doctrine that equity regards and treats as done what in good conscience ought to be done. Such trusts are also known as trusts *ex maleficio* or *ex delicto*, or involuntary trusts, and their forms and varieties are practically without limit, being raised by courts of equity whenever it becomes necessary to prevent a failure of justice.'

79. A constructive trust exists when "property has been obtained through fraud, misrepresentation, concealment, undue influence, duress, taking advantage of one's weakness or necessities, or any other similar circumstances which render it unconscionable for the holder of the legal title to retain and enjoy the property." *Kammer Asphalt Paving Co, Inc v East China Twp Sch*, 443 Mich 176, 188; 504 NW2d 635 (1993). Defendants' conduct in failing to turn over Plaintiffs' property is *ex delicto*.

80. Defendants' acquired possession of and/or title to the Accrued Surplus Proceeds through duress, taking advantage of Plaintiffs' weakness, necessities, or other circumstances.

81. Defendants acquired and still hold Accrued Surplus Proceeds which are imbued with and subject to a constructive, involuntary and/or *ex delicto* trust for the benefit of Plaintiffs as a matter of law.

82. It is inequitable and unconscionable for Defendants to retain Plaintiffs' property as well as the benefits Defendants have obtained from retaining Plaintiffs' property.

## COUNT II
## UNJUST ENRICHMENT
## (AGAINST DEFENDANT COUNTY)

83. Plaintiffs incorporate the allegations above as if fully restated herein.

84. Defendant County has been unjustly enriched by its illegal taking and/or retention of Plaintiffs' property.

85. Plaintiffs do not have an adequate and complete remedy at law except as asserted in this Complaint as alternative claims.

13

86.     It is inequitable for Defendants to retain Plaintiffs' property and the benefits

Defendants have obtained from retaining Plaintiffs' property. *Dean v Dep't of Natural Res*, 399

Mich 84; 247 NW2d 876 (1976); *Rafaeli, LLC v Oakland County*, 505 Mich 429; 952 NW2d 434

(2020).

## COUNT III
## TAKING CLAIM – INVERSE CONDEMNATION (AGAINST DEFENDANT COUNTY AND DEFENDANT TREASURERS IN THEIR OFFICIAL CAPACITIES)

87.     Plaintiffs incorporate the allegations above as if fully restated herein.

88.     Defendants refused or have otherwise ignored demand to pay just compensation for

Plaintiffs' Surplus Proceeds.

89.     Defendants' failure or refusal to turn over of Plaintiffs' Surplus Proceeds after

*Rafaeli* constitutes a taking in violation of Article 10, § 2 of Michigan's 1963 Constitution and the

Fifth and Fourteenth Amendments of the United States Constitution.

90.     In addition to the Surplus Proceeds, the Defendants have also retained income

earned from the Surplus Proceeds ("Income Takings").

91.     Defendants' retention of earnings and/or interest on Plaintiffs' Surplus Proceeds

constitutes an additional taking under Article 10, § 2 of Michigan's 1963 Constitution and the Fifth

and Fourteenth Amendments of the United States Constitution.

92.     Defendants' retention of the Accrued Surplus Proceeds is a continual, ongoing

taking that is causing a continual accruing harm. See *HRSS, Inc v Wayne County Treasurer*, 279

F Supp 2nd 846, 854 (2003): "For the reasons stated above, the court finds that, if the interest

earned on the overbid surpluses was greater than fees properly attributed to those surpluses, the

resulting net interest is the property of the individual that owns the principal and that the County's

14

retention of such interest, if it exists, without any compensation constitutes a taking in violation of the Fifth Amendment."

93.     Defendants have taken Plaintiffs' property without using any direct condemnation process before the taking, including those Defendants could have utilized as outlined under the Uniform Condemnation Procedures Act, MCL 213.51, et seq.

94.     Defendants did not provide Plaintiffs, on or after the date of accrual of their claims, any substantial or adequate opportunity to claim the Accrued Surplus Proceeds generated from the Subject Property, and Defendants did not provide or have an adequate process on or after the date of accrual for Plaintiffs to claim just compensation for Defendants' seizure of Plaintiffs' property interest.

95.     Assuming the current version of the GPTA does not allow and/or require the Defendants to turn over the Accrued Surplus Proceeds to Plaintiffs, Section 211.78m(8) of the GPTA, as amended by 2020 Public Act 256, violates the Michigan Constitution.[2]

96.     Defendants have not paid just compensation to the Plaintiffs.

97.     Defendants will not now pay just compensation to Plaintiffs.

98.     Defendants do not intend to pay just compensation in the future to Plaintiffs.

99.     An inverse condemnation has occurred as to Plaintiffs.

100.    Plaintiffs have been injured by Defendants' actions.

101.    Plaintiffs are entitled to maintain this action as an action for inverse condemnation and a taking. *See Electro-Tech, Inc v HF Campbell Co*, 433 Mich 57; 445 NW2d 61 (1989).

---

[2] The GPTA was amended on December 22, 2021 by PA 255 and 256.

## COUNT IV
## CONVERSION
## (AGAINST ALL DEFENDANTS)

102.    Plaintiffs incorporate all the allegations above as if fully restated herein.

103.    Defendants' failure to turn over Plaintiffs' Accrued Surplus Proceeds promptly after the Michigan Supreme Court's decision in *Rafaeli* was released deprived Plaintiffs of their property and constitutes an act of conversion and theft.

104.    Plaintiffs demanded the Defendants relinquish Plaintiffs' property.

105.    Further demands are excused inasmuch as such efforts would be futile.

106.    Defendants took Plaintiffs' property without Plaintiffs' consent.

107.    Defendants continued control of Plaintiffs' property constitutes conversion, embezzlement, or theft.

108.    Plaintiffs have been damaged as a direct result and proximate result of Defendants' actions.

## COUNT V
## STATUTORY CONVERSION
## (AGAINST ALL DEFENDANTS)

109.    Plaintiffs incorporate the allegations above as if fully restated herein.

110.    On July 17, 2020, the Michigan Supreme Court issued its opinion in *Rafaeli*, which authorized Plaintiffs to make claims and receive the Surplus Proceeds.

111.    Plaintiffs demanded Defendants turn over Plaintiffs' property.

112.    Defendants failed or refused to turn over Plaintiffs' property.

113.    Defendants have converted Plaintiffs' Surplus Proceeds, Accrued Surplus Proceeds or Equities to the County's own use as contemplated by MCL § 600.2919a.

114. Defendants' continued retention and control of Plaintiffs' property and Defendants' conversion of Plaintiffs' property to the County's own use constitutes statutory conversion under MCL § 600.2919a.

115. As a result of Defendants' actions, Plaintiffs sustained damages.

116. State law provides that a person damaged as a result of a violation of that law, "may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees." MCL § 600.2919a. Plaintiffs are, therefore, entitled to treble damages.

117. Plaintiffs are entitled to treble damages, costs, and recovery of actual reasonable attorney fees. MCL § 600.2919a.

<div align="center">

**COUNT VI**
**42 USC § 1983**
**VIOLATION OF SUBSTANTIVE DUE PROCESS**
**(AGAINST ALL DEFENDANTS)**

</div>

118. Plaintiffs incorporate the allegations above as if fully restated herein.

119. Pursuant to the Fourteenth Amendment of the United States Constitution, Plaintiffs are entitled to substantive due process.

120. Defendants' taking of Plaintiffs' property deprived Plaintiffs of substantive due process.

121. Defendants' conduct in seizing Plaintiffs' Accrued Surplus Proceeds, and refusal to return the same, even after the Michigan Supreme Court's decision in *Rafaeli*, is arbitrary and/or shocks the conscience.

122. Defendant's have not given Plaintiffs just compensation.

123. Plaintiffs have been damaged as a direct and proximate result of Defendants' violations.

124.     Plaintiffs do not have an adequate remedy at law except as asserted in this Complaint.

<div align="center">

**COUNT VII**
**42 USC § 1983**
**VIOLATION OF PROCEDURAL DUE PROCESS**
**(AGAINST ALL DEFENDANTS)**

</div>

125.     Plaintiffs incorporate the allegations above as if fully restated herein.

126.     Pursuant to the Fourteenth amendment, Plaintiffs are entitled to procedural due process.

127.     Plaintiffs have a Constitutionally protected property interest in Surplus Proceeds.

128.     Ever since the issuance of *Rafaeli*, Defendants provided no adequate method or procedure for Plaintiffs to secure return of their property or obtain it from Defendants.

129.     Defendants have not given Plaintiffs just compensation.

130.     Defendants' retention of Plaintiffs' Surplus Proceeds without notices or opportunities to be heard deprived Plaintiffs of procedural due process.

131.     Plaintiffs have been damaged as a direct and proximate result of Defendants' violations.

<div align="center">

**COUNT VIII**
**42 USC § 1983**
**TAKING – FIFTH/FOURTEENTH AMENDMENT VIOLATION**
**(AGAINST ALL DEFENDANTS)**

</div>

132.     Plaintiffs incorporate the allegations above as if fully restate herein.

133.     The Fifth Amendment, made applicable to the States via the Fourteenth Amendment, is a constitutional provision and right requiring the payment of just compensation upon a taking by Defendants. *See Knick v Twp of Scott*, 139 S Ct 2162 (2019).

<div align="center">18</div>

134. Defendants have taken Plaintiffs' property and appropriated this property for public use without the payment of just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution. See *Hall v Meisner*, 51 F.4th 185 (2023) ("*Hall*").

135. Defendants' refusal to take (or not take) action to effectuate the return of Plaintiffs' property after *Rafaeli* deprived Plaintiffs of their constitutional right to just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

136. Plaintiffs are entitled to interest from the time of taking until payment as a part of just compensation in accordance with *Jacobs v United States*, 290 US 13 (1933); *Knick v Twp of Scott*, 139 S Ct 2162 (2019), and their progeny.

137. Defendants' retention of earnings or interest on the Surplus Proceeds is a continual ongoing taking that is causing a continual harm. *See HRSS, Inc v Wayne County Treasurer*, 279 F Supp 2nd 846, 854 (2003).

138. Plaintiffs are entitled to just compensation.

139. Plaintiffs are entitled to their attorney fees and costs as a result of Defendant's actions.

140. Defendants' taking of Plaintiffs' property also violated and continues to violate 42 USC § 1983 and Plaintiffs are entitled to attorney fees pursuant to 42 USC § 1988.

141. Plaintiffs have been injured and have suffered damages.

## COUNT IX
## TAKING – FIFTH/FOURTEENTH AMENDMENT VIOLATION
## "ARISING DIRECTLY" UNDER THE FIFTH AMENDMENT
## (AGAINST ALL DEFENDANTS)

142. Plaintiffs incorporate the allegations above as if fully restated herein.

143. Plaintiffs makes this claim directly under the Fifth Amendment of the United States Constitution (the "Fifth Amendment").

19

144. The Fourteenth Amendment of the United States Constitution (the "Fourteenth Amendment") has made the Fifth Amendment directly applicable to the individual States.

145. The Takings Clause, applicable to the States through the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation." *Tyler v. Hennepin Cnty., Minnesota*, 143 S. Ct. 1369, 1375 (2023). See also *Id* at 1378 ("[t]o withhold the surplus from the owner would be to violate the Fifth Amendment to the Constitution and to deprive him of his property without due process of law, or to take their property for public use without just compensation.") (quoting *United States v. Lawton*, 110 U. S. 146, 150 (1884)).

146. The taking of Plaintiffs' property without just compensation is in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States.

147. Plaintiffs are entitled to just compensation.

148. By Defendants' refusal to take (or not take) any action effectuating the turnover of Plaintiffs' property after *Rafaeli*, Defendants have deprived Plaintiffs of Plaintiffs' constitutional right to just compensation in violation of the Fifth and Fourteenth Amendments, and the violation can, therefore, be remedied by a direct claim under the Fifth Amendment.

149. Plaintiffs are entitled to interest from the time of taking until payment as part of just compensation in accordance with *Jacobs v United States*, 290 US 13 (1933); *Kick v Twp of Scott*, 139 S Ct 2162 (2019), and their progeny.

150. Defendants' retention of earnings or interest on the Surplus Proceeds is a continual ongoing taking that is causing a continual and continuing harm. *See HRSS, Inc v Wayne County Treasurer*, 279 F Supp 2nd 846, 854 (2003).

151. Plaintiffs have been injured and have suffered damages as a result of Defendant's actions or inactions.

152.    Plaintiffs are entitled to costs and attorney fees as a result of Defendant's actions.

## COUNT X
## VIOLATION OF THE EIGHTH AMENDMENT
## (AGAINST ALL DEFENDANTS)

153.    Plaintiffs incorporate all allegations above as if fully restated herein.

154.    This Count is pled to the extent that Defendants argue or assert that Plaintiffs were punished with an *in-rem* civil forfeiture pursuant to the GPTA.

155.    The Eighth Amendment to the United States Constitution (the "Eighth Amendment"), located in the United States Bill of Rights, prohibits the government from imposing excessive fines, which the US Supreme Court has applied to action(s) involving *in-rem* civil forfeitures.

156.    The Fourteenth Amendment makes the Eighth Amendment applicable to the individual States.

157.    By imposing and retaining an excessive fine in the form of the *in-rem* civil forfeiture of Plaintiffs' equity interest in the Subject Properties in excess of the Tax Delinquencies, Plaintiffs' Eighth Amendment rights have been violated. *See Austin v United States*, 509 US 602 (1993) and *Tyler v. Hennepin Cnty., Minnesota*, 143 S. Ct. 1369, 1375 (2023) (Gorsuch, J and Jackson, J, concurring).

158.    Defendants' retention of Plaintiffs' Surplus Proceeds and/or Fair Market Price, which, by definition, is exclusive of the Tax Delinquencies, is punitive and not remedial.

159.    Defendants' conduct was reckless and undertaken with complete indifference to Plaintiffs' federal right to be free from violations of the Eighth Amendment.

160.    Plaintiffs are entitled to their costs and attorney fees as a result of Defendants' actions.

21

161.    Violations of the Eighth Amendment are remedied by a money judgment against Defendants, pursuant to 42 USC § 1983 and § 1988.

162.    Plaintiffs have been injured and have suffered damages as a result of Defendant's actions or inactions.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

a.    Enter an order declaring the Defendants' retention of Plaintiffs' Accrued Surplus Proceeds as unconstitutional under the Michigan Constitution and United States Constitution, even if the conduct was taken under and consistent with the General Property Tax Act;

b.    Enter an Order confirming the constructive trust to remedy Defendants' unconscionable withholding of Plaintiffs' property and requiring an accounting and turnover of all Accrued Surplus Proceeds over the relevant time frames;

c.    Enter an Order finding Defendants liable under any or all counts contained herein;

d.    Enter an order for any and all damages and/or compensation as is deemed proper;

e.    Enter an order requiring Defendants to turn over the Accrued Surplus Proceeds due to Plaintiffs;

f.    Enter an order disgorging the interest or money earned by the Defendants on the retention of the proceeds from the Tax Sales of Plaintiffs' property to the extent that the proceeds from the sales exceed the Tax Delinquencies for Plaintiffs' properties;

g.    Enter an order for an award of any and all damages available under state law as applicable, including but not limited to, an award of nominal and punitive damages;

h.    Enter an order for an award of treble the amount of the Accrued Surplus Proceeds, plus actual attorney fees, for violation of MCL 600.2919a;

i.    Enter an order for an award of attorney fees and expenses pursuant to all other applicable laws, rules, or statutes;

j.    Enter an order for an award of attorney fees, costs, and interest from the date of Judgment until Defendants pay the Judgment;

k.   Enter an order adjudging Defendants' conduct to be statutory conversion and a federal taking and order Defendants to pay Plaintiffs three times the Equity taken/converted, costs, attorney fees, and interest;

l.   Enter an order for all such other legal and equitable relief the Court deems proper.

## JURY DEMAND

For all triable issues, a jury is hereby demanded.

VISSER AND ASSOCIATES, PLLC

Dated: July 18, 2023

**Donald R. Visser (P27961)**
*Counsel for Plaintiffs*

23

Peter Avery, et al v Kent County, et al

Case No. 23- _____-CV

# EXHIBIT A

## To Plaintiffs' Complaint

EXHIBIT A to COMPLAINT

| Plaintiff | Property Address(es) | Parcel Number(s) | Tax Delinquency | SEV at Foreclosure | Sales Price | Surplus Proceeds | FMV Proceeds |
|---|---|---|---|---|---|---|---|
| Peter Avery | 15296 Whitbeck Ave NE | 41-04-20-400-027 | $ 3,300.00 | $ 25,800.00 | $ 27,000.00 | $ 23,700.00 | $ 48,300.00 |
| Estate of Barbara R. Navarro, by Personal Representative, Larry Hall | 3774 Horton Ave SE | 41-18-19-102-017 | $ 2,900.00 | $ 29,200.00 | $ 31,250.00 | $ 28,350.00 | $ 55,500.00 |
| Estate of Viola Lancioni, by Personal Representative, Elita Rice | 1954 Martindale Ave. SW | 41-17-02-379-006 | $ 5,000.00 | $ 29,900.00 | $ 28,250.00 | $ 23,250.00 | $ 54,800.00 |
| Estate of Ilene L. Post, by Personal Representative, Cheryl Barrett | 530 Leisure Acres Dr NW | 41-05-23-352-025 | $ 4,000.00 | $ 24,600.00 | $ 27,121.12 | $ 23,121.12 | $ 45,200.00 |
| Christine Cole | 2141 Merlin NE | 41-14-04-202-020 | $ 10,750.00 | $ 53,700.00 | $ 72,000.00 | $ 61,250.00 | $ 96,650.00 |
| Dong Lin | 1800 Old Woods Ct NE | 41-14-13-226-053 | $ 18,500.00 | $ 74,200.00 | $ 128,397.52 | $ 109,897.52 | $ 129,900.00 |
| Alan Notenbaum | 141 Clements St SE | 41-18-18-303-029 | $ 4,600.00 | $ 28,560.00 | $ 42,595.07 | $ 37,995.07 | $ 52,520.00 |
| Kellie Sinke, a/k/a Kellie Campos | 2034 Denwood Ave SW | 41-17-11-204-007 | $ 7,000.00 | $ 33,300.00 | $ 51,000.00 | $ 44,000.00 | $ 59,600.00 |
| Deborah J. Parker, f/k/a Deborah J. Whilden, f/k/a Deborah J. Belbot | 1360 Hollywood St. NE | 41-14-08-254-027 | $ 5,100.00 | $ 35,500.00 | $ 19,500.00 | $ 14,400.00 | $ 65,900.00 |
| Harry Campbell | 507 Deleware St. SE | 41-14-31-405-017 | $ 7,800.00 | $ 32,000.00 | $ 23,250.00 | $ 15,450.00 | $ 56,200.00 |
| Marco Morales | 845 Joslin St. SE | 41-18-08-106-038 | $ 9,000.00 | $ 46,400.00 | $ 25,000.00 | $ 16,000.00 | $ 83,800.00 |
| Linda Buford | 2141 Melvin St. SW | 41-17-10-136-017 | $ 8,100.00 | $ 30,800.00 | $ 26,500.00 | $ 18,400.00 | $ 53,500.00 |
| Fausto Rosario | 2030 Division Ave. S | 41-18-07-101-008 | $ 2,900.00 | $ 58,400.00 | $ 23,000.00 | $ 20,100.00 | $ 113,900.00 |
| David Vanderveen | 290 54th St. | 41-17-36-253-044 | $ 6,200.00 | $ 27,200.00 | $ 25,000.00 | $ 18,800.00 | $ 48,200.00 |
| David Vanderveen | 933 Innes St. NE | 41-14-29-104-023 | $ 6,400.00 | $ 27,200.00 | $ 16,000.00 | $ 9,600.00 | $ 48,000.00 |
| David Vanderveen | 316 Walter St. SE | 41-18-19-178-013 | $ 7,100.00 | $ 26,600.00 | $ 14,750.00 | $ 7,650.00 | $ 46,100.00 |
| Jose Luzon | 35 Corinne St. SW | 41-17-01-426-026 | $ 4,800.00 | $ 34,900.00 | $ 21,000.00 | $ 16,200.00 | $ 65,000.00 |
| Courtnie Vaughn | 1442 Edward Ave. SE | 41-18-05-260-007 | $ 9,000.00 | $ 46,800.00 | $ 28,250.00 | $ 19,250.00 | $ 84,600.00 |
| Willie Dawson | 505 Lydia St. NE | 41-14-19-403-014 | $ 7,900.00 | $ 34,200.00 | $ 27,000.00 | $ 19,100.00 | $ 60,500.00 |
| Superior Real Estate Investment Company II | 142 Indiana Ave. NW 821 Lake Michigan Dr. NW | 41-13-26-277-004, 41-13-26-277-005 | $ 15,250.00 | $ 101,400.00 | $ 37,000.00 | $ 21,750.00 | $ 187,550.00 |
| Patricia Terpstra, Richard Terpstra, Power of Attorney | 436 Adams St. SE | 41-18-06-251-015 | $ 7,600.00 | $ 42,300.00 | $ 7,900.00 | $ 300.00 | $ 77,000.00 |
| Patricia Terpstra, Richard Terpstra, Power of Attorney | 840 Lafayette Ave. NE | 41-14-19-183-008 | $ 4,500.00 | $ 28,900.00 | $ 6,000.00 | $ 1,500.00 | $ 53,300.00 |
| Patricia Terpstra, Richard Terpstra, Power of Attorney | 4327 Byron Center Ave. SW | 41-17-21-477-022 | $ 8,500.00 | $ 40,800.00 | $ 30,750.00 | $ 22,250.00 | $ 73,100.00 |

Peter Avery, et al v Kent County, et al

Case No. 23- _____-CV

# EXHIBIT B

## To Plaintiffs' Complaint

Rafaeli, LLC v. Oakland County, 505 Mich. 429 (2020)

952 N.W.2d 434

KeyCite Yellow Flag - Negative Treatment
Not Followed as Dicta Charter Township of Pittsfield v. Washtenaw County
Treasurer, Mich.App., August 19, 2021

505 Mich. 429
Supreme Court of Michigan.

**RAFAELI, LLC,** and Andre
Ohanessian, Plaintiffs-Appellants,

v.

**OAKLANDCOUNTY** and Andrew
Meisner, Defendants-Appellees.

Docket No. 156849
|
Calendar No. 1
|
Argued November 7, 2019
|
Decided July 17, 2020

**Synopsis**

**Background:** Former property owners brought action against
county and its treasurer, alleging due-process and equal-
protection violations as well as unconstitutional taking by
selling their real properties in satisfaction of their tax debts
and retaining surplus proceeds from tax-foreclosure sale
of their properties. The Circuit Court, OaklandCounty,
Denise Langford Morris, J., 2015 WL 13859576, granted
summary disposition to county and treasurer, and denied
reconsideration, 2015 WL 13859578. Taxpayers appealed.
the Court of Appeals, Markey, J., 2017 WL 4803570,
affirmed. Taxpayers appealed.

**Holdings:** The Supreme Court, Zahra, J., held that:

[1] former owners did not "forfeit" all rights, titles, and
interests they had in their properties under the General
Property Tax Act (GPTA) by failing to pay their real-property
taxes;

[2] GPTA did not create new rights beyond those prescribed
in Michigan and United States Constitutions;

[3] nature of former owners' claim was taking without
just compensation, not deprivation of property without due
process of law;

[4] aggrieved property owners had cognizable, vested,
common law right to collect surplus proceeds from tax-
foreclosure sale of his or her property;

[5] amendments to GPTA did not abrogate aggrieved property
owners' cognizable, vested, common law right to collect
surplus proceeds from tax-foreclosure sale of his or her
property;

[6] government's retention of surplus proceeds from tax-
foreclosure sale was unconstitutional taking; and

[7] government could not rely on its taxing power to justify
retention of surplus proceeds from tax-foreclosure sale under
GPTA.

Reversed and remanded.

Viviano, J., filed concurring opinion.

**Procedural Posture(s):** On Appeal; Motion for Summary
Disposition; Motion for Reconsideration.

West Headnotes (49)

[1]     **Appeal and Error** ⟜ Constitutional law
        **Appeal and Error** ⟜ De novo review
        A circuit court's decision regarding a motion
        for summary disposition, as well as any
        constitutional issues, is reviewed de novo.

        3 Cases that cite this headnote

[2]     **Taxation** ⟜ Nature and form
        Under the General Property Tax Act (GPTA),
        "forfeiture" simply permits defendants to seek
        a judgment of foreclosure; forfeiture does not
        affect title, and it does not give the county
        treasurer, or the state if the state is the foreclosing
        governmental unit, any rights, titles, or interests
        to the forfeited property. Mich. Comp. Laws
        Ann. § 211.78(8)(b).

[3] **Taxation** ⟜ Effect of Failure to Pay

Former property owners did not "forfeit" all rights, titles, and interests they had in their properties under the General Property Tax Act (GPTA) by failing to pay their real-property taxes; former owners did not use their properties for illicit purposes or commit criminal offense by not paying their property taxes. Mich. Comp. Laws Ann. § 211.78(8)(b).

[4] **Constitutional Law** ⟜ Tax sales and proceedings thereon

**Taxation** ⟜ Proceedings, relief granted, and review

General Property Tax Act (GPTA) did not create new rights beyond those prescribed in Michigan and United States Constitutions, and therefore former property owners could not contest legitimacy of government's authority to foreclose on their properties for unpaid tax debts and they could not contest sale of their properties to third-party purchasers on due process grounds to extent government complied with due-process, since GPTA stated its intent to only comply with minimum requirements of due process. U.S. Const. Amend. 5; Mich. Const. art. 1, § 17.

1 Case that cites this headnote

[5] **Constitutional Law** ⟜ Tax sales and proceedings thereon

The United States and Michigan Constitutions dictate that before the government may take property for unpaid taxes, it must provide the property owner sufficient notice of the delinquency and foreclosure proceedings as well as an opportunity to contest those proceedings. U.S. Const. Amend. 5; Mich. Const. art. 1, § 17.

[6] **Constitutional Law** ⟜ Tax sales and proceedings thereon

**Taxation** ⟜ Review

**Taxation** ⟜ Proceedings, relief granted, and review

As long as the government complies with due-process considerations, property owners may not contest the legitimacy of the government's authority to foreclose on their properties for unpaid tax debts, and property owners may not contest the sale of their properties to third-party purchasers. U.S. Const. Amend. 5; Mich. Const. art. 1, § 17.

[7] **Eminent Domain** ⟜ Necessity of just or full compensation or indemnity

The remedy for a taking of private property is just compensation. U.S. Const. Amend. 5; Mich. Const. art. 10, § 2.

[8] **Civil Rights** ⟜ Judgment and relief in general

**Civil Rights** ⟜ Judgment and Relief in General

The remedy for being deprived of property without due process of law is the return of the property. U.S. Const. Amend. 14; Mich. Const. art. 1, § 17.

[9] **Constitutional Law** ⟜ Tax sales and proceedings thereon

**Eminent Domain** ⟜ Taxes, licenses, assessments, and users' fees in general

Nature of former property owners' claim was taking without just compensation, not deprivation of property without due process of law, where former owners alleged that compliance with General Property Tax Act (GPTA) notice provisions did not justify defendants' retention of surplus proceeds from tax sale and asked court to reverse decision of Court of Appeals and remand to circuit court for determination of just compensation. Mich. Const. art. 1, § 17; Mich. Const. art. 10, § 2.

3 Cases that cite this headnote

[10] **Civil Rights** ⟵ Judgment and Relief in General

Property owners can file a motion to set aside their judgment of foreclosure if the foreclosing governmental unit failed to comply with due process when providing notice to owners. Mich.

Const. art. 1, § 17; Mich. Comp. Laws Ann. § 211.78*l*.

2 Cases that cite this headnote

[11] **Eminent Domain** ⟵ Constitutional and statutory provisions

Michigan's Takings Clause affords property owners greater protection than its federal counterpart when it comes to the state's ability to take private property for a public use under the power of eminent domain. U.S. Const. Amend. 5; Mich. Const. art. 10, § 2.

2 Cases that cite this headnote

[12] **Eminent Domain** ⟵ Property and Rights Subject of Compensation

Aggrieved property owners had cognizable, vested, common law right, protected by Michigan's Takings Clause in inverse-condemnation action, to collect surplus proceeds from tax-foreclosure sale of his or her property, although General Property Tax Act (GPTA) did not recognize divested property owner's right to surplus proceeds. Mich. Const. art. 10, § 2; Mich. Comp. Laws Ann. § 211.78m(8)(h).

2 Cases that cite this headnote

[13] **Eminent Domain** ⟵ What Constitutes a Taking; Police and Other Powers Distinguished

**Eminent Domain** ⟵ Recovery of compensation

A "taking" for purposes of inverse condemnation means that the government has permanently deprived the property owner of any possession or use of the property without the commencement of formalized condemnation proceedings; when such a taking occurs, the property owner is

entitled to just compensation for the value of the property taken. U.S. Const. Amend. 5; Mich. Const. art. 10, § 2.

[14] **Eminent Domain** ⟵ What Constitutes a Taking; Police and Other Powers Distinguished

The government's seizure of real property is the clearest form of a taking requiring just compensation, but a taking can, and often does, encompass more than just the physical deprivation of real, tangible property; a "taking" also includes the government's interference with one's personal, intangible property. U.S. Const. Amend. 5; Mich. Const. art. 10, § 2.

1 Case that cites this headnote

[15] **Eminent Domain** ⟵ Personal property and rights therein

In order to assert a takings claim by the government's interference with one's personal, intangible property, a claimant must first establish a vested property right under state law. U.S. Const. Amend. 5; Mich. Const. art. 10, § 2.

2 Cases that cite this headnote

[16] **Eminent Domain** ⟵ Property and Rights Subject of Compensation

Because the Constitution protects rather than creates property interests, the existence of a property interest for the purpose of a takings claim is determined by reference to existing rules or understandings that stem from an independent source such as state law. U.S. Const. Amend. 5; Mich. Const. art. 10, § 2.

1 Case that cites this headnote

[17] **Eminent Domain** ⟵ Constitutional and statutory provisions

The primary objective of a court in interpreting the Michigan Takings Clause is to determine the text's original meaning to the ratifiers, the people, at the time of ratification; accordingly, a court must canvass the body of law so that it can ascertain the common understanding of

the Clause and the property rights protected thereunder. Mich. Const. art. 10, § 2.

2 Cases that cite this headnote

[18]  **Eminent Domain** ⟸ Conditions precedent to action; ripeness

A property owner does not have a federal Takings Clause claim when there is a statutory path to recover the surplus proceeds but the property owners fail to avail themselves of that procedure. U.S. Const. Amend. 5.

1 Case that cites this headnote

[19]  **Eminent Domain** ⟸ Taxes, licenses, assessments, and users' fees in general

The Takings Clause under the United States Constitution may afford former property owners a remedy when a tax-sale statute provides the divested property owner an interest in the surplus proceeds and the government does not honor that statutory interest. U.S. Const. Amend. 5.

3 Cases that cite this headnote

[20]  **Eminent Domain** ⟸ Extent of appropriation
**Taxation** ⟸ Quantity of land which may be sold

The fundamental principles that the government shall not collect more taxes than are owed, nor shall it take more property than is necessary to serve the public, protect taxpayers and property owners alike from government overreach.

[21]  **Taxation** ⟸ Surplus

A property owner has a recognized common-law property right to the surplus proceeds from a tax-foreclosure sale.

23 Cases that cite this headnote

[22]  **Taxation** ⟸ Surplus

A former property owner's claim for the surplus proceeds from a tax-foreclosure sale may be asserted through unjust enrichment.

7 Cases that cite this headnote

[23]  **Taxation** ⟸ Surplus

Michigan's common law recognizes a former property owner's property right to collect the surplus proceeds that are realized from the tax-foreclosure sale of property.

30 Cases that cite this headnote

[24]  **Taxation** ⟸ Surplus

A former property owner's property right to collect the surplus proceeds that are realized from the tax-foreclosure sale of property is "vested" such that the right is to remain free from unlawful governmental interference.

13 Cases that cite this headnote

[25]  **Eminent Domain** ⟸ Property and Rights Subject of Compensation

To constitute a vested right that is to remain free from unlawful governmental interference, for the purpose of a takings claim, the interest must be something more than such a mere expectation as may be based upon an anticipated continuance of the present general laws; the interest must have become a title, legal or equitable, to the present or future enjoyment of property. U.S. Const. Amend. 5; Mich. Const. art. 10, § 2.

1 Case that cites this headnote

[26]  **Taxation** ⟸ Surplus

The prohibitions against collecting excess taxes, selling more land than needed to collect such taxes, and taking more property than necessary to serve the public all underlie a property owner's right to collect the surplus proceeds that are realized from the tax-foreclosure sale of property.

[27]  **Property** ⟸ Ownership, Possession, and Incidents Thereof in General

**Property** ⟷ Acquisition, Transfer, and
Disposition of Property in General

Property rights range from a property owner's
right to use or enjoy the property, the right to eject
others from the property, and the right to dispose
of the property altogether.

1 Case that cites this headnote

[28]  **Eminent Domain** ⟷ What Constitutes a
Taking; Police and Other Powers Distinguished

Unlawful governmental interference with even
one aspect in the bundle of property rights, which
range from a property owner's right to use or
enjoy the property, the right to eject others from
the property, and the right to dispose of the
property altogether, constitutes a taking requiring
just compensation. U.S. Const. Amend. 5; Mich.
Const. art. 10, § 2.

1 Case that cites this headnote

[29]  **Taxation** ⟷ Surplus

The right to collect any surplus proceeds that
result from the sale of a person's property for
unpaid taxes is one stick in the owner's bundle of
rights, entitled to as much protection as any other
stick in that bundle.

[30]  **Eminent Domain** ⟷ Property and Rights
Subject of Compensation

Amendments to General Property Tax Act
(GPTA) did not abrogate aggrieved property
owners' cognizable, vested, common law right,
protected by Michigan's Takings Clause in
inverse-condemnation action, to collect surplus
proceeds from tax-foreclosure sale of his or her
property. Mich. Const. art. 10, § 2; [📖]Mich.
Comp. Laws Ann. § 211.78m(8)(h).

1 Case that cites this headnote

[31]  **Common Law** ⟷ Nature and authority in
general

The common law is but the accumulated
expressions of the various judicial tribunals in

their efforts to ascertain what is right and just; it
is dynamic and flexible, not static or fixed like
statutory law.

1 Case that cites this headnote

[32]  **Common Law** ⟷ Application and operation

The common law is incremental in adapting
to society's changing circumstances, developing
gradually to reflect policies, customs, norms, and
values.

1 Case that cites this headnote

[33]  **Statutes** ⟷ Statutory Alteration or
Abrogation of Common Law

The legislature may enact legislation that
abrogates or alters the common law.

2 Cases that cite this headnote

[34]  **Constitutional Law** ⟷ Relation to common
law

**Constitutional Law** ⟷ Relation to statutory
law

Both legislation and the common law are
secondary to the Constitution. Mich. Const. art.
3, § 7.

[35]  **Eminent Domain** ⟷ Taxes, licenses,
assessments, and users' fees in general

The Takings Clause protects a former owner's
property right to collect the surplus proceeds
following a tax-foreclosure sale; this right
existed at common law, was commonly
understood to exist in the common law before
ratification of the Constitution, and continues to
exist. Mich. Const. art. 10, § 2.

1 Case that cites this headnote

[36]  **Eminent Domain** ⟷ Constitutional and
statutory provisions

While the legislature typically is free to abrogate
the common law, it is powerless to override a

right protected by Michigan's Takings Clause. Mich. Const. art. 10, § 2.

3 Cases that cite this headnote

[37] **Eminent Domain** ⟶ Taxes, licenses, assessments, and users' fees in general

Although the legislature may not write the constitutionally protected vested property right to collect the surplus proceeds following a tax-foreclosure sale out of existence, legislation may require former property owners to avail themselves of certain procedural avenues to recover the surplus proceeds. Mich. Const. art. 10, § 2; Mich. Comp. Laws Ann. § 211.78(8)(b).

1 Case that cites this headnote

[38] **Taxation** ⟶ Sale of Land for Nonpayment of Tax

**Taxation** ⟶ Costs and fees

**Taxation** ⟶ Officers authorized to sell

**Taxation** ⟶ Fees and expenses of sale

A foreclosing governmental unit under the General Property Tax Act (GPTA) is entitled to seize properties to satisfy the unpaid delinquent real-property taxes as well as any interest, penalties, and fees associated with the foreclosure and sale of plaintiffs' properties, but the unit can only collect the amount plaintiffs owed and nothing more. Mich. Comp. Laws Ann. § 211.78m(8)(a).

3 Cases that cite this headnote

[39] **Eminent Domain** ⟶ Taxes, licenses, assessments, and users' fees in general

Although government was entitled to seize owners' properties under General Property Tax Act (GPTA) to satisfy unpaid delinquent real-property taxes, as well as any interest, penalties, and fees associated with foreclosure and sale of those properties, government's retention of surplus proceeds from tax-foreclosure sale was unconstitutional taking. Mich. Const. art. 10, § 2; Mich. Comp. Laws Ann. § 211.78m(8)(h).

3 Cases that cite this headnote

[40] **Taxation** ⟶ Surplus

Once the government forecloses on taxpayers' real properties, obtained title to those properties, and sold them to satisfy plaintiffs' unpaid taxes, interest, penalties, and fees related to the foreclosures, any surplus resulting from those sales belonged to the taxpayers; that is, after the sale proceeds are distributed in accordance with the order of priority under the General Property Tax Act (GPTA), any surplus that remains is the property of plaintiffs, and government is required to return that property to the taxpayers. Mich. Comp. Laws Ann. § 211.78m.

1 Case that cites this headnote

[41] **Taxation** ⟶ Surplus

In the same way that the foreclosure process does not eliminate the former property owner's interest in the personal property that sits on the foreclosed land, the vesting of fee simple title to the real property under the General Property Tax Act (GPTA) does not extinguish the former property owner's right to collect the surplus proceeds of the sale; this is a separate property right that survives the foreclosure process. Mich. Comp. Laws Ann. § 211.78m.

6 Cases that cite this headnote

[42] **Eminent Domain** ⟶ Taxes, licenses, assessments, and users' fees in general

**Eminent Domain** ⟶ When taking is complete; date of taking

While a takings claim is not compensable until the property taken under the General Property Tax Act (GPTA) is sold for an amount in excess of the tax debt, that lack of an immediate right to collect the surplus proceeds does not mean that there is no right to collect the surplus proceeds at all. Mich. Const. art. 10, § 2; Mich. Comp. Laws Ann. § 211.78m(8)(a).

Rafaeli, LLC v. Oakland County, 505 Mich. 429 (2020)
952 N.W.2d 434

[43]   **Eminent Domain** ⬦ Taxes, licenses, assessments, and users' fees in general

A former property owner has a right to collect the surplus proceeds from the tax-foreclosure sale under the General Property Tax Act (GPTA), that is, a former property owner has a compensable takings claim if and only if the tax-foreclosure sale produces a surplus; once the sale produces a surplus, the former owner may make a claim for the surplus proceeds, and this holds true even though the former owner no longer holds title to the property. Mich. Const. art. 10, § 2; Mich. Comp. Laws Ann. § 211.78m(8)(a).

13 Cases that cite this headnote

[44]   **Eminent Domain** ⬦ Taxes, licenses, assessments, and users' fees in general

Government could not rely on its taxing power to justify retention of surplus proceeds from tax-foreclosure sale under General Property Tax Act (GPTA), since government's ability to take taxpayers' properties was limited by what taxpayers actually owed as result of failing to pay their taxes and therefore any physical taking of property was arbitrary and disproportionate tax. Mich. Const. art. 10, § 2; Mich. Comp. Laws Ann. § 211.78m(8)(a).

[45]   **Municipal Corporations** ⬦ Power and Duty to Tax in General

**Taxation** ⬦ Power of legislature in general

The legislature has the inherent power to levy taxes, and cities and villages also have the authority to impose taxes for public purposes.

[46]   **Eminent Domain** ⬦ Taxes, licenses, assessments, and users' fees in general

Citizens may be held accountable for failing to pay property taxes by taking their properties in satisfaction of their tax debts, but the government may not seize property valued far in excess of the amount owed in unpaid taxes, penalties, interest, and fees and convert that surplus into a public benefit under the guise of tax collection because the purpose of taxation is to assess and collect taxes owed, not appropriate property in excess of what is owed. Mich. Const. art. 10, § 2.

1 Case that cites this headnote

[47]   **Eminent Domain** ⬦ Constitutional and statutory provisions

Michigan's Takings Clause was adopted for the protection of and security to the rights of the individual as against the government. Mich. Const. art. 10, § 2.

1 Case that cites this headnote

[48]   **Eminent Domain** ⬦ Necessity of just or full compensation or indemnity

When property was taken under General Property Tax Act (GPTA) to satisfy unpaid tax debt, just compensation under Takings Clause required foreclosing governmental unit to return any proceeds from tax-foreclosure sale in excess of delinquent taxes, interest, penalties, and fees reasonably related to foreclosure and sale of property, although just compensation did not require former owners to be awarded fair market value of their properties. Mich. Const. art. 10, § 2; Mich. Comp. Laws Ann. § 211.78m(8)(a).

10 Cases that cite this headnote

[49]   **Eminent Domain** ⬦ Value of land

As a general principle, just compensation under the Takings Clause is measured by the value of the property taken. Mich. Const. art. 10, § 2.

1 Case that cites this headnote

**West Codenotes**

**Recognized as Unconstitutional**
Mich. Comp. Laws Ann. § 211.78*l*

**Unconstitutional as Applied**

Rafaeli, LLC v. Oakland County, 505 Mich. 429 (2020)
952 N.W.2d 434

[□]Mich. Comp. Laws Ann. § 211.78m(8)(h)

**439 Oakland Circuit Court, Denise K. Langford-Morris, J.

## Attorneys and Law Firms

Fink & Fink, PLLC (by Andrew F. Fink III), The Law Offices of Aaron D. Cox, PLLC (by Aaron D. Cox), Mark K. Wasvary, PC (by Mark. K. Wasvary), Christina M. Martin, and Lawrence G. Salzman for plaintiffs.

Giarmarco, Mullins & Horton, PC (by William H. Horton), Bursch Law PLLC (by John J. Bursch), and Keith L. Lerminiaux and Joellen Shortley, Oakland County Corporate Counsel, for defendants.

Lewis, Reed & Allen, PC (by Ronald W. Ryan), Jaimie Cavanaugh, and Wesley Hottot for the Institute for Justice, Amici Curiae.

Lewis, Reed & Allen, PC (by Ronald W. Ryan), John C. Eastman, and Anthony T. Caso for the Claremont Institute's Center for Constitutional Jurisprudence, Amici Curiae.

Barnes & Thornburg LLP (by Tracy D. Knox and Aaron D. Lindstrom) for 2 Crooked Creek, LLC, Amici Curiae.

Dykema Gossett PLLC (by Steven C. Liedel, Theordore W. Seitz, and Erin A. Sedmak) for the Michigan Association of Counties, the Michigan Municipal League, and the Michigan Townships Association, Amici Curiae.

Daniel B. Kohrman and Matthew E. Gronda for the AARP and the AARP Foundation, Amici Curiae.

Bodman PLC (by Thomas J. Rheaume, Jr., and Amanda J. Frank), Robert Alt, and John J. Park for the Buckeye Institute for Public Policy Solutions, Amici Curiae.

Clark Hill PLC (by Charles A. Lawler) and Kevin T. Smith for the Michigan Association of County Treasurers, Amici Curiae.

Dana Nessel, Attorney General, Fadwa A. Hammoud, Solicitor General, and Matthew B. Hodges, Assistant Attorney General, for the Michigan Department of Treasury, Amici Curiae.

Outside Legal Counsel PLC (by Philip L. Ellison) for Donald Freed, Lynette Hathon, and Amy Jo Denkins, Amicus Curiae

BEFORE THE ENTIRE BENCH

## OPINION

Zahra, J.

**440 *437 Plaintiff Rafaeli, LLC, owed $8.41 in unpaid property taxes from 2011, which grew to $285.81 after interest, penalties, and fees. Oakland County and its treasurer, Andrew Meisner (collectively, defendants), foreclosed on Rafaeli's property for the delinquency, sold the property at public auction for $24,500, and retained all the sale proceeds in excess of the taxes, interest, penalties, and fees. Plaintiff Andre Ohanessian owed approximately $6,000 in unpaid taxes, interest, penalties, and fees from 2011. Like Rafaeli's property, defendants foreclosed on Ohanessian's property for the delinquency, sold his property at auction for $82,000, and retained all the proceeds in excess of Ohanessian's tax debt. The issue in this case is whether defendants have committed an unconstitutional taking by retaining the surplus proceeds from the tax-foreclosure sale of Rafaeli's and Ohanessian's (collectively, plaintiffs) properties that exceed the amount plaintiffs owed in unpaid delinquent taxes, interest, penalties, and **441 fees under the General Property Tax Act (GPTA).[1] We hold that defendants' retention of those surplus proceeds is an unconstitutional taking without just compensation under Article 10, § 2 of our 1963 Constitution. Accordingly, we reverse the judgment of the Court of Appeals and remand this case to the Oakland Circuit Court for proceedings consistent with this opinion.

### *438 I. FACTS AND PROCEDURAL HISTORY

Rafaeli purchased a rental property in Southfield for $60,000 on August 15, 2011, but failed to pay the 2011 taxes due on the property in the amount of $536.24.[2] Defendants mailed to Rafaeli notice of the delinquency on June 11, 2012. Rafaeli sent payment to defendants on August 30, 2012, yet this payment was insufficient to cover the full amount of the tax delinquency. Defendants mailed a second notice of the delinquency to Rafaeli on September 3, 2012, and Rafaeli sent another payment to defendants on January 14, 2013; however, even after Rafaeli's second payment, a deficiency of $8.41, plus $2.26 in interest, penalties, and fees remained on Rafaeli's property. On February 1, 2013, defendants sent Rafaeli a third notice of delinquency. This delinquency was never paid, and as a result, on March 1, 2013, Rafaeli's

property was forfeited in the amount of the unpaid taxes, interest, penalties, and fees.

On May 16, 2013, defendants filed a petition seeking to foreclose all tax-delinquent properties that were forfeited for unpaid 2011 real-property taxes, including Rafaeli's property. On February 26, 2014, a foreclosure hearing was held in the Oakland Circuit Court. Rafaeli did not appear. After the hearing, the court entered a judgment of foreclosure that included Rafaeli's property. At the time of the foreclosure, the delinquency had grown to $285.81 because of penalties, interest, and fees. Rafaeli failed to timely redeem the property by March 31, 2014, resulting in the transfer to defendants of fee simple title to Rafaeli's property. *439 On August 19, 2014, defendants sold Rafaeli's property at auction to a third party for $24,500. Defendants retained all the surplus proceeds that exceeded the $285.81 debt Rafaeli owed to defendants.

Ohanessian purchased a 2.7-acre property located in the city of Orchard Lake Village in 2004. Ohanessian paid $2,510.05 to defendants to satisfy his 2010 delinquent property taxes but failed to pay his 2011 property taxes. [3] After Ohanessian's property was forfeited for the amount of the unpaid taxes, interest, penalties, and fees, defendants added his property to the petition for foreclosure for unpaid 2011 real-property taxes. The same judgment of foreclosure entered on February 26, 2014, that included Rafaeli's property also included Ohanessian's property. At the time of the foreclosure, Ohanessian owed approximately **442 $6,000 in unpaid taxes, interest, penalties, and fees. Ohanessian failed to redeem his property by March 31, 2014, and defendants obtained fee simple title to his property. On September 26, 2014, defendants sold Ohanessian's property at auction to a third party for $82,000. Defendants retained all the surplus proceeds exceeding Ohanessian's tax debts.

Plaintiffs filed this action against defendants in the Oakland Circuit Court, alleging due-process and equal-protection violations as well as an unconstitutional *440 taking. [4] As relevant to this case, plaintiffs specifically alleged that defendants, by selling plaintiffs' real properties in satisfaction of their tax debts and retaining the surplus proceeds from the tax-foreclosure sale of their properties, had taken their properties without just compensation in violation of the Takings Clauses of the United States and Michigan Constitutions.

The circuit court granted summary disposition to defendants, finding that defendants did not "take" plaintiffs' properties because plaintiffs forfeited all interests they held in their properties when they failed to pay the taxes due on the properties. [5] The court determined that property properly forfeited under the GPTA and in accordance with due process is not a "taking" barred by either the United States or Michigan Constitution. Because the GPTA properly divested plaintiffs of all interests they had in their properties, the court concluded that plaintiffs did not have a property interest in the surplus proceeds generated from the tax-foreclosure sale of their properties. [6] Plaintiffs appealed in the Court of Appeals. The Court *441 of Appeals affirmed the circuit court and rejected plaintiffs' argument that the GPTA's "scheme" allows for unconstitutional takings. [7] Drawing on precedent from the United States Supreme Court regarding civil-asset forfeiture resulting from criminal activity, the Court of Appeals held that defendants acquired their interest in plaintiffs' properties "by way of a statutory scheme that did not violate due process" and thus defendants were not required to compensate plaintiffs for property that was lawfully obtained. [8]

**443 Plaintiffs sought leave to appeal in this Court, raising the takings issue as the sole issue on appeal. We granted plaintiffs' application, ordering the parties to address whether defendants violated the Takings Clause of the United States Constitution, the Michigan Constitution, or both by retaining the proceeds from the sale of tax-foreclosed property that exceeded the amount of the taxes, penalties, interest, and fees owed on the property. [9]

## II. OVERVIEW OF THE GPTA

The GPTA permits the recovery of unpaid real-property taxes, penalties, interest, and fees through the foreclosure and sale of the property on which there *442 is a tax delinquency. Under the current process, tax-delinquent properties are forfeited to the county treasurers; foreclosed on after a judicial foreclosure hearing; and, if not timely redeemed, sold at a public auction. [10] Counties may elect to serve as the "foreclosing governmental unit"; otherwise, the state will do so. [11]

Real-property taxes are assessed and collected first by the city, township, or village treasurer where the *443 property is

located.[12] When property taxes are not satisfied and become delinquent, collection is turned over to the foreclosing governmental unit.[13] If the county elects to serve as the foreclosing governmental unit, it may create a "delinquent tax revolving fund" that funds local municipalities for the unpaid delinquent taxes.[14] The county treasurer **444 then attempts to collect the delinquent taxes.[15]

On March 1 of each tax year, taxes due in the immediately preceding year that remain unpaid are returned to the county treasurer as "delinquent."[16] Notice of the delinquency, which must explain the effect of failing to pay the tax delinquency and the possibility of foreclosure, must be afforded to property *444 owners throughout the next 12 months.[17] On March 1 of the year following delinquency, properties with delinquent taxes are "forfeited" to the county treasurer for the amount of the tax delinquency, as well as any interest, penalties, and fees associated with the delinquency.[18] Notably, the term "forfeiture," as used in the GPTA, means only that a foreclosing governmental unit may seek a judgment of foreclosure if the property is not redeemed; it does not affect title.[19]

Once forfeiture occurs, the county treasurer must record a certificate of forfeiture with the county register of deeds, placing all parties with an interest in the property on notice that the property has been forfeited to the county treasurer, that the property has not been redeemed, and "that absolute title to the property will vest in the county treasurer on the March 31 immediately succeeding the entry of a judgment foreclosing the property ...."[20] Forfeited property may be redeemed at any time on or before that March 31 date if the total amount of unpaid delinquent taxes, interest, penalties, and fees are paid to the county treasurer.[21] Meanwhile, foreclosing governmental units must file a petition for foreclosure with the circuit court that presides over where the forfeited *445 property is located no later than the 15th day of June following the forfeiture.[22] The petition must "seek a judgment in favor of the foreclosing governmental unit for the forfeited unpaid delinquent taxes, interest, penalties, and fees listed against each parcel of property ... [and] shall request that a judgment be entered vesting absolute title to each parcel of property in the foreclosing governmental unit, **445 without right of redemption."[23]

A judicial foreclosure hearing must be held in the circuit court within 30 days of March 1 of the year after the petition for foreclosure is filed.[24] After the judicial foreclosure hearing, the judgment of foreclosure must be entered by March 30, with an effective date of March 31.[25] Unless the delinquent taxes, interest, penalties, and fees are paid on or before March 31, fee simple title to the property vests absolutely in the foreclosing governmental unit without any further redemption rights available to the delinquent taxpayer.[26] Thereafter, the foreclosing governmental unit's title to the property is not subject to any recorded or unrecorded lien.[27]

*446 After foreclosure, and assuming the state, city, village, township, or county where the property is located does not purchase the property, the GPTA provides for one or more auction sales beginning on the third Tuesday in July immediately succeeding the entry of the judgment of foreclosure.[28] Once sold, the foreclosing governmental unit deposits the sale proceeds into an account designated as the "delinquent tax property sales proceeds for the year [the taxes became delinquent]" (hereinafter, the account).[29]

Importantly, the account is comprised of the proceeds of all sales for that year, such that the proceeds of a single sale are commingled with the proceeds of all the other sales.[30] The foreclosing governmental unit then distributes the proceeds in the account in a specific order of priority. The first priority is to reimburse the delinquent tax revolving fund for the full amount of unpaid taxes, interest, and fees owed on the *447 property.[31] This is followed by the annual costs incurred as a result of conducting foreclosure sales and general **446 overhead in conducting the foreclosure proceedings for the year.[32] The statutory scheme for reimbursement is quite exhaustive and even includes costs for maintaining property foreclosed under the GPTA, defending title actions, and administering the foreclosure and the disposition of forfeited property for delinquent taxes.[33]

The parties acknowledge that sale proceeds are often insufficient to cover the full amount of the delinquent taxes, interest, penalties, and fees related to the foreclosure and sale of the property. But when there are excess proceeds from individual sales, such as the sale of plaintiffs' properties in this case, those proceeds are used to subsidize the costs for *all* foreclosure proceedings and sales for the year of the tax delinquency, as well as any years prior or subsequent to the delinquency.[34] Then, after the required statutory

Rafaeli, LLC v. Oakland County, 505 Mich. 429 (2020)

952 N.W.2d 434

disbursements are made, surplus proceeds may be transferred to the county general fund in cases in which the county is the foreclosing governmental unit. [35] Of particular importance here, the GPTA does not provide for any disbursement of the surplus proceeds to the former property owner, nor does it provide former owners a right to make a claim for these surplus proceeds. *448 Michigan is one of nine states with a statutory scheme that requires the foreclosing governmental unit to disperse the surplus proceeds to someone other than the former owner. [36] It is under this framework that we review plaintiffs' takings claim.

### III. STANDARD OF REVIEW

[1] This Court reviews a circuit court's decision regarding a motion for summary disposition, as well as any constitutional issues, de novo. [37]

### IV. ANALYSIS

### A. "FORFEITURE" UNDER THE GPTA AND CIVIL-ASSET FORFEITURE

Before turning to plaintiffs' takings claim, we first address why the trial court's reliance on the term "forfeiture" in the GPTA was incorrect and why the panel majority erred by relying on *Bennis v. Michigan*, a case involving civil-asset forfeiture, to conclude that no taking occurred in this case.

[2] [3] First, the GPTA makes clear that "forfeiture" simply permits defendants to seek a judgment of foreclosure. [38] *449 Forfeiture does not affect title, nor does **447 it give the county treasurer (or the state if the state is the foreclosing governmental unit) any rights, titles, or interests to the forfeited property. Therefore, we reject the premise that plaintiffs "forfeited" all rights, titles, and interests they had in their properties by failing to pay their real-property taxes.

Second, *Bennis* is distinguishable because the purpose of civil-asset forfeiture is different than the purpose of the GPTA provisions at issue here. *Bennis* recognized that civil-asset forfeiture "serves, at least in part, to punish the owner" of property. [39] But the GPTA is not punitive in nature.

Its aim is to encourage the timely payment of property taxes and to return tax-delinquent properties to their tax-generating status, not necessarily to punish property owners for failing to pay their property taxes. [40] *Bennis* also recognized that civil-asset forfeiture works as a deterrent, preventing property tainted with criminality from being further used for illicit purposes. [41] To this end, the Supreme Court in *Bennis* stated that "[t]he government may not be required to compensate an owner for property which it has already lawfully acquired under *450 the exercise of governmental authority other than the power of eminent domain." [42] We conclude that *Bennis* is distinguishable and provides us little guidance as it relates to plaintiffs' takings claim. The Court's holding in *Bennis* focused narrowly on forfeited property that was used as an instrumentality for criminal activity and the government's interest in deterring illegal activity. [43] In this case, plaintiffs did not use their properties for illicit purposes. They simply failed to pay their property taxes, which is not a criminal offense. [44] Accordingly, we conclude **448 that the Court of Appeals improperly conflated the meaning of "forfeiture" in an unrelated area of law with the meaning of "forfeiture" as expressly described under the GPTA.

### B. DUE PROCESS

[4] [5] [6] We also reject defendants' argument that no taking occurred in this case because plaintiffs were afforded *451 the minimal protections of due process. The United States and Michigan Constitutions dictate that before the government may take property for unpaid taxes, it must provide the property owner sufficient notice of the delinquency and foreclosure proceedings as well as an opportunity to contest those proceedings. [45] To this end, the GPTA explicitly states its intent to comply with minimum requirements of due process and not create new rights beyond those prescribed in the Constitutions of our nation or this state. [46] As long as defendants comply with these due-process considerations, plaintiffs may not contest the legitimacy of defendants' authority to foreclose on their properties for unpaid tax debts, nor may plaintiffs contest the sale of their properties to third-party purchasers. [47]

A claim of an unconstitutional taking, however, is distinct from a claim of property deprivation without due process of

Rafaeli, LLC v. Oakland County, 505 Mich. 429 (2020)

952 N.W.2d 434

law.[48] In Lingle v. Chevron U.S.A. Inc., the *452 United States Supreme Court discussed the difference between these two constitutional clauses:

> The [Takings] Clause expressly requires compensation where government takes private property for public use. It does not bar government from interfering with property rights, but rather requires compensation in the event of otherwise proper interference amounting to a taking. Conversely, if a government action is found to be impermissible—for instance because it ... is so arbitrary as to violate due process—that is the end of the inquiry. No amount of compensation can authorize such action.[49]

[7] [8] [9] [10] As Lingle suggests, each constitutional provision protects property owners against specific government action, offering different remedies for distinct constitutional violations. The remedy for a taking of private property is just compensation, **449 while the remedy for being deprived of property without due process of law is the return of the property.[50] Notably, plaintiffs do not dispute the legitimacy of defendants' authority to foreclose *453 on their properties, nor do plaintiffs contest the adequacy of defendants' efforts to notify plaintiffs of the tax delinquency, forfeiture, and foreclosure. Instead, plaintiffs challenge defendants' retention of the surplus proceeds as an unconstitutional taking. Plaintiffs ask this Court to reverse the decision of the Court of Appeals and remand to the circuit court for a determination of just compensation. Plaintiffs' request for a determination of just compensation demonstrates that the nature of their claim is a taking without just compensation, not a deprivation of property without due process of law. Therefore, there is no legal basis to conclude that defendants' compliance with the GPTA's notice provisions justifies defendants' retention of the surplus proceeds.

## C. OVERVIEW OF TAKINGS JURISPRUDENCE AND PLAINTIFFS' TAKINGS CLAIM

The Fifth Amendment of the United States Constitution, as applied to the states through the Fourteenth Amendment, provides, in relevant part: "[N]or shall private property be taken for public use, without just compensation."[51]

Comparatively, Michigan's Takings Clause provides, in relevant part:

> Private property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law. If private property consisting of an individual's principal residence is taken *454 for public use, the amount of compensation made and determined for that taking shall be not less than 125% of that property's fair market value, in addition to any other reimbursement allowed by law....
>
> "Public use" does not include the taking of private property for transfer to a private entity for the purpose of economic development or enhancement of tax revenues. Private property otherwise may be taken for reasons of public use as that term is understood on the effective date of the amendment to this constitution that added this paragraph.[52]

[11] While we draw on authority discussing and interpreting both clauses, we must keep in mind that Michigan's Takings Clause has been interpreted to afford property owners greater protection than its federal counterpart when it comes to **450 the state's ability to take private property for a public use under the power of eminent domain.[53]

[12] [13] [14] Plaintiffs, as the aggrieved property owners, have filed this inverse-condemnation action alleging that defendants have taken plaintiffs' properties without just compensation. A "taking" for purposes of inverse condemnation means that the government has permanently deprived the property owner of any possession or use of the property without the commencement of formalized condemnation proceedings.[54] When such a *455 taking occurs, the property owner is entitled to just compensation for the value of the property taken.[55] The government's seizure of real property is the clearest form of a taking requiring just compensation.[56] But a taking can, and often does, encompass

more than just the physical deprivation of real, tangible property; it also includes the government's interference with one's personal, intangible property. [57]

[15] [16] In order to assert a takings claim of this nature, a claimant must first establish a vested property right under state law. [58] "Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law." [59] Plaintiffs allege *456 that they have a cognizable, vested property right to the surplus proceeds that result from the tax-foreclosure sale of their properties under Michigan law that is protected by Michigan's Takings Clause.

[17] Our "primary objective" in interpreting a constitutional provision such as **451 our state's Takings Clause is "to determine the text's original meaning to the ratifiers, the people, at the time of ratification." [60] This Court has held that "the whole of art 10, § 2 has a technical meaning that must be discerned by examining the 'purpose and history' of the power of eminent domain." [61] Accordingly, we must canvass the body of law so that we may ascertain the "common understanding" of Article 10, § 2 and the property rights protected thereunder. [62]

### i. A HISTORICAL REVIEW OF CLAIMS FOR SURPLUS PROCEEDS FOLLOWING A TAX-FORECLOSURE SALE

This is not the first time a former property owner has made a claim for the surplus proceeds that result from the tax-foreclosure sale of the owner's property. In People ex rel. Seaman v. Hammond, the plaintiff, referred to as the "relator," purchased land in October 1840 that was sold to satisfy the 1837 taxes. [63] The relator received the county treasurer's certificate of sale, which, according to statute, entitled the "purchaser" to the deed to the land within two years of the sale (October 1842) unless the land was redeemed. Before the relator became entitled to the deed, however, the land was sold again in August 1842 to satisfy *457 the 1838 taxes, this time producing a surplus. According to the statute, the surplus was to be deposited in the state treasury to the credit of the "owner or claimant" of the land. After the redemption period expired for the first sale, the relator presented his deed for the land and demanded the surplus proceeds from the second sale,

but he was refused. This Court held that the relator, as the purchaser of the land, was not entitled to receive the surplus proceeds because, under the statute, he was not the owner or claimant of the land at the time of the sale, explaining, in relevant part:

> In that statute, whenever mention is made of the person who buys land at a tax sale, he is denominated the purchaser, and no title whatever to the land sold, vests in him, until, at the expiration of two years, he receives the treasurer's deed, "which conveyance," says the statute, "shall vest in the person who receives it, an absolute estate in fee simple." Prior to that conveyance, he has only a lien upon the land for the repayment of the amount of the tax paid, with twenty per cent interest; he has no right to interfere with the possession of the owner; he cannot enter upon the land for any purpose whatever, nor can he control the rents and profits.
>
> * * *
>
> It is perfectly clear that the individual who has the legal title to the land at the time of the tax sale, is the owner, entitled, under the statute, to the surplus money, if any there be. [64]

Thirty-seven years later, the United States Supreme Court, in United States v. Taylor, addressed whether a federal statute, which permitted the federal government to conduct tax sales to recover delinquent federal *458 tax debts, gave property owners a right to claim the surplus proceeds that resulted from the tax sales. [65] **452 The Court in Taylor concluded that the statute allowed for the recovery of the surplus proceeds. Three years later, the Court followed Taylor in United States v. Lawton. [66] In Lawton, the appellee's property was seized for a tax delinquency of $88, which grew to $170.50 after interest, penalties, and costs. The board of tax commissioners bought the land on behalf of the United States in satisfaction of the appellee's tax debt. The property was "struck off" for $1,100, leaving a total of $929.50 in excess of the tax debt. The tax debtor sought the surplus but was refused. The Court held that the tax debtor was entitled to the surplus proceeds, stating:

> The land in the present case having been "struck off for" and "bid in" for

the United States at the sum of $1,100, we are of [the] opinion that the surplus of that sum, beyond the $170.50 tax, penalty, interest, and costs, must be regarded as being in the treasury of the United States, under the provisions of section 36 of the act of 1861, for the use of the owner, in like manner as if it were the surplus of purchase money received by the United States from a third person on a sale of the land to such person for the non-payment of the tax. It was unnecessary to go through any form of paying money out of the treasury to any officer and then paying it in again to be held for the owner of the land. But, so far as such owner is concerned, the surplus money is set aside as his as fully as if it had come from a third person. If a third person had bid $1,099 in this case, there would have been a surplus of $928.50 paid into the treasury and held for the owner. It can make no difference that the United States acquired the property by bidding *459 one dollar more. *To withhold the surplus from the owner would be to violate the fifth amendment to the constitution,* and deprive him of his property without due process of law *or take his property for public use without just compensation.* If he affirms the propriety of selling or taking more than enough of his land to pay the tax and penalty and interest and costs, and applies for the surplus money, he must receive at least that. [ 67 ]

The Supreme Court later clarified the holding of *Lawton* in *Nelson v. City of New York.* [68] In *Nelson,* the city of New York foreclosed on properties for water charges that went unpaid for four years. As in *Lawton,* the delinquencies were far lower than the value of the properties, yet the city kept the surplus proceeds after the properties were sold. [69] The property owners challenged the city's retention

of these surplus proceeds under the city's tax-lien foreclosure statute. The Court concluded that it was undisputed that the statutory notice provisions were complied with and that the application of the statute did not deprive the plaintiffs of procedural due process. [70] The Court then turned to **453 and rejected the plaintiffs' takings claim. The Court explained that the plaintiffs' reliance on *Lawton* was inappropriate because the takings claim asserted in *460 *Lawton* was premised on a statutory right to the proceeds. The statute in *Lawton required* that the surplus proceeds be paid to the former property owner, thus rendering the government's failure to return those surplus proceeds an unconstitutional taking. The statute in *Nelson,* in contrast, did not require the surplus proceeds to be paid back to the property owner. Still, the city's statute provided a property owner a path to obtain the surplus proceeds from the sale. Specifically, the statute permitted a property owner to file a timely answer in the foreclosure proceeding asserting an interest in the property that exceeded the tax debt. Upon proof of the owner's allegation, a separate sale would be directed so that the owner could receive the surplus. [71] Because the plaintiffs failed to avail themselves of this opportunity, the Court concluded that they were not entitled to relief. The Court explained:

> What the City of New York has done is to foreclose real property for charges four years delinquent and, *in the absence of timely action* to redeem or *to recovery any surplus,* retain the property *or the entire proceeds of its sale.* We hold that nothing in the Federal Constitution prevents this where the record shows adequate steps were taken to notify the owners of the charges due and the foreclosure proceedings. [ 72 ]

[18] [19] Significantly, *Seaman,* *Lawton,* and *Nelson* all address a former property owner's *statutory* right to recover the surplus proceeds. *Seaman* recognized that the owner or claimant of the land at the time of the tax-foreclosure sale had a statutory right to recover the surplus.

Rafaeli, LLC v. Oakland County, 505 Mich. 429 (2020)

952 N.W.2d 434

Consistent with ⊞*Seaman,* ⊞*Lawton* not only recognized this statutory right but also made it clear \*461 that a Takings Clause violation will arise when a tax-sale statute grants a former owner an independent property interest in the surplus proceeds and the government fails to return that surplus.

⊞*Nelson,* on the other hand, informs us that no federal Takings Clause claim will exist when there is a statutory path to recover the surplus proceeds but the property owners fail to avail themselves of that procedure. Read together, ⊞*Lawton* and ⊞*Nelson* establish that the Takings Clause under the United States Constitution may afford former property owners a remedy when a tax-sale statute provides the divested property owner an interest in the surplus proceeds and the government does not honor that statutory interest.

What ⊞*Seaman,* ⊞*Lawton,* and ⊞*Nelson* do not tell us, however, is what occurs when the statutes governing foreclosure make no mention of, or expressly preclude, a divested property owner's right to the surplus proceeds, but the divested property owner establishes a property right to the surplus proceeds through some other legal source, such as the common law. [73] In that instance, the failure to provide the divested property owner an avenue for recovering the surplus proceeds would produce an identical \*\*454 result to ⊞*Lawton*: "Property to which an individual is legally entitled has been taken without recourse." [74] Michigan's statutory scheme under the GPTA does not recognize a former property owner's \*462 statutory right to collect these surplus proceeds. [75] Therefore, we must determine whether plaintiffs have a vested property right to these surplus proceeds through some other legal source, such as the common law.

### 2. VESTED PROPERTY RIGHTS UNDER THE COMMON LAW

Like the founders of our nation, Michigan has historically held property rights in the highest regard. Former Michigan Supreme Court Justice Thomas M. Cooley, one of our nation's preeminent jurists and learned scholars, wrote that the "right to private property is a sacred right; ... it was the old fundamental law, springing from the original frame and constitution of the realm." [76]

[P]roperty ... is recognized as such by the law, and nothing else is or can be. Property and law are born and must die together. Before the laws, there was no property; take away the laws, all property ceases. [ 77 ]

Drawing on Sir William Blackstone, Justice Cooley further recognized that the Magna Carta "guaranteed" the protection of private property against government overreach. [78] Just as the Magna Carta guaranteed property owners due process of law, so too did the sacred text limit the King's ability to take his subject's property, real or personal, under principles of eminent \*463 domain. [79] Thus, it is without surprise that private-property rights have been protected from unlawful government takings in every version of this state's Constitution. [80]

"This state's common law is adopted from England, and to identify such law this Court may consider original English cases and authorities." [81] Our review of English common law supports the notion that an owner of real or personal property has \*\*455 a right to any surplus proceeds that remain after property is sold to satisfy a tax debt. Just as the Magna Carta protected property owners from uncompensated takings, it also recognized that tax collectors could only seize property to satisfy the value of the debt payable to the Crown, leaving the property owner with the excess. [82] In fact, \*464 although the "mode of collecting the land tax in England was by distress," it was a well-recognized principle that any excess property sold to satisfy a tax debt would be paid back to the owner. [83] Further, Blackstone explained that in the context of bailments, whenever the government seized property for delinquent taxes, it did so subject to "an implied contract in law" to either return the property if the tax debt was paid or "to render back the overplus" if the property was sold to satisfy the delinquent taxes. [84]

The right to collect the surplus proceeds was also firmly established in the early years of Michigan's statehood. In his treatise on the Law of Taxation, Justice Cooley discusses the various methods that states used to save the surplus proceeds for the former owner when that owner's land was sold for

unpaid taxes. [85]  The first of these methods was to sell the distressed land for payment of delinquent taxes, and if the accepted bid exceeded the delinquency, the surplus would be deposited with the local treasury "for the benefit of the party, who shall show his right." [86]  This is precisely what occurred in 🔖 *Seaman*. While 🔖 *Seaman* *465 was resolved on then-existing statutory authority, this Court's discussion regarding a property owner's right to collect surplus proceeds is valuable in defining the nature and scope of that right:

> The surplus money produced by the tax sale, is the property of the person who has the legal title to the land at the time of the sale, and the moment the amount is ascertained and passed to his credit in the books of the treasurer, it is as absolutely his as though it were in his own keeping; and the right is personal—as unqualifiedly so as the ownership of any chattel; and although the surplus spoken of is produced by the sale of **456 land, yet the right to receive and control it, no more follows the title to the land, than does the ownership of the cattle and farming utensils that a man may happen to have on his farm when it is sold for taxes, and the purchaser may, with as much propriety, claim a right to the latter as the former. [ 87 ]

Notably, at the time 🔖 *Seaman* was decided, a property owner's right to redeem his property continued after the foreclosure sale. That is, it was commonly understood that the delinquent taxpayer would continue to be the legal owner of the property at the time of the foreclosure sale and thus would be entitled to any surplus proceeds produced from the sale as the "owner or claimant" of the land. This is vastly different from the current version of the GPTA, in which a property owner's interest in the property is extinguished well before the tax-foreclosure sale. Thus, a fair reading of 🔖 *Seaman* demonstrates that in the early years of this state, it was commonly understood that the delinquent taxpayer, not the foreclosing entity, continued to own *466 the land at the

time of the tax-foreclosure sale and would have been entitled to any surplus, which no more followed title to the land than the former owner's other personal property.

At the same time that it was common for any surplus proceeds to be returned to the former property owner, it was also generally understood that the government could only collect those taxes actually owed and nothing more. Justice Cooley explained that excessive tax levies were "beyond the jurisdiction of the officers" charged with collecting taxes and that even *de minimis* amounts in excess of the taxes owed were impermissible. [88]  This Court recognized a similar principle in 1867, stating that "[n]o law of the land authorizes the sale of property for any amount in excess of the tax it is legally called upon to bear." [89]  Indeed, any sale of property for unpaid taxes that was in excess of the taxes owed was often rendered voidable at the option of the landowner. [90]  Rather than selling all of a person's land and risk the sale being voided, officers charged with selling land for unpaid taxes often only sold that portion of the land that was needed to satisfy the tax debt. [91]  That is, early in Michigan's statehood, it was commonly understood that the government could not collect more in *467 taxes than what was owed, nor could it sell more land than necessary to collect unpaid taxes.

Further, in the context of eminent domain, it was axiomatic that the government shall take no more property than necessary for the particular public use for which the taking was done. As Justice Cooley stated:

> The taking of property must always be limited to the necessity of the case, and consequently no more can be appropriated in any instance than the proper tribunal shall adjudge to be **457 needed for the particular use for which the appropriation is made. When a part only of a man's premises is needed by the public, the necessity for the appropriation of that part will not justify the taking of the whole, even though compensation be made therefor. The moment the appropriation goes beyond the necessity of the case, it ceases to be justified on the principles

which underlie the right of eminent domain.[92]

This Court has consistently recognized this constitutional precept. Throughout this state's history, this Court has held that the government's takings power is limited to only that property which is necessary to serve the public.[93]

*468 [20] Accordingly, these fundamental principles—that the government shall not collect more taxes than are owed, nor shall it take more property than is necessary to serve the public—protect taxpayers and property owners alike from government overreach. These principles have remained a staple in this state's jurisprudence well after the most recent ratification of our Constitution in 1963.[94]

A property owner's right to collect the surplus proceeds from the tax-foreclosure sale of his or her property has also withstood the most recent ratification of our Constitution, as exemplified by our decision in *Dean v. Dep't of Natural Resources*, which recognized a right to collect those proceeds under the common-law claim of unjust enrichment.[95] In *Dean*, the plaintiff-property owner failed to pay her property taxes for both the city of Flint and Genesee County, in the amount of $230.68 *469 and $146.90, respectively. After the plaintiff failed to appear at the foreclosure **458 hearing, the court issued a judgment authorizing the sale of the plaintiff's property at a tax sale and stating that if the property was sold to the state, the state's title would become absolute unless the plaintiff timely redeemed the property.[96] The state successfully bid on the plaintiff's property, starting the one-year redemption period for the plaintiff. During the redemption period, the plaintiff paid her delinquent city-property taxes in full but mistakenly failed to pay her delinquent county-property taxes. After she failed to timely redeem her property during the redemption period, the State Treasurer deeded the plaintiff's property to the state, which received absolute title to the property and then sold it to a private investor for $10,000. The plaintiff filed an action against the state, alleging, in relevant part, that the state had been unjustly enriched by retaining the $10,000 following the sale of her property. The circuit court granted summary disposition to the defendant, but this Court reversed, holding that the plaintiff could bring her suit for unjust enrichment:

> In fact, the events out of which plaintiff's claim of unjust enrichment arises occurred subsequent to the default judgment entered by the Genesee County Circuit Court: the alleged good-faith attempt at redemption, the running of the redemption period after this attempt with plaintiff under the impression that she had in fact redeemed her home, the loss of her home, and the sale of the property by the state for a profit of close to $10,000.[97]

[21] [22] *Dean* stands for more than just a recognition of the plaintiff's right to bring a claim under unjust enrichment *470 for the surplus proceeds. Inherent in *Dean*'s holding is Michigan's protection under our common law of a property owner's right to collect the surplus proceeds that result from a tax-foreclosure sale. A viable claim for unjust enrichment requires the complaining party to show that the other party retained a *benefit* from the complaining party.[98] In concluding that the plaintiff in *Dean* stated an actionable claim for unjust enrichment, this Court did not rely on any statutory right that the plaintiff had to collect the surplus proceeds. As is the case here, title to the plaintiff's property in *Dean* had already vested with the state. Without a statutory right, the plaintiff must have had a common-law right to these surplus proceeds. Otherwise, her claim of unjust enrichment would not be actionable because it could not have been said that the state retained a *benefit* at her expense. In sum, *Dean* supports the proposition that a property owner has a recognized common-law property right to the surplus proceeds from a tax-foreclosure sale.[99]

**459 [23] [24] [25] [26] [27] [28] [29] We conclude that our state's common law recognizes a former property owner's property right to collect the surplus proceeds that are realized from the tax-foreclosure sale of property. Having originated as far back as the Magna Carta, having ingratiated itself into *471 English common law, and having been recognized both early in our state's jurisprudence and as late as our decision in *Dean* in 1976, a property owner's right to collect the surplus proceeds from the tax-foreclosure sale of

Rafaeli, LLC v. Oakland County, 505 Mich. 429 (2020)
952 N.W.2d 434

his or her property has deep roots in Michigan common law. We also recognize this right to be "vested" such that the right is to remain free from unlawful governmental interference. "To constitute a vested right, the interest must be something more than such a mere expectation as may be based upon an anticipated continuance of the present general laws; it must have become a title, legal or equitable, to the present or future enjoyment of property ...."[100] As demonstrated by the discussion earlier, the right to collect these proceeds was beyond a mere expectancy or claim of entitlement. It is as much an interest in property as our kitchen tables; television sets; and, as this Court observed in [□] *Seaman*, our cattle and farming utensils.[101] *472 Further, the prohibitions against collecting excess taxes, selling more land than needed to collect such taxes, and taking more property than necessary to serve the public all underlie a property owner's right to collect the surplus proceeds and were well-established legal principles before 1963. Therefore, we hold that the ratifiers would have commonly understood this common-law property right to be protected under Michigan's Takings Clause at the time of the ratification of the Michigan Constitution in 1963.[102]

[30] Having recognized both the existence of this vested property right at common law and that the ratifiers of the 1963 Michigan Constitution would have commonly understood this right to be protected under Michigan's Takings Clause at that time, the question now becomes whether the amendments of the GPTA abrogated this common-law right.[103] If it did, there is no taking here.

**460 [31]   [32]   [33]   [34] The common law "is but the accumulated expressions of the various judicial tribunals in their efforts to ascertain what is right and just...."[104] It is dynamic and flexible, not static or fixed like statutory law.[105] The *473 common law is, however, incremental in adapting to society's changing circumstances, developing gradually to reflect our policies, customs, norms, and values.[106] Nonetheless, the Legislature may enact legislation that abrogates or alters the common law. Of course, both legislation and the common law are secondary to our Constitution. Article 3, § 7 of Michigan's Constitution provides:

> The common law and the statute laws now in force, *not repugnant to this constitution*, shall remain in force until they expire by their own limitations, or are changed, amended or repealed.[107]

[35]   [36]   [37] It is clear that our 1963 Constitution protects a former owner's property right to collect the surplus proceeds following a tax-foreclosure sale under Article 10, § 2. This right existed at common law; was commonly understood to exist in the common law before the 1963 ratification of our Constitution; and continues to exist after 1963, as our decision in *Dean* demonstrates. Because this common-law property right is constitutionally protected by our state's Takings Clause, the Legislature's amendments of the GPTA could not abrogate it. While the Legislature is typically free to abrogate the common law, it is powerless to override a right protected by Michigan's Takings Clause.[108]

## *474 V. APPLICATION

### A. DEFENDANTS' RETENTION OF THE SURPLUS PROCEEDS WAS AN UNCONSTITUTIONAL TAKING

[38]   [39]   [40] As the foreclosing governmental unit under the GPTA, defendants were entitled to seize plaintiffs' properties to **461 satisfy the unpaid delinquent real-property taxes as well as any interest, penalties, and fees associated with the foreclosure and sale of plaintiffs' properties. But defendants could only collect the amount plaintiffs owed and nothing more. Once defendants foreclosed on plaintiffs' properties, obtained title to those properties, and sold them to satisfy plaintiffs' unpaid taxes, interest, penalties, and fees related to the foreclosures, any surplus resulting from those sales belonged to plaintiffs. That is, after the sale proceeds are distributed in accordance with the GPTA's order of priority, any surplus that remains is the property of plaintiffs, and defendants were required to return that property to plaintiffs. Defendants' retention of those surplus proceeds under the GPTA amounts to a taking of a vested property right requiring just compensation. To the extent the GPTA permits defendants to retain *475

these surplus proceeds and transfer them into the county general fund, the GPTA is unconstitutional as applied to former property owners whose properties were sold at a tax-foreclosure sale for more than the amount owed in unpaid taxes, interest, penalties, and fees related to the forfeiture, foreclosure, and sale of their properties.

[41] Defendants rely on a line of Michigan cases to argue that plaintiffs held no rights, titles, or interests in their properties once foreclosure occurs and fee simple title vests with the state. [109] None of these decisions, however, involved a claim for the surplus proceeds after a foreclosure sale. Rather, these cases all addressed the former property owners' ability to retain or convey an interest in the land that had been foreclosed. Indeed, one of these cases even noted that the "primary and inducing purpose of the legislation was to secure *a portion of the unpaid taxes, rather than nothing*, and to restore lands to a taxpaying basis, instead of squarely allowing them to accumulate tax delinquencies with no hope of ever recovering them." [110] In this case, defendants recovered the entire amount of plaintiffs' tax debts *and more* by way of a surplus. Plaintiffs had a cognizable, vested property right to collect those surplus *476 proceeds. This vested right did not simply "vanish[ ] into thin air." [111] In the same way that the foreclosure process does not eliminate the former property owner's interest in the personal property that sits on the foreclosed land, the vesting of fee simple title to the real property does not extinguish the property owner's right to collect the surplus proceeds of the sale. This is a separate property right that survives the foreclosure process. Accordingly, like any other creditor, defendants were required to return **462 the surplus. [112]

[42] [43] We see no reason to recharacterize these surplus proceeds as public money to be transferred into the county general fund and used for public purposes wholly independent of the GPTA without paying just compensation. [113] While plaintiffs' takings claim was not compensable until their properties sold for an amount in excess of their tax debts, that lack of an immediate right to collect the surplus proceeds does *477 not mean that plaintiffs had no right to collect the surplus proceeds at all. [114] Indeed, a former property owner only has a right to collect the surplus proceeds from the tax-foreclosure sale; that is, a former property owner has a compensable takings claim if and only if the tax-foreclosure sale produces a surplus. Once the sale produces a surplus, the former owner may make a claim for the surplus proceeds.

Again, this holds true even though the former owner no longer holds title to the property.

Moreover, we are unmoved by caselaw from other states that have addressed the disposition of surplus proceeds. Some courts that have confronted the issue whether a cognizable takings claim can be made for the surplus proceeds have only addressed the issue in the context of the federal Takings Clause. [115] Unlike those courts, however, our holding speaks to Michigan's Takings Clause, which this Court has, on occasion, interpreted as offering broader protection to property owners. [116] Other courts have limited the inquiry to whether there is statutory authority for a property owner to collect the surplus proceeds, not whether a *478 right existed within their states' common law. [117] Moreover, **463 a few courts have addressed the takings issue in the context of other areas of jurisprudence, including tax collection, forfeiture, and due process. [118] That said, we note that two states, Vermont and New Hampshire, have recognized the government's obligation to return any surplus proceeds to the former owner after a tax-foreclosure sale and that the failure to return those proceeds is a taking under their state constitutions. [119] *479 Similarly, we hold that defendants were required to return the surplus proceeds to plaintiffs and that defendants' failure to do so constitutes a government taking under the Michigan Constitution entitling plaintiffs to just compensation.

### B. DEFENDANTS CANNOT RELY ON THE TAXING POWER TO JUSTIFY THEIR RETENTION OF THE SURPLUS PROCEEDS

[44] [45] [46] Defendants also contend that their actions are simply a matter of tax collection and that "there can be no taking when a Michigan county foreclosures on a property for the nonpayment of taxes." [120] The Legislature undoubtedly has the inherent power to levy taxes, and cities and villages also have the authority to impose taxes for public purposes. [121] We recognize that municipalities rely heavily on their citizens to timely pay real-property taxes so that local governments have a source of revenue for their operating costs. [122] Nothing **464 in this opinion impedes defendants' right to hold citizens *480 accountable for failing to pay property taxes by taking citizens' properties in satisfaction of their tax debts. What defendants may not do under the guise of tax collection is seize property valued far in

excess of the amount owed in unpaid taxes, penalties, interest, and fees and convert that surplus into a public benefit. The purpose of taxation is to assess and collect taxes *owed*, not appropriate property *in excess of what is owed.* Defendants' ability to take plaintiffs' properties was limited by what plaintiffs actually owed as a result of failing to pay their taxes. Thus, defendants' retention of the surplus proceeds amounts to a taking of plaintiffs' properties far in excess of plaintiffs' tax debts that cannot be justified as a valid form of tax collection.

[47] Moreover, "the power of taxation should not be confused with the power of eminent domain ...."[123] As Justice Cooley has explained, whereas taxation requires citizens to bear the burden of public expenses equally and proportionally, "something exceptional" is taken under the government's exercise of eminent domain such that apportionment cannot be achieved, thus requiring compensation "of a pecuniary nature" to the property owner.[124] By retaining the surplus proceeds and transferring them into the county general fund to be used for public purposes, defendants are forcing delinquent taxpayers to contribute to the general government revenues beyond their fair share. This is not simply an adjustment of "the benefits and burdens of economic life to promote the common good."[125] Rather, this confiscation of the sale proceeds *481 in excess of what is actually owed requires delinquent taxpayers " 'alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' "[126] Michigan's Takings Clause was " 'adopted for the protection of and security to the rights of the individual as against the government ....' "[127] To permit such forced contributions to stand would undermine the very rights our Takings Clause seeks to protect.

Put simply, defendants' argument that the taxing power justifies their retention of the surplus proceeds from tax-foreclosure sales over and above property owners' tax liabilities is an exceedingly poor attempt at disguising a physical taking of property requiring just compensation as an arbitrary and disproportionate tax.[128]

**465 C. JUST COMPENSATION IS EQUAL TO THE AMOUNT OF SURPLUS PROCEEDS GENERATED FROM THE TAX-FORECLOSURE SALE**

[48] Having found an unconstitutional taking, we must next decide the method by which just compensation *482 may be determined. This Court has stated that the remedy for a government taking is "just compensation for the value of the property taken."[129] As our holding today makes clear, the property "taken" is the surplus proceeds from the tax-foreclosure sale of plaintiffs' properties to satisfy their tax debts. While it could be said that plaintiffs have received at least some compensation, given that they are no longer liable for their delinquent taxes,[130] satisfaction of plaintiffs' tax debts cannot constitute just compensation for the value of the property taken, i.e., the surplus proceeds. Therefore, plaintiffs are entitled to the value of those surplus proceeds.

Defendants submit that if plaintiffs have, in fact, pleaded a viable takings claim, then the amount of compensation due could be more than the surplus proceeds from the tax-foreclosure sale. Plaintiffs make this point in their postargument briefing, arguing that a full remedy for an unconstitutional taking requires property owners to be put in as good of position had their properties not been taken at all. That is, while the surplus proceeds from a tax-foreclosure sale are some evidence of the value of the *483 property and compensation due, plaintiffs contend that it may be less than just compensation and may instead constitute the fair market value of their properties.[131]

[49] We reject the premise that just compensation requires that plaintiffs be awarded the fair market value of their properties so as to be put in as good of position had their properties not been taken at all. First, this would run contrary to the general principle that just compensation is measured by the value of the property *taken.* In this case, the property improperly taken was the surplus proceeds, not plaintiffs' real properties.[132] Second, plaintiffs are largely responsible for the loss of their properties' value by failing to pay their taxes on time and in full. If plaintiffs were entitled to collect more than **466 the amount of the surplus proceeds, not only would they be taking money away from the public as a whole, but they would themselves benefit from their tax delinquency.[133]

Accordingly, when property is taken to satisfy an unpaid tax debt, just compensation requires the foreclosing governmental unit to return any proceeds from the tax-foreclosure sale in excess of the delinquent *484 taxes, interest, penalties, and fees reasonably related to the foreclosure and sale of the property—no more, no less.[134]

## VI. CONCLUSION

We hold that plaintiffs, former property owners whose properties were foreclosed and sold to satisfy delinquent real-property taxes, have a cognizable, vested property right to the surplus proceeds resulting from the tax-foreclosure sale of their properties. This right continued to exist even after fee simple title to plaintiffs' properties vested with defendants, and therefore, defendants' retention and subsequent transfer of those proceeds into the county general fund *485 amounted to a taking of plaintiffs' properties under Article 10, § 2 of our 1963 Constitution. Therefore, plaintiffs are entitled to just compensation, which in the context of a tax-foreclosure sale is commonly understood as the surplus proceeds. Accordingly, we reverse the judgment of the Court of Appeals and remand this case to the Oakland Circuit Court for proceedings consistent with this opinion.

McCormack, C.J., and Markman, Bernstein, Clement, and Cavanagh, JJ., concurred with Zahra, J.

Viviano, J. (concurring).

At issue is whether defendant Oakland County's retention of the surplus proceeds from tax-foreclosure sales constitutes a taking under Article 10, § 2 of the 1963 Michigan Constitution. I concur with the majority's result but disagree with much of its reasoning.[1] In its zeal to adopt a pragmatic rule in order to provide limited relief to these plaintiffs and others similarly situated, the majority has made a number of **467 doctrinal missteps. In particular, the majority has applied a flawed interpretive methodology and, even more fundamentally, has failed to identify the correct property right. These mistakes are not without consequences. The first trenches upon the Legislature's power to abrogate nonvested property rights. And the second—by defining plaintiffs' property right as the right to surplus proceeds, instead of the right to equity more generally—would seemingly encourage and endorse many takings of a person's equity without just compensation whenever a foreclosure sale does not yield surplus proceeds.

*486 I would instead interpret the Constitution in the usual manner, discerning the ordinary meaning of "property" and applying it to the facts here. Doing so, I conclude that the property right that has been taken from the plaintiffs is their

equity in their respective properties and not any independent interest in the surplus proceeds from the tax-foreclosure sale.

### I. INTERPRETIVE ISSUES

The majority correctly notes that "a claimant must first establish a vested property right under state law" in order to have a takings claim and that " 'the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law.' "[2] Then the majority recounts the familiar rule that "[o]ur 'primary objective' in interpreting a constitutional provision such as our state's Takings Clause is 'to determine the text's original meaning to the ratifiers, the people, at the time of ratification.' "[3]

However, the majority does not explain which words in the Takings Clause are in need of interpretation.[4] In fact, rather than go on to explain what the ratifiers would have understood any particular words in the Takings Clause to mean, the majority proceeds to recount historical claims for surplus and a menagerie of other past cases involving vested property rights more generally. Later, when considering whether the *487 Legislature might have abrogated a common-law right to the surplus, the majority explains:

> It is clear that our 1963 Constitution protects a former owner's property right to collect the surplus proceeds following a tax-foreclosure sale under Article 10, § 2. This right existed at common law; was commonly understood to exist in the common law before the 1963 ratification of our Constitution; and continues to exist after 1963, as our decision in *Dean* demonstrates. Because this common-law property right is constitutionally protected by our state's Takings Clause, the Legislature's amendments of the [General Property Tax Act (GPTA), MCL 211.1 *et seq.*] could not abrogate it. While the Legislature is typically free to abrogate the common law, it is powerless to override a

right protected by Michigan's Takings Clause.[5]

Though the majority does not make it explicit, I understand its opinion as reasoning that because various past cases and other materials appear to recognize some interest on the part of the previous landowner **468 in the surplus proceeds after a tax foreclosure, the ratifiers would have understood the term "property" in the Constitution to encompass such a property right to surplus proceeds. Consequently, that property right must be considered frozen and inviolable under our Takings Clause. And because it is enshrined in the Constitution, the Legislature may not abrogate that common-law right; to do so would run afoul of the Takings Clause.

I, of course, take no issue with the general rule that when interpreting a constitutional provision, we aim to "determine the text's original meaning to the ratifiers ...."[6] Consequently, under our rules of constitutional interpretation, the definition of "property" is *488 determined by what the ratifiers understood "property" to mean. But the majority's investigation of this concept ultimately rests on a flawed understanding of original meaning. Obviously, the majority cannot say that the constitutional term "property" *means* "surplus proceeds."[7] Rather, what the majority says, at least implicitly, is that the phrase "surplus proceeds" falls within the meaning of "property" because the ratifiers would have considered surplus proceeds to be property at the time of ratification. But the majority never defines the term "property." Yet, this question—the semantic content of "property"—should be at the center of any interpretation of a legal term or phrase, and its absence here is telling.[8] Compare this with how the United States Supreme Court has defined "property" in the Takings Clause: "The constitutional provision is addressed to every sort of interest the citizen may possess."[9] Whether right or wrong, this definition at least gives the term a meaning that can be applied.

By contrast, the majority here focuses on what res the ratifiers would have believed were encompassed by the term "property."[10] This treats the ratifiers' expectations about the application of the constitutional text as *489 binding. Such an approach has been rejected by those who, like myself, consider courts to be bound by the Constitution's original textual meaning—it is the publicly accessible meaning of the text, rather than its intended or expected applications, that binds the courts.[11]

**469 *490 The ratifiers' understanding thus establishes the general meaning of "property" but not necessarily which things fall within that concept. In other words, the meaning of "property," as defined at the time of ratification, establishes the parameters by which we determine the things denoted by "property."[12] It does not necessarily establish, for all time, what those *491 things were.[13] This is particularly the **470 case with a broad concept like property, which covers various classes of things that can be redefined by the Legislature.[14]

For these reasons, the ratifiers' understanding of which particular res were included in the definition of property at a particular moment in time does not dictate which res we must recognize as "property" under the Takings Clause today. Instead, I would define the term "property" according to its ordinary meaning at the time the Constitution was ratified. Because this case does not turn on fine distinctions in the definitions—but it does turn on having *some* definition rather than a mere example—it is sufficient for present purposes to employ a common definition of "property" from the relevant *492 period: "something owned or possessed; *specif:* a piece of real estate"; "the exclusive right to possess, enjoy, and dispose of a thing: OWNERSHIP"; "something to which a person has a legal title."[15]

Defining property using this traditional approach to constitutional interpretation avoids other problems raised by the majority's reading. One such problem is that any property rights extant when the Constitution was ratified would be insulated from legislative change, whereas later-developed property rights would presumably be subject to change. Though the majority might conclude that the Legislature could expand the res in which citizens may have property interests, the majority's broad position would not allow the Legislature to repeal rights in the res that were recognized property rights at the time of ratification and thereby preserved in the protective amber of the Takings Clause.[16] That is not problematic if the rights the Legislature sought to abrogate were vested. The troubling sweep of the majority's opinion, however, would extend its prohibition even to legislation that prospectively modified or abrogated nonvested property rights—i.e., rights to property that individuals might acquire in the future.[17]

**471 *493 This would be a novel approach to legislative power over property. We have stated, for example, that the right of redemption—which we have recognized is a property right in the context of tax-foreclosure *494 sales [18]—"is not a constitutional right but exists only as permitted by statute, that such rights ... are subject to abridgement by the legislature for the reason they are remedial in nature, and that no vested rights arise ...." [19] Other courts, too, have recognized that the Legislature's role in defining property rights extends to removing items from the category of property, if done prospectively, i.e., without affecting vested rights. [20] And, of course, **472 even the majority recognizes that the *495 Legislature may, at times, abrogate the common law. [21] As the United States Supreme Court has explained:

> A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances. [ [22] ]

A vested right, therefore, cannot be divested without just compensation. [23] But the Legislature has greater scope to prospectively reshape laws establishing property rights as long as those laws function in a way that leaves vested rights untouched. [24] Such actions are not *496 prohibited by the Takings Clause. [25] Thus, for example, the United States Supreme Court has held that the expectation of future child-support benefits is not protected because it is a "prospective right ... clearly subject to modification by law, be it through judicial decree, state legislation, or congressional enactment." [26]

**473 Moreover, as the United States Supreme Court and numerous state supreme courts have established, "the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source *such as state law.*" [27] In other words, "the Constitution protects rather than creates property interests ...." [28] Citing this rule, one federal *497 court has reasoned that the nature of the "property" at issue in the tax-foreclosure context would be found in local law, not the Constitution itself. [29] Yet by reasoning that "property" must be defined at least as the particular types the ratifiers had in mind, the majority interprets the Takings Clause as exalting those interests above the Legislature's authority to modify them. [30]

I believe that such a reading raises serious concerns regarding the separation of powers. The Constitution *498 provides that "the legislative power of the State of Michigan is vested in a senate and a house of **474 representatives." [31] This Court has recognized that the legislative power includes the power to abrogate the common law. [32] In fact, the Constitution specifically allows the common law to be changed: Const. 1963, art. 3, § 7 states, "The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, *or are changed*, amended or repealed." [33] It is true that this Court has applied the principle that statutes in derogation of the common law must be strictly construed. [34] But the majority now significantly limits that power by reasoning that any attempt to prospectively abrogate a common-law property right in a particular object that existed in 1963, without providing just compensation, is unconstitutional. [35]

## II. THE PROPERTY RIGHT AT ISSUE

The majority's flawed interpretive methodology has led it to characterize the "property" at issue as merely *499 the surplus proceeds from the foreclosure sale. But the existence and scope of these proceeds are contingent upon the foreclosure sale—the proceeds spring to life only at the end of that process. The majority does not consider the property interests that exist before the sale or how these interests affect the taxpayer's entitlement to anything resulting from the sale. In starting its analysis at the end of the process, the majority

Rafaeli, LLC v. Oakland County, 505 Mich. 429 (2020)
952 N.W.2d 434

ignores the laws and history of real-property ownership and creates problematic gaps in the process that fail to respect takings law. My analysis, by contrast, starts at the beginning: the property owners' preexisting interest in the real estate, or their equity.

## A. THE MAJORITY'S MISTAKEN APPROACH

It is important, at the outset, to note the questionable basis for the majority's conclusion that "our state's common law recognizes a former property owner's property right to collect the surplus proceeds ...." The majority relies, first, on the Magna Carta, saying, "Just as the Magna Carta protected property owners from uncompensated takings, it also recognized that tax collectors could only seize property to satisfy the value of the debt payable to the Crown, leaving the property owner with the excess."[36] But the provision of the Magna Carta to which the majority refers concerns collecting debts by seizing only movable property.[37] It is *500 much more **475 understandable to have a rule discouraging the government from needlessly taking property in excess of the tax debt when the government is seizing various movable goods rather than real estate—it is easier to take the chair and leave the table than it is to take the kitchen and leave the living room. Thus, although many of our rights can be traced to the Magna Carta, I question whether Clause 26 has much bearing on the seizure of real property.[38] Additionally, it is not quite true that tax collectors could only seize property to satisfy the debt—as "the value of the goods seized had to approximate the value of the debt[.]"[39] Such a rule falls short of one that demands any surplus be returned to the previous owner.

Next, the majority turns to [image] *People ex rel. Seaman v. Hammond*, 1 Doug. 276 (Mich., 1844), noting that though [image] *Seaman* held that the previous landowner was *501 entitled to the surplus, the statutory scheme at the time was different than the GPTA. Specifically, the statute specified that the excess proceeds must be returned to the owner.[40] The majority appears to recognize that [image] *Seaman*, and other cases involving statutes, are not particularly instructive.[41] Nevertheless, the majority concludes that "a fair reading of [image] *Seaman* demonstrates that in the early years of this state, it was commonly understood that the delinquent taxpayer, not the foreclosing entity, continued to own the land at the time of the tax-foreclosure sale and would have been entitled to

any surplus, which no more followed title to the land than the former owner's other personal property."[42] But this is a misreading of [image] *Seaman*. To the extent that the owner's entitlement to the surplus was "commonly understood," it no doubt resulted from the statute that expressly provided such a **476 right. If the majority means this common understanding somehow reflected a common-law right to the surplus, I do not see how. It is just as possible that the statutory scheme provided for a right in the surplus because the Legislature did not believe the common law recognized such a right. Speculations on what the Legislature thought it was doing are thus unfruitful and far afield from establishing a common-law right to *502 the proceeds. In sum, it is far from clear what implications the former existence of a statutory right to surplus proceeds has in determining the application of the constitutional right in this case.

And *Dean v. Dep't of Natural Resources*, 399 Mich. 84, 247 N.W.2d 876 (1976), can hardly be read as recognizing a longstanding vested property right in the surplus. That case considered an unjust-enrichment claim. The key determination in that cause of action is whether retention of the benefit is inequitable, not which party has the property right.[43] In other words, *Dean* involved an equitable decision based on the specific facts of the case. Those facts, which involved "the alleged good-faith attempt at redemption, the running of the redemption period after this attempt with plaintiff under the impression that she had in fact redeemed her home, the loss of her home, and the sale of the property by the State for a profit of close to $10,000," are very different than those here.[44] *Dean* does not indicate that all former property owners have a property right to the surplus as a matter of course.[45]

## B. EQUITY

In contrast to the majority's approach, I would turn to the law of property and the development of property *503 interests in real estate to determine the rights at issue. The history of equity in real estate is particularly illuminating because this property right formed in response to foreclosure practices that raised concerns like those in the present case. Until mortgages came into widespread use, creditors generally obtained a "gage of land" as security in the debtor's land, but the creditor could not recover possession of the land from the debtor.[46] That defect, from the creditor's perspective, likely led to the

creation of the predominant form of common-law mortgage, in which the mortgagor conveyed the land, usually in fee simple, to the mortgagee on the condition subsequent that it would be reconveyed to the mortgagor **477 when the debt was repaid at the appointed time. [47]

*504 The harshness of this procedure was evident to many at the time and is similar to harshness involved in the present case, namely that it automatically led to the full loss of the mortgagor's interest in the property no matter how much debt was owed—no surplus was owed or paid to the mortgagor. [48] Equity courts addressed *505 **478 these concerns—in part because the transaction functioned as an extension of a security interest in *506 the property rather than a true transfer of the fee—by creating the "equity of redemption," under which the mortgagor could redeem the property by paying off the debt after defaulting. [49] The "equity of redemption" was considered—including by this Court—a property right and came to represent the homeowner's interest in the property, known as "equity." [50]

**479 *507 Thereafter, the equity courts "developed the decree of foreclosure," which a mortgagee could seek in order *508 to end the mortgagor's period of equitable redemption; when foreclosure by sale was permitted, "the mortgagee [took] the money owed to her/him, the remainder going to the mortgagor." [51] Thus the creation of **480 "equity" led to the homeowner's right to surplus proceeds from foreclosure sales. Indeed, as stated in Restatement Property, 3d, Mortgages, § 7.4, comment a, "[W]hen a surplus occurs, it represents what remains of the *509 equity of redemption and is, as such, a substitute res. The surplus stands in the place of the foreclosed real estate ...." [52]

**481 *510 Given this history and caselaw, I would characterize the property right at issue here as the taxpayer's equity in the property. This conclusion best fits the development of ownership rights in property laden with debts or liens. The majority's belief that a property right in the surplus proceeds exists apart from the interest in the equity finds no support in the historical record. Indeed, equity formed in response to practices like those at issue here, albeit in the private realm, and gives rise to any right in surplus proceeds. It thus constitutes a disposable property right to the value of land above any liens or other interests in the property. [53] And it is a vested right—at least with regard to *511 an individual who owns property with equity value—because it represents an estate in the land providing immediate

and future benefit. [54] It thus fits the general definition of "property" at the time our Constitution was ratified. [55] If more proof were needed that "equity" is routinely considered the relevant property right in the nondebt value of a house, one need look no further than divorce proceedings, in which home equity is part of the property split between the parties. [56]

Perhaps for these reasons, numerous courts, parties, and commentators who have addressed similar cases in the tax-foreclosure context discuss the right to a surplus as related to the homeowner's equity—and none that I have found (nor any the majority cites) holds that the right to surplus proceeds is a freestanding property interest independent of the underlying equity interest. [57] *512 The right to equity is, **483 in fact, the very right that plaintiffs rely on here to support their claim *514 under the Takings Clause. [58] One federal district court provided an insightful discussion on the topic, first summing up the United States Supreme Court's caselaw—the same cases the majority here discusses—as "mak[ing] clear that a Takings Clause violation regarding the retention of *equity* will not arise when a tax-sale statute provides an avenue for recovery of the surplus equity." [59] The question in that case was, as here, "[w]hat if the tax-sale statute does *515 not provide a right to the surplus" or an "avenue for recover[ing]" it? [60] The court continued, "A property interest in equity could conceivably be created by some other legal source," including caselaw—although not the Takings Clause itself. [61] Throughout the opinion, the property right was characterized as "surplus equity." [62]

In short, the relevant property right in this case is the taxpayers' equity interest, not some contingent right to proceeds if there is a foreclosure sale. Equity has better historical grounding than any novel and freestanding right to proceeds—indeed, it is the reason entitlement to proceeds may exist—and is a common enough concept that I cannot comprehend the majority's efforts to avoid it.

## C. CONSEQUENCES

My difference of opinion with the majority on this point is no small matter. Characterizing **484 the property right at issue as equity has very real consequences here. For one thing, the GPTA does not clearly abrogate any of a person's property rights in their real estate or in their equity generally. Instead, the GPTA simply allocates the surplus proceeds after

the tax-foreclosure sale. Accordingly, it cannot be said to have abrogated the common-law right to equity.[63]

*516 In addition, the statute contemplates—and indeed, expressly provides for—a number of scenarios in which there will be no surplus proceeds. For our purposes, the first key point in the process occurs when the court enters the foreclosure judgment. This must occur before March 30, and the judgment must become effective on March 31.[64] When it becomes effective, the taxpayer loses his or her redemption rights and absolute title vests in the government.[65] The following day, April 1, the foreclosing governmental unit obtains the right to possession.[66]

Afterward, the state has until the first Tuesday in July to buy the property from the foreclosing governmental unit for the greater of either the minimum bid—which equals the debt and various additional costs[67]—or the "fair market value."[68] This protects the *517 foreclosing unit, which would be certain to recoup the debt and costs if the state exercises its right to purchase. And under this option the property might sell for a price reflecting the debt and the equity. But if the state declines, the next series of options ensures that no surplus will occur. Next, the "city, village, or township" where the property is located can purchase the property "for a public purpose" at the minimum bid, meaning that no surplus would result.[69] If they pass on the purchase, then the county has the chance to buy it (without being required to have a "public purpose" for doing so), again for the minimum bid.[70] If any of these last few governmental units—city, **485 village, township, or county—buys the property and subsequently sells it, any excess proceeds (less additional costs) are distributed in various funds.[71]

If the property goes unpurchased after all this, the foreclosing unit holds one or more auctions from July to November.[72] Although the statute prescribes notice requirements, it allows the foreclosing unit to "adopt procedures governing the conduct of the sale ...."[73] To sell the property, the foreclosing unit must receive at least the "minimum bid."[74] If the property is unpurchased after an auction, the city, village, township, or county can buy it for the minimum bid without needing a public purpose to do so.[75] At the final auction, there is *518 no minimum bid.[76] Property that is not purchased is transferred to the city, village, or township where

it is located unless the unit objects, in which case the property goes to the foreclosing unit.[77]

In light of this statutory framework, the majority's focus on the surplus proceeds as the relevant property, and thus the postsale retention as the taking, produces puzzling results. Because "a property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it,"[78] under the majority's theory, no constitutional issues occur until the surplus proceeds are retained. It does not matter that once title has vested in the government without chance of redemption, the taxpayer's property—his or her equity—has been taken. Consequently, the majority's view of the case would seemingly be that if the property does not sell at auction and is simply transferred to a governmental unit, the taxpayer is out of luck; no proceeds, let alone a surplus, have been produced or retained by the government.[79] Perhaps worse still, governmental units have numerous opportunities to purchase the property for the minimum bid, i.e., for the debt (and costs), and thus obtain it for an amount that will usually be much less than fair market value. Yet in those cases, too, *519 because no surplus would result, the majority leaves the taxpayer without a remedy.

The better view, under the law described above, is that the property taken is the taxpayer's equity and that this occurs when title vests in the government with no opportunity for redemption. In that circumstance, if the government retains the property, the taxpayer would be able to seek compensation for the deprivation of his or her equity.[80] If the property is sold, any surplus represents the remaining equity in the property and is owed as the just **486 compensation due the taxpayer.[81] Returning the surplus would usually satisfy the Takings Clause by "leav[ing] the property owner] 'in as good a position as if his lands had not been taken,' "[82] i.e., by leaving the property owner with the representation of what was taken.

To elaborate on this last point, awarding the surplus as "just compensation" only makes sense in light of the underlying principle that the surplus represents the owner's equity.[83] It is, of course, possible that the surplus might not capture the value of a taxpayer's property.[84] But the "just compensation" requirement does not require local governments to impoverish *520 themselves.[85] Thus, taxpayers seeking some speculative value beyond the surplus

realized in the tax sale might often lack meritorious claims. It is also worth noting, in this regard, that the taxpayers would be free to conduct a private sale of the property during the redemption period prior to title vesting in the government and, by failing to do so, might be considered to have agreed to the value produced by the tax-foreclosure sale. [86]

On the other hand, by limiting the compensation to the surplus (when one exists), the majority risks depriving taxpayers of "just compensation." As demonstrated above, the statute gives governmental units the option to ensure that there will be no surplus. Under the majority's regime, a rational governmental actor is incentivized to buy properties that have a market value above the minimum bid amount that must be paid or to take other steps to limit or eliminate surpluses. For example, both the Legislature in constructing the statutory framework and the foreclosing *521 unit in prescribing sale procedures could design rules that diminish the probability of obtaining fair market value in the tax-foreclosure sale. Indeed, while it might be true that most sale prices now do not even cover the taxes owed, the foreclosing unit would have little incentive to conduct a sale that earns anything more than the delinquent tax sum. [87] Consequently, **487 I would not now rule out the possibility that "just compensation" might require something greater than the surplus in a particular case, especially in cases in which the government purchased the property for the minimum bid.

But we have no reason to decide that issue in this case because, although plaintiffs nominally distinguish equity and surplus, they have offered no argument suggesting that the tax foreclosures here failed to obtain a fair price for their properties.

### III. CONCLUSION

Although I agree with the majority as to the ultimate disposition of this case, I disagree with its reasoning. I would not define the constitutional term "property" by merely citing an example of what the ratifiers might have thought would fall within the meaning of that term. Instead, I would give the word its ordinary meaning at the time the Constitution was ratified and then apply that meaning to the case at hand. In addition, I would examine the relevant property right: the taxpayers' equity in the real property. Equity falls within the semantic scope of "property" *522 under our Constitution. And the Legislature did not purport to abrogate the taxpayer's equity. Therefore, a taking occurred when title to plaintiffs' property was vested in the government without any possibility of redemption. In this case, I agree with the majority that plaintiffs are owed the surplus proceeds from the tax-foreclosure sales.

**All Citations**

505 Mich. 429, 952 N.W.2d 434

### Footnotes

1       MCL 211.1 *et seq.*

2       In plaintiffs' complaint, Rafaeli alleges that a tax deficiency remained on the property despite certification from Meisner that all taxes were paid on the property from the previous five years. This led to a tax delinquency of $496.52 plus $39.72 in penalties, fees, and interest.

3       According to Ohanessian, he moved to California sometime in 2011. He alleges that he filled out an electronic change-of-address form on defendants' website but that he stopped receiving his tax bills when he moved. He states that he used a mailbox at a UPS store in Eastpointe to receive his property-tax bills. Defendants claim that they used this address, as well as Ohanessian's former residence in Livonia, to send Ohanessian notice of the tax delinquency in June 2013, December 2013, and February 2014. Defendants claim that they received no response to these notices.

4       Prior to filing this action, Rafaeli and a nonparty to this case filed a putative class action against the counties of Wayne and Oakland in federal court, asserting, among other things, an unconstitutional-takings claim.

The case was dismissed for lack of subject-matter jurisdiction. *Rafaeli, LLC v. Wayne Co.*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued June 4, 2015 (Case No. 14-13958), 2015 WL 3833159.

5　*Rafaeli, LLC v. Oakland* Co., unpublished opinion and order of the Oakland Circuit Court, issued October 8, 2015 (Docket No. 15-147429-CZ), p. 3, 2015 WL 13859576.

6　Plaintiffs moved for reconsideration and also moved to amend their complaint to add claims of substantive due-process violations, violations of the Eighth Amendment's prohibition against excessive fines, and unjust enrichment. The circuit court denied reconsideration and denied plaintiffs' proposed amendment as futile.

7　*Rafaeli, LLC v. Oakland* Co., unpublished per curiam opinion of the Court of Appeals, issued October 24, 2017 (Docket No. 330696), p. 5, 2017 WL 4803570.

8　*Id.*, citing *Bennis v. Michigan*, 516 U.S. 442, 452, 116 S. Ct. 994, 134 L. Ed. 2d 68 (1996). Judge SHAPIRO concurred with the majority's conclusion that plaintiffs failed to state a compensable takings claim but disagreed with the majority's reliance on principles of civil-asset forfeiture. Instead, Judge SHAPIRO relied on different authority from the United States Supreme Court, which he concluded had rejected a similar claim to recover the surplus proceeds from a tax-foreclosure sale. *Rafaeli* (SHAPIRO, J., concurring), unpub. op. at 1-2, citing *Nelson v. City of New York*, 352 U.S. 103, 111, 77 S. Ct. 195, 1 L. Ed. 2d 171 (1956).

9　*Rafaeli, LLC v. Oakland* Co., 503 Mich. 909, 919 N.W.2d 401 (2018).

10　Before 1999, delinquent-tax liens were offered at annual tax-lien sales in which anyone could purchase the tax liens. See Smith, *Foreclosure of Real Property Tax Liens Under Michigan's New Foreclosure Process*, 29 Mich. Real Prop. Rev. 51, 51 (2002); see also Alexander, *Tax Liens, Tax Sales, and Due Process*, 75 Ind. L. J. 747, 760 (2000) ("This transfer of the lien is distinct from the sale of the underlying property which occurs at a tax foreclosure sale. Instead, what is transferred is the lien itself, vesting in the purchaser the right to enforce the lien in accordance with statutory procedures."). The tax-lien sale was followed by a one-year redemption period. If the property was not timely redeemed, the tax-lien purchaser, or the state if there was no tax-lien purchaser, would be deeded the property and was responsible for the final foreclosure of the property. The former foreclosure process could extend many years, causing properties to deteriorate and become clouded with poor title, which often led to title-insurance companies refusing to insure these properties. As a result, the Legislature overhauled the GPTA in 1999. See 1999 PA 123. The current scheme expedites the foreclosure process, thereby reducing the amount of abandoned, tax-delinquent properties within the state. Given that the sole issue in this appeal is whether a "taking" occurred, many of the GPTA's procedures regarding the notice and hearing requirements, which are relevant to due-process jurisprudence, are either described briefly or omitted entirely from this general overview. For a complete discussion of the current foreclosure process, see *Michigan's New Foreclosure Process*, 29 Mich. Real Prop. Rev. at 51. And for a comprehensive overview of the prior foreclosure process, see Smith, *Foreclosure of Real Property Tax Liens*, 75 Mich. B. J. 953 (1996).

11　MCL 211.78(8)(a). Seventy-five of Michigan's 83 **counties** elect to act as the foreclosing governmental unit. See Michigan Department of Treasury, *New Law Tax Foreclosure Archive* <https://www.michigan.gov/taxes/0,4676,7-238-43535_55601_55605-235134--,00.html> (accessed May 12, 2020) [https://perma.cc/L9V2-BC35].

12　MCL 211.44; MCL 211.45; see also OAG, 2014, No. 7,279 (June 11, 2014) ("[Real property taxes] are assessed and, in the first instance, collected by the city, township, or village treasurer.").

13 MCL 211.55.

14 MCL 211.87b. Local municipalities rely heavily on real-property taxes for revenue streams. Thus, **counties** use the delinquent tax revolving fund to advance municipalities' funds that would otherwise come from the unpaid real-property taxes. This advance allows local municipalities to continue with their day-to-day operations without having to wait for payment of the delinquent property taxes.

15 Any taxes, interest, penalties, and fees subsequently collected by the **county** treasurer are deposited into the delinquent tax revolving fund. If delinquent property taxes are not collected, properties are foreclosed and typically sold at a public auction known as a tax-foreclosure sale. In disbursing the proceeds from the tax-foreclosure sale, the first priority is to reimburse the delinquent tax revolving fund for "all taxes, interest, and fees on all of the property ...." MCL 211.78m(8)(a). If the **county** is ultimately unable to collect the entire amount it advanced to the municipalities, either by tax collection or foreclosure sales, then the **county** can charge the municipalities back the uncollected amount. MCL 211.87b(1). When a surplus exists, the **county** board of commissioners may transfer the surplus into the **county's** general fund. MCL 211.78m(8)(h).

16 MCL 211.78a(2).

17 See MCL 211.78a through MCL 211.78c; MCL 211.78f.

18 MCL 211.78g(1).

19 MCL 211.78(8)(b) (" 'Forfeited' or 'forfeiture' means a foreclosing governmental unit may seek a judgment of foreclosure under [MCL 211.78k] if the property is not redeemed as provided under [the GPTA], but does not acquire a right to possession or any other interest in the property.").

20 MCL 211.78g(2).

21 MCL 211.78g(3)(a). This subsection details additional taxes, interest, and fees that must be paid to the **county** treasurer in order to successfully redeem the property. MCL 211.78g(3)(b) through (d).

22 MCL 211.78h(1).

23 *Id.* Forfeited properties listed in the petition may be redeemed after the petition for foreclosure is filed, in which case the properties are removed from the petition for foreclosure. MCL 211.78h(2).

24 MCL 211.78h(5). In the meantime, the GPTA provides for various notices and hearings that must be given before foreclosure is finalized. These include various notices by mail, publication, recordation, and even a personal visit to the property, see MCL 211.78h through MCL 211.78i, as well as a show cause hearing within seven days of the judicial foreclosure hearing, see MCL 211.78j.

25 MCL 211.78k(5). The final redemption date is March 31. *Id.*

26 MCL 211.78k(5) and (6).

27 MCL 211.78k(6).

28 MCL 211.78m(2). All property not sold on or before December 30 immediately succeeding entry of the judgment of foreclosure is transferred to the city, village, or township where the property is located unless

the city, village, or township objects to the transfer. MCL 211.78m(6). If the property remains unsold and is not transferred to the city, village, or township, the foreclosing governmental unit retains the property. *Id.*

29   MCL 211.78m(8). Notably, this account is a subsidiary account within the delinquent tax revolving fund. The delinquent tax revolving fund is segregated into separate accounts for each year's delinquent taxes. Those accounts continue to exist until all the delinquent taxes for that tax year have been collected. See generally Michigan Department of Treasury, *2001-5 Delinquent Tax Revolving Funds Revisions To Accounting After Public Act 123 of 1999* (February 8, 2001), available at <https:// www.michigan.gov/treasury/0,4679,7-121-1751_2194-6024--,00.html> (accessed May 13, 2020) [https:// perma.cc/395WFWHC].

30   Money and property within the delinquent tax revolving fund, however, remain separate from any other money, property, or assets in the custody of the county treasurer. MCL 211.87b(1).

31   MCL 211.78m(8)(a). In fact, the GPTA requires the delinquent tax revolving fund to be reimbursed regardless of "whether or not all of the property was sold." *Id.*

32   MCL 211.78m(8)(b) and (c).

33   MCL 211.78m(8)(e), (f)(*ii*), and (f)(*iii*).

34   MCL 211.78m(8)(b) through (d); MCL 211.78m(8)(f)(*i*).

35   MCL 211.78m(8)(h). In cases in which the state is the foreclosing governmental unit, "any remaining balance shall be transferred to the land reutilization fund created under [MCL 211.78n]." MCL 211.78m(8)(g).

36   Comment, *State Theft In Real Property Tax Foreclosure Procedures*, 54 Real Prop. Tr. & Est. L. J. 93, 101-102 & n. 56 (2019) (explaining that Alabama, Arizona, Illinois, Indiana, Michigan, Minnesota, Mississippi, Montana, and Oregon all require the foreclosing governmental unit "to do something with the foreclosure sale surplus other than return it to the original owner").

Recent legislation has been proposed requiring the foreclosing governmental unit, in instances in which sale of the property exceeds the minimum bid at auction, to "remit an amount equal to that excess" to the former property owner if the property was owned and occupied as a principal residence before the judgment of foreclosure was entered. See 2019 HB 4219.

37   *Sidun v. Wayne Co. Treasurer*, 481 Mich. 503, 508, 751 N.W.2d 453 (2008).

38   MCL 211.78(8)(b).

39   *Bennis*, 516 U.S. at 451-453, 116 S.Ct. 994 (quotation marks and citation omitted).

40   MCL 211.78(1) ("The legislature finds that there exists in this state a continuing need to strengthen and revitalize the economy of this state and its municipalities by encouraging the efficient and expeditious return to productive use of property returned for delinquent taxes. Therefore, the powers granted in this act relating to the return of property for delinquent taxes constitute the performance by this state or a political subdivision of this state of essential public purposes and functions.").

41    *Bennis*, 516 U.S. at 452, 116 S.Ct. 994 ("[F]orfeiture ... serves a deterrent purpose distinct from any punitive purpose. Forfeiture of property prevents illegal uses both by preventing further illicit use of the property and by imposing an economic penalty, thereby rendering illegal behavior unprofitable.") (quotation marks, brackets, and citation omitted).

42    *Id.*

43    *Id.* at 453, 116 S.Ct. 994 (explaining that the forfeiture of the petitioner's car used in her husband's criminal activity was consistent with longstanding punitive, deterrent, and remedial goals underlying civil-asset forfeiture); *Id.* at 455, 116 S.Ct. 994 (Thomas, J., concurring) (holding that the forfeiture was permissible because the car was used as an instrumentality of crime and the petitioner did not argue otherwise); *Id.* at 458, 116 S.Ct. 994 (Ginsburg, J., concurring) ("Michigan has decided to deter johns from using cars they own (or co-own) to contribute to neighborhood blight, and that abatement endeavor hardly warrants this Court's disapprobation.").

44    As the Supreme Court of Appeals of Virginia in *Martin v. Snowden*, 59 Va. (18 Gratt.) 100, 142-143 (1868), aff'd sub nom. *Bennett v. Hunter*, 76 U.S. (9 Wall.) 326, 19 L.Ed. 672 (1869), stated:

> This forfeiture cannot be sustained as a forfeiture for crime .... In such cases, the thing forfeited is the instrument by which the offence was committed, or was the fruit of the offence, and is treated as being itself, in some sort, the offender. But the land of a delinquent tax-payer cannot be brought within the principle of this class of cases; it is neither the instrument nor the fruit of any offence. Nor can we suppose that Congress intended to make it a criminal, or even a *quasi* criminal offence, for a man not to pay his taxes ....

45    U.S. Const., Am. V ("[N]or shall private property be taken for public use, without just compensation."); Const. 1963, art. 1, § 17 ("No person shall ... be deprived of life, liberty or property, without due process of law.").

46    MCL 211.78(2).

47    See *Jones v. Flowers*, 547 U.S. 220, 234, 126 S. Ct. 1708, 164 L. Ed. 2d 415 (2006) ("People must pay their taxes, and the government may hold citizens accountable for tax delinquency by taking their property. But before forcing a citizen to satisfy his debt by forfeiting his property, due process requires the government to provide adequate notice of the impending taking."); *Sidun*, 481 Mich. at 509, 751 N.W.2d 453 ("Proceedings that seek to take property from its owner must comport with due process.").

48    Compare Const. 1963, art. 10, § 2 (Michigan's Takings Clause) with Const. 1963, art. 1, § 17 (Michigan's Due Process Clause); see also Peñalver & Strahilevitz, *Judicial Takings or Due Process?*, 97 Cornell L. Rev. 305, 317-318 (2012) (stating that the Takings Clause and the Due Process Clause of the Fifth Amendment "have frequently been muddled together by courts and commentators alike," but "grammatically they operate independently of one another and the Supreme Court understands them to protect owners against different kinds of government harms") (citation omitted).

49    *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543, 125 S. Ct. 2074, 161 L. Ed. 2d 876 (2005) (quotation marks, citation, and emphasis omitted).

50    *Id.*; see also *Judicial Takings*, 97 Cornell L. Rev. at 320 ("Distinguishing between the Takings and Due Process Clauses is consistent with the text of the Constitution, but it also provides a richer conceptual vocabulary for evaluating constitutional property claims ...."). The GPTA, at one point, limited property owners

to a damages action under ⧉MCL 211.78l whenever "he or she did not receive any notice required under [the GPTA] ...." Once the judgment of foreclosure was entered and the former property owner's interest in the property was extinguished, the former owner could not bring an action for possession. But, in ⧉In re Petition By Treasurer of Wayne Co. for Foreclosure, 478 Mich. 1, 732 N.W.2d 458 (2007), this Court held that limitation unconstitutional. Thus, property owners can now file a motion to set aside their judgment of foreclosure if the foreclosing governmental unit failed to comply with due process when providing notice to owners.

51 U.S. Const., Am. V; U.S. Const., Am. XIV; see AFT Mich. v. Michigan, 497 Mich. 197, 217, 866 N.W.2d 782 (2015) ("The Fifth Amendment is applied to the states through the Fourteenth Amendment."), citing ⧉Chicago, B. & Q. R. Co. v. Chicago, 166 U.S. 226, 241, 17 S. Ct. 581, 41 L. Ed. 979 (1897).

52 Const. 1963, art. 10, § 2.

53 Compare ⧉Kelo v. New London, Conn., 545 U.S. 469, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005) (holding that the government's condemnation and transfer of private property to a private entity to facilitate economic development was a permissible "public use" under the Fifth Amendment's Takings Clause), with ⧉Wayne Co. v. Hathcock, 471 Mich. 445, 684 N.W.2d 765 (2004) (holding that a similar condemnation and transfer was not a permissible "public use" under Michigan's Takings Clause).

54 ⧉United States v. Clarke, 445 U.S. 253, 257, 100 S. Ct. 1127, 63 L. Ed. 2d 373 (1980) (explaining that the property owner's right to bring an inverse-condemnation action is derived from "the self-executing character of the constitutional provision with respect to compensation") (quotation marks and citation omitted).

55 ⧉Hart v. Detroit, 416 Mich. 488, 494, 331 N.W.2d 438 (1982) (discussing inverse-condemnation actions under Michigan law).

56 ⧉Horne v. Dep't of Agriculture, 576 U.S. 350, 135 S. Ct. 2419, 2425-2426, 192 L. Ed. 2d 388 (2015) (explaining that a "classic" or per se taking occurs when the government directly appropriates private property for its own use).

57 AFT Mich., 497 Mich. at 218, 866 N.W.2d 782 ("The term 'taking' can encompass governmental interference with rights to both tangible and intangible property."), citing ⧉Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1003, 104 S. Ct. 2862, 81 L. Ed. 2d 815 (1984) ("[I]ntangible property rights protected by state law are deserving of the protection of the Taking Clause...."); see also 1 Cooley, General Principles of Constitutional Law in the United States (1880), p. 336 (explaining that the federal Takings Clause protects "anything of value which the law recognizes as such, and in respect to which the owner is entitled to a remedy against any one who may disturb him in its enjoyment," regardless of "whether the property be tangible or intangible").

58 ⧉In re Certified Question, 447 Mich. 765, 788, 527 N.W.2d 468 (1994) (⧉Fun 'N Sun R.V., Inc. v. Michigan).

59 ⧉Phillips v. Washington Legal Foundation, 524 U.S. 156, 164, 118 S. Ct. 1925, 141 L. Ed. 2d 174 (1998) (quotation marks and citation omitted).

60 ⧉Hathcock, 471 Mich. at 468, 684 N.W.2d 765.

Rafaeli, LLC v. Oakland County, 505 Mich. 429 (2020)
952 N.W.2d 434

61   *Id.* at 471, 684 N.W.2d 765.

62   *Id.*

63   *People ex rel. Seaman v. Hammond*, 1 Doug. 276 (Mich., 1844).

64   *Id.* at 279-280.

65   *United States v. Taylor*, 104 U.S. 216, 217-218, 26 L. Ed. 721 (1881). Although we decide this case based on our state Constitution, we can look for guidance in the decisions of the United States Supreme Court regarding surplus proceeds and the federal Takings Clause.

66   *United States v. Lawton*, 110 U.S. 146, 3 S. Ct. 545, 28 L. Ed. 100 (1884).

67   *Id.* at 149-150, 3 S.Ct. 545 (emphasis added).

68   *Nelson v. City of New York*, 352 U.S. 103, 77 S. Ct. 195, 1 L. Ed. 2d 171 (1956).

69   The water charges for the first parcel amounted to $65. The first parcel's property value was assessed at $6,000, and it ultimately sold for $7,000. The water charges for the second parcel amounted to $814.50. The second parcel's property value was assessed at $46,000, but the city acquired title to that parcel and retained it. *Id.* at 105-106, 77 S.Ct. 195.

70   *Id.* at 108-109, 77 S.Ct. 195 ("We conclude ... that the City having taken steps to notify appellants of the arrearages and the foreclosure proceedings and their agent having received such notices, its application of the statute did not deprive appellants of procedural due process."). The Court also rejected the plaintiffs' equal-protection challenge. *Id.* at 109, 77 S.Ct. 195.

71   *Id.* at 110 & n. 10, 77 S.Ct. 195.

72   *Id.* at 110, 77 S.Ct. 195 (emphasis added).

73   And even if those cases had directly addressed the issue presented here, they would provide only helpful guidance; our decision interpreting Michigan's Constitution would not be bound by them.

74   *Coleman v. Dist. of Columbia*, 70 F. Supp. 3d 58, 80 (D. D.C., 2014), citing *Lawton*, 110 U.S. at 149, 3 S.Ct. 545; see also Clifford, *Massachusetts Has A Problem: The Unconstitutionality of the Tax Deed*, 13 U. Mass L. Rev. 274, 287 (2018) ("In summary, the *Coleman* court recognized that once a state recognizes a property interest in the taxpayer, it cannot summarily remove that interest.").

75   See MCL 211.78m(8)(h) (directing that any surplus proceeds from the tax-foreclosure sale be transferred into the county's general fund).

76   2 Cooley, Constitutional Limitations (8th ed.), p. 745 (quotation marks and citation omitted).

77   Cooley, General Principles, p. 315 (quotation marks and citation omitted).

78      Cooley, Constitutional Limitations, pp. 733-734, citing 4 Blackstone, Commentaries on the Laws of England, p. *424.

79      See Magna Carta, Grant 39 (1215) ("No freeman shall be ... disseised ... unless by the lawful judgment of his peers, or by the law of the land."); see also 📖 *Horne*, 135 S. Ct. at 2426 (discussing the history of the federal Takings Clause going as far back as the Magna Carta and making no distinction between real or personal private property); 📖 *Silver Creek Drain Dist. v. Extrusions Div., Inc.*, 468 Mich. 367, 373, 374 & n. 6, 663 N.W.2d 436 (2003) (explaining that the sovereign's power of eminent domain and its "ancient provenance" dates back to the Magna Carta); 📖 *Peterman v. Dep't of Natural Resources*, 446 Mich. 177, 186-187 & 187 n. 14, 521 N.W.2d 499 (1994) (discussing the history of eminent domain in America).

80      See Const. 1835, art. 1, § 19; Const. 1850, art. 18, § 14; Const. 1908, art. 13, § 1; Const. 1963, art. 10, § 2.

81      *People v. Woolfolk*, 497 Mich. 23, 25, 857 N.W.2d 524 (2014) (citations omitted).

82      See Johnson, *The Ancient Magna Carta and the Modern Rule of Law: 1215 to 2015*, 47 St. Mary's L. J. 1, 47 (2015), citing McKechnie, *Magna Carta: A Commentary on the Great Charter of King John* (Glasgow: James Maclehose & Sons, 2d ed., 1914), p. 322. Johnson explains that when a man died, officers would seek collection of the deceased's debts. *Ancient Magna Carta*, 47 St. Mary's L. J. at 47. However, these officials would often seize everything, sell the decedent's property for an amount far in excess of the debt, and refuse to disgorge the surplus to the decedent's heirs. *Id.* As a protection against such abuse practices, Clause 26 of the Magna Carta required that "the value of the goods seized had to approximate the value of the debt[,] and the process had to be superintended by worthy men whose function it was to form a check on the actions of the sheriff's officers." *Id.* (quotation marks and citation omitted); see also *Martin*, 59 Va. at 136 ("The summary methods employed in England in early times for the collection of debts to the Crown seem to have been turned to purposes of oppression, and ... [the] *Magna Charta* provided for their restraint.").

83      *Martin*, 59 Va. at 136-137 (explaining that while land was typically only taken to satisfy tax debts when personal property was insufficient to satisfy the debt, any surplus resulting from the sale of the property taken, real or personal, would be paid back to the owner).

84      2 Blackstone, Commentaries on the Laws of England, p. *452.

85      Cooley, Law of Taxation (3d ed.), p. 952.

86      *Id.* As support for this first method, Justice Cooley cites the Supreme Court's decision in 📖 *Lawton* for the notion that if land was sold to the United States for unpaid federal taxes, the United States remained liable to the former owner for any surplus. *Id.* at 952 & n. 1, citing 📖 *Lawton*, 110 U.S. 146, 3 S.Ct. 545, 28 L.Ed. 100.

87      📖 *Seaman*, 1 Doug. at 281.

88      Cooley, Law of Taxation, pp. 590-591 ("If the line which the legislature has established be once passed, we know of no boundary to the discretion of the assessors.") (quotation marks and citation omitted).

89      *Case v. Dean*, 16 Mich. 12, 19 (1867).

90      Cooley, Law of Taxation, p. 953 ("A sale of the whole when less would pay the tax would be such a fraud on the law as to render the sale voidable at the option of the landowner ....").

91    *Id.* at 952-958. Indeed, this was another method discussed by Justice Cooley to ensure that any "surplus moneys" remained with the landowner after the property was sold. *Id.* at 952-953. The other method was to require that a lien be placed on the land holding the purchaser accountable to pay the excess back to the original owner. *Id.* at 952.

92    Cooley, Constitutional Limitations, p. 1147.

93    See ⊞ *Peterman*, 446 Mich. at 201, 202 n. 36, 521 N.W.2d 499 ("As an unnecessary taking of property, defendant's actions violated the strict dictates of the constitutional guarantee that private property may be taken only when necessary for public purposes."); *Livonia Twp. Sch. Dist. v. Wilson*, 339 Mich. 454, 460, 64 N.W.2d 563 (1954) ("It is a general principle that the legislature cannot authorize the taking of property in excess of that required for public use."); *Cleveland v. Detroit*, 322 Mich. 172, 179, 33 N.W.2d 747 (1948) ("In acquiring property for public use it is not permissible for the city to take additional property not necessary for that public use for private purposes."); *Berrien Springs Water Power Co. v. Berrien Circuit Judge*, 133 Mich. 48, 53, 94 N.W. 379 (1903) ("[O]nly so much [land] can be taken as is necessary to the public use."); *Bd. of Health of Portage Twp. v. Van Hoesen*, 87 Mich. 533, 537, 49 N.W. 894 (1891) ("It can never be just to take property, under pretence of public benefit, which is not needed by the public ...."), citing *Paul v. Detroit*, 32 Mich. 108, 114 (1875) (explaining that the 1850 Michigan Constitution added a provision requiring juries to determine the necessity of a taking of private property for public use, as well as the compensation owed for that taking, because there was "a well founded belief, founded on experience, that private property was often taken improperly and without any necessity").

94    ⊞ *Detroit v. Walker*, 445 Mich. 682, 701-704, 520 N.W.2d 135 (1994) (explaining that citizens have a duty to pay their taxes and that the Legislature may enact procedural schemes "to secure taxes owed"); ⊞ *Peterman*, 446 Mich. at 184, 521 N.W.2d 499 (" '[I]t can never be lawful to compel any man to give up his property, when it is not needed, or to lose it, whether needed or not, without being made whole.' "), quoting *Paul*, 32 Mich. at 119; see also ⊞ *Fidlin v. Collison*, 9 Mich. App. 157, 167, 156 N.W.2d 53 (1967) (holding that under the GPTA's provision allowing seizure of personal property to satisfy unpaid taxes, the city treasurer's seizure of the plaintiffs' personal property valued at $629.32 to satisfy a $10,500 tax debt was "an excessive distraint" on their property, given that " '[t]he *amount of property distrained must not be excessive and, if it is, the seizure is illegal* '"), quoting 84 CJS, Taxation, § 694, p. 1371.

95    *Dean v. Dep't of Natural Resources*, 399 Mich. 84, 247 N.W.2d 876 (1976).

96    Notice of the hearing was published in the newspaper as required under the former version of the GPTA. *Id.* at 88, 247 N.W.2d 876, citing ⊞ MCL 211.66, repealed by 1999 PA 123.

97    *Dean*, 399 Mich. at 94-95, 247 N.W.2d 876.

98    ⊞ *Tkachik v. Mandeville*, 487 Mich. 38, 47-48, 790 N.W.2d 260 (2010) ("Unjust enrichment is defined as the unjust retention of money or benefits which in justice and equity belong to another. No person is unjustly enriched unless the retention of the benefit would be unjust.") (quotation marks and citations omitted).

99    While *Dean* stands for the proposition that a claim for the surplus proceeds may be asserted through unjust enrichment, and that the Court of Appeals concluded that plaintiffs abandoned their claim of unjust enrichment by failing to develop it in their briefing below. See ⊞ *Mitcham v. Detroit*, 355 Mich. 182, 203, 94 N.W.2d 388 (1959) (explaining that a party's failure to adequately brief an issue on appeal constitutes abandonment).

100   *Fun 'N Sun*, 447 Mich. at 788, 527 N.W.2d 468 (quotation marks and citation omitted); Cooley, General Principles, p. 320 ("The test of unlawful interference with property is that *vested* rights are abridged or taken away.") (emphasis added).

101   An often-used metaphor in property law further illustrates this point. Property rights are commonly referred to as a "bundle of sticks," with each stick representing a distinct right defined by state law. *United States v. Craft*, 535 U.S. 274, 278, 122 S. Ct. 1414, 152 L. Ed. 2d 437 (2002) ("A common idiom describes property as a 'bundle of sticks'—a collection of individual rights which, in certain combinations, constitute property. State law determines only which sticks are in a person's bundle.") (citation omitted). These sticks range from a property owner's right to use or enjoy the property, the right to eject others from the property, and the right to dispose of the property altogether. See *Adams v. Cleveland-Cliffs Iron Co.*, 237 Mich. App. 51, 57, 602 N.W.2d 215 (1999) ("The general concept of 'property' comprises various rights—a 'bundle of sticks,' as it is often called—which is usually understood to include '[t]he exclusive right of possessing, enjoying, and disposing of a thing.' "), quoting *Black's Law Dictionary* (6th ed.), p. 1216. Unlawful governmental interference with even one stick in that bundle constitutes a taking requiring just compensation. Our holding today recognizes that the right to collect any surplus proceeds that result from the sale of a person's property for unpaid taxes is one stick in the owner's bundle of rights, entitled to as much protection as any other stick in that bundle.

102   *Hathcock*, 471 Mich. at 471, 684 N.W.2d 765.

103   While the bulk of the revisions to the GPTA took place in 1999, the provision allowing counties to transfer any surplus proceeds to their general funds, MCL 211.78m(8)(h), was not added until 2006. See 2006 PA 498.

104   *Price v. High Pointe Oil Co., Inc.*, 493 Mich. 238, 242, 828 N.W.2d 660 (2013) (quotation marks and citation omitted).

105   *Beech Grove Investment Co. v. Civil Rights Comm.*, 380 Mich. 405, 430, 157 N.W.2d 213 (1968) ("The common law does not consist of definite rules which are absolute, fixed, and immutable like the statute law ....") (quotation marks and citation omitted).

106   *Price*, 493 Mich. at 243, 828 N.W.2d 660 ("The common law is always a work in progress and typically develops incrementally, i.e., gradually evolving as individual disputes are decided and existing common-law rules are considered and sometimes adapted to current needs in light of changing times and circumstances.").

107   Const. 1963, art. 3, § 7 (emphasis added).

108   Nothing in our holding today prevents the Legislature from enacting legislation that would require former property owners to avail themselves of certain procedural avenues to recover the surplus proceeds. See, e.g., *Nelson*, 352 U.S. at 110 & n. 10, 77 S.Ct. 195. We only hold that the Legislature may not write this constitutionally protected vested property right out of existence. See *Munn v. Illinois*, 94 U.S. 113, 134, 24 L. Ed. 77 (1876) ("A person has no property, no vested interest, in any rule of the common law.... Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, *unless prevented by constitutional limitations*.") (emphasis added); see also *Mackin v. Detroit-Timkin Axle Co.*, 187 Mich. 8, 13, 153 N.W. 49 (1915) ("*Except as to vested rights*, the legislative power exists to change or abolish existing statutory and common-law remedies.") (emphasis added). Further, because this common-law property right existed well before 1963, it cannot be said that our Constitution created this property right; rather, this right

was, and still is, commonly understood to be *protected* by Michigan's Takings Clause. See 🖺 *Phillips*, 524 U.S. at 164, 118 S.Ct. 1925 ("[T]he Constitution protects rather than creates property interests ....").

109    🖺 *Krench v. Michigan*, 277 Mich. 168, 179, 269 N.W. 131 (1936) (holding that a tax-foreclosure sale divests the former owner of title and vests title with the state in fee simple with a new chain of title being formed); 🖺 *James A. Welch Co., Inc. v. State Land Office Bd.*, 295 Mich. 85, 93-95, 294 N.W. 377 (1940) (holding that after the state received absolute title to land that was sold for delinquent property taxes, the former owner held no greater interest in title to the land than any other stranger); 🖺 *Meltzer v. State Land Office Bd.*, 301 Mich. 541, 545, 3 N.W.2d 875 (1942) (affirming 🖺 *Krench* and 🖺 *Welch* and concluding that once absolute title to a tax-foreclosed property vests with the state, the former owners hold "no interest in the land at the time of the tax sale").

110    🖺 *Welch*, 295 Mich. at 92, 294 N.W. 377 (quotation marks and citation omitted; emphasis added).

111    🖺 *Armstrong v. United States*, 364 U.S. 40, 48, 80 S. Ct. 1563, 4 L. Ed. 2d 1554 (1960) (holding that the government's "total destruction" of the value of a lienholder's lien against government-held property was an unconstitutional taking).

112    See 🖺 *Lawton*, 110 U.S. at 150, 3 S.Ct. 545 ("[S]o far as such owner is concerned, the surplus money is set aside as his as fully as if it had come from a third person .... It can make no difference that the United States acquired the property by bidding one dollar more."); 🖺 *Armstrong*, 364 U.S. at 48, 80 S.Ct. 1563 ("[T]he Government for its own advantage destroyed the value of the liens, something that the Government could do because its property was not subject to suit, but which no private purchaser could have done."); see also 🖺 *Bank of America, NA v. First American Title Ins. Co.*, 499 Mich. 74, 91, 878 N.W.2d 816 (2016) ("No one disputes that the mortgagee is entitled to recover only his debt. Any surplus value belongs to others, namely, the mortgagor or subsequent lienors.") (quotation marks and citation omitted).

113    See 🖺 *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164, 101 S. Ct. 446, 66 L. Ed. 2d 358 (1980) ("[A] State, by *ipse dixit*, may not transform private property into public property without compensation ....").

114    🖺 *Id.* at 162, 101 S.Ct. 446 (explaining that creditors of a deposit account, whose statutory right to collect a portion of the account's interest did not accrue until distribution of the account was ordered, had a cognizable property right despite that right not being immediately compensable).

115    See, e.g., 🖺 *Ritter v. Ross*, 207 Wis. 2d 476, 484-485, 558 N.W.2d 909 (1996) (analyzing the former property owners' claim for the surplus proceeds under the federal Takings Clause and holding that no taking under that clause occurred), cert. den. 522 U.S. 995, 118 S.Ct. 559, 139 L.Ed.2d 400 (1997); 🖺 *Auburn v. Mandarelli*, 320 A.2d 22, 25 (Me., 1974) (same).

116    See *AFT Mich.*, 497 Mich. at 217 & n. 9, 866 N.W.2d 782 ("Although the courts of this state have applied the state and federal Takings Clauses coextensively in many situations, this Court has found that [Michigan's Takings Clause] offers broader protection than [the federal Takings Clause].") (citation omitted), comparing 🖺 *Kelo*, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439, with 🖺 *Hathcock*, 471 Mich. 445, 684 N.W.2d 765.

117   See, e.g., Kelly v. Boston, 348 Mass. 385, 388, 204 N.E.2d 123 (1965) ("We think it is clear from the above history of the tax statutes that the Legislature intended the surplus from a sale of land taken for nonpayment of taxes, on which the right of redemption has been foreclosed in the Land Court, to belong to the municipality.");

Automatic Art., **LLC** v. Maricopa Co., unpublished opinion of the United States District Court for the District of Arizona, issued March 18, 2010 (Case No. CV 08-1484-PHX-SRB), pp. 5-7, 2010 WL 11515708 (holding that, under Arizona's statutory scheme governing tax foreclosures, the government's retention of the surplus proceeds is not an unconstitutional taking because "Arizona law does not provide for the recovery of any funds by a previous owner after a tax sale"); Reinmiller v. Marion Co., unpublished opinion of the United States District Court for the District of Oregon, issued October 16, 2006 (Case No. CV 05-1926-PK), pp. 2-4, 2006 WL 2987707 (holding the same under Oregon law).

118   See, e.g., Balthazar v. Mari Ltd., 301 F. Supp. 103, 105 n. 6 (N.D. Ill., 1969) ("Rather than taking private property for a public purpose, Illinois is here collecting taxes which are admittedly overdue."), aff'd 396 U.S. 114, 90 S.Ct. 397, 24 L.Ed.2d 307 (1969); Sheehan v. Suffolk Co., 67 N.Y.2d 52, 60, 490 N.E.2d 523, 499 N.Y.S.2d 656 (1986) ("There is no constitutional prohibition against such a full forfeiture."); Miner v. Clinton Co., 541 F.3d 464, 475 (C.A. 2, 2008) ("The retention of any surplus from a tax auction is constitutional because there was no violation of plaintiffs' right to due process related to the notices of foreclosure.").

119   See Bogie v. Barnet, 129 Vt. 46, 55, 270 A.2d 898 (1970) ("No justification for the withholding of this excess from the plaintiff, derived as it was from the compelled sale of his land, has been demonstrated. Its retention by the town amounts to an unlawful taking for public use without compensation, contrary to ... the Vermont Constitution."); Polonsky v. Bedford, 173 N.H. 226, 239, 238 A.3d 1102 (2020) (holding that, under New Hampshire's Takings Clause, "the taking of property without just compensation is unconstitutional, even when the municipality has taken the property by tax deed due to the former owner's failure to pay taxes," and that the municipality's failure to return any excess proceeds to the former owner is an unconstitutional taking), citing Thomas Tool Servs., Inc. v. Croydon, 145 N.H. 218, 220, 761 A.2d 439 (2000).

120   Defendants' Brief on Appeal (April 3, 2019) at 14.

121   Const. 1963, art. 9, § 1 ("The legislature shall impose taxes sufficient with other resources to pay the expenses of state government."); Const. 1963, art. 7, § 21 ("Each city and village is granted power to levy other taxes for public purposes, subject to limitations and prohibitions provided by this constitution or by law.").

122   Walker, 445 Mich. at 702, 520 N.W.2d 135 ("Traditionally, the property tax—and in particular, the tax on real property—has been the mainstay of municipal revenue-gathering—the largest single source of municipal revenue.") (quotation marks and citation omitted); see also Tax Liens, 75 Ind. L. J. at 756 (explaining that property taxes are the primary source of revenue for local governments and that "[t]he failure to collect even a small portion of property taxes can have a dramatic impact on local governments").

123   Koontz v. St. Johns River Water Mgt. Dist., 570 U.S. 595, 617, 133 S. Ct. 2586, 186 L. Ed. 2d 697 (2013) (quotation marks and citation omitted).

124   Cooley, General Principles, pp. 333-334.

125   See Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 124, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978); see also AFT Mich., 497 Mich. at 218, 866 N.W.2d 782 ("[G]overnmental action creating

general burdens or liabilities, i.e., merely requiring citizens to expend monies for valid public purposes and expenditures, typically will not form the basis for a cognizable taking claim.").

126  📖 *Webb's Fabulous Pharmacies*, 449 U.S. at 163, 101 S.Ct. 446, quoting 📖 *Armstrong*, 364 U.S. at 49, 80 S.Ct. 1563.

127  📖 *Bott v. Natural Resources Comm'n.*, 415 Mich. 45, 81 n. 43, 327 N.W.2d 838 (1982), quoting *Pearsall v. Eaton Co. Bd. of Supervisors*, 74 Mich. 558, 561, 42 N.W. 77 (1889).

128  See *Acker v. Comm'r of Internal Revenue*, 258 F.2d 568, 574 (C.A. 6, 1958) ("[D]espite the breadth of the taxing power conferred by the Constitution, there might arise 'a case where, although there was a seeming exercise of the taxing power, the act complained of was so arbitrary as to constrain to the conclusion that it was not the exertion of taxation but a confiscation of property; that is, a taking of the same in violation of the 5th Amendment[.]' "), quoting 📖 *Brushaber v. Union Pacific R. Co.*, 240 U.S. 1, 24-25, 36 S. Ct. 236, 60 L. Ed. 493 (1916).

129  📖 *Hart*, 416 Mich. at 494, 331 N.W.2d 438.

130  See *State Theft*, 54 Real Prop. Tr. & Est. L. J. at 124 & nn. 219-220 ("In the case of property tax foreclosure, there is some compensation provided to the owner because the proceeds from the property sale are used to satisfy the amount that the property owner owes the government in taxes, interest, and fees. This is a form of compensation because after the property is sold the former owner's debt is canceled."), citing Comment, *Tax Foreclosure: A Drag On Community Vitality Or A Tool For Economic Growth?*, 81 U. Cin. L. Rev. 1615, 1617 (2013) (explaining that the collection of unpaid real-property taxes involves, among other things, "liquidation of the property by public sale in order to satisfy the debt owed").

131  Plaintiffs' Supplemental Brief on Appeal (December 13, 2019) at 4 n. 1, citing 📖 *United States v. Miller*, 317 U.S. 369, 373, 63 S. Ct. 276, 87 L. Ed. 336 (1943) (stating that just compensation for a takings claim requires that the property owner "be put in as good position pecuniarily as he would have occupied if his property had not been taken").

132  This distinction also explains why the Michigan Takings Clause's 125% requirement does not apply. That provision is triggered only when the property taken consists of an individual's principal residence. That is not the case here.

133  *In re State Hwy. Comm'r*, 249 Mich. 530, 535, 229 N.W. 500 (1930) ("Just compensation should neither enrich the individual at the expense of the public nor the public at the expense of the individual.").

134  Plaintiffs suggest that they are entitled to the equity they held in their properties before foreclosure, but throughout their briefing they conflate equity with surplus proceeds, suggesting that they are one in the same. See Plaintiffs' Brief on Appeal (February 13, 2019) at 12 ("Equity is realized when property is sold. Thus, logically, common law and statutory law have traditionally treated the surplus proceeds from the sale of foreclosed property as representing the former owner's equity."). Similarly, the concurring opinion asserts that the property right taken is the equity a former property owner held in his or her property prior to foreclosure. The concurring opinion supports this assertion with scant caselaw, relying primarily on the "equity of redemption" as representing an owner's equity interest in property. Yet the concurring opinion acknowledges that equity of redemption and equity are distinct concepts, with the former serving to protect the latter. Further, we are unaware of any authority affirming a vested property right to equity held in property generally. Nor is it necessary for us to do so here. The question presented is whether a former property owner retains the ability to collect any surplus proceeds that might result after the government seizes title to real

Rafaeli, LLC v. Oakland County, 505 Mich. 429 (2020)
952 N.W.2d 434

property for failure to pay taxes and then sells that property for more than the tax delinquency. The earlier discussion reaffirms a former property owner's vested common-law property right to the surplus proceeds resulting from a tax-foreclosure sale that is protected by our state's Takings Clause. Thus, plaintiffs have a compensable takings claim for the surplus proceeds, i.e., the value of the property taken.

1    I concur in all parts except Parts IV(C), V(A), V(C), and VI.

2    *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164, 118 S. Ct. 1925, 141 L. Ed. 2d 174 (1998) (quotation marks and citation omitted).

3    *Wayne Co. v. Hathcock*, 471 Mich. 445, 468, 684 N.W.2d 765 (2004).

4    The Takings Clause reads, in pertinent part: "Private property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law." Const. 1963, art. 10, § 2.

5    *Ante* at 460.

6    *Hathcock*, 471 Mich. at 468, 684 N.W.2d 765.

7    Cf. McGinnis & Rappaport, *Original Interpretive Principles as the Core of Originalism*, 24 Const. Comment 371, 378 (2008) ("The original meaning of the words would not normally be defined by the expected applications, but instead by the meaning that people at the time would understand the words to have.").

8    Cooley, Constitutional Limitations (5th ed.), p. 49 (explaining that the purpose of interpretation is to "find[ ] out the true sense of any form of words").

9    *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378, 65 S. Ct. 357, 89 L. Ed. 311 (1945).

10   "Res" is Latin for "thing; event, business; fact; cause; property[.]" University of Notre Dame, *William Whitaker's Words* <http://archives.nd.edu/cgi-bin/wordz.pl?keyword=res> (accessed June 26, 2020) [https://perma.cc/5HEJ-RHSD].*Black's Law Dictionary* (11th ed.) now defines it as "*n.* [Latin 'thing'] (17c) **1.** An object, interest, or status, as opposed to a person ...."

11   See McConnell, *The Importance of Humility in Judicial Review: A Comment on Ronald Dworkin's "Moral Reading" of the Constitution*, 65 Fordham L. Rev. 1269, 1284 (1997) ("Mainstream originalists recognize that the Framers' analysis of particular applications could be wrong, or that circumstances could have changed and made them wrong .... [T]hey believe that '[w]e are governed by what our lawmakers said— by the principles they laid down—not by any information we might have about how they themselves would have interpreted those principles or applied them in concrete cases.' ") (citation omitted); Balkin, *Living Originalism* (Cambridge: The Belknap Press of Harvard University Press, 2011), p. 13 ("Fidelity to original meaning as original semantic content does not require that we must apply [for example] the equal protection clause the same way that people at the time of enactment would have expected it would be applied."); Whittington, *Constitutional Interpretation: Textual Meaning, Original Intent, and Judicial Review* (Lawrence: University Press of Kansas, 1999), p. 178 ("An expectation, in and of itself, is derived from the text and as a prediction about its effects in the future is only contingently related to the text .... [T]he author has no special authority relative to expectations about effects."); Scalia, *A Matter of Interpretation: Federal Courts and the Law* (Princeton: Princeton University Press, 1997), p. 144 ("I agree with the distinction ... between ... 'semantic intention' and the concrete expectations of lawgivers. It is indeed the former rather than the latter that I follow."); Rosenthal, *Originalism in Practice*, 87 Ind. L. J. 1183, 1209 (2012) ("Most originalists draw a distinction between the original meaning of constitutional text and its originally intended applications, arguing that only the former is interpretively binding.") (collecting sources); Barnett, *An Originalism for Nonoriginalists,*

45 Loy. L. Rev. 611, 622 (1999) ("While some originalists still search for how the relevant generation of ratifiers expected or intended their textual handiwork would be applied to specific cases, original meaning originalists need not concern themselves with this, except as circumstantial evidence of what the more technical words and phrases in the text might have meant to a reasonable listener.").

The majority's emphasis on expected applications rather than the semantic content of the text itself fundamentally misperceives the object of interpretation as the ratifiers' intentions rather than the original public meaning of the text. As Robert Bork described the larger interpretive principle, the search for the "understanding of the ratifiers ... is actually a shorthand formulation" for what courts must interpret "because what the ratifiers understood themselves to be enacting must be taken to be what the public of that time would have understood the words to mean. It is important to be clear about this. The search is not for a subjective intention." Bork, *The Tempting of America: The Political Seduction of the Law* (New York: Simon & Schuster Inc., 1990), p. 144. See also Calabresi & Fine, *Two Cheers for Professor Balkin's Originalism*, 103 N.W. U. L. Rev. 663, 669 (2009) ("What judges must be faithful to is the enacted law, not the expectations of the parties who wrote the law .... The enactment into law of these texts was an open democratic process, and every citizen was entitled to think that the words in the texts that were enacted meant what a good dictionary in use at the time said they meant.").

Contemporaneous expectations about how the constitutional text applied in a case are useful only to the extent they shed light on the original public meaning. Whittington, *Originalism: A Critical Introduction*, 82 Fordham L. Rev. 375, 385 (2013) ("[E]xpected applications might be helpful to later interpreters in clarifying the substantive content of the embodied constitutional rule. The Founders could be mistaken or disingenuous about the implications of adopting a proposed rule, but the rule itself must be publicly understandable. If examples of likely applications of the rule are regularly offered and there is widespread agreement on such applications, then they may be reflective of the content of the rule in question."); *Original Interpretive Principles*, 24 Const. Comment at 378 (noting that expected applications are not tantamount to original meaning but can provide evidence of that meaning).

12  See Slocum, *Ordinary Meaning: A Theory of the Most Fundamental Principle of Legal Interpretation* (Chicago: University of Chicago Press, 2015), p. 222.

13  Justice Thomas Cooley recognized, for example, that the same text bearing the same meaning could, over time, come to take on a different significance because changing circumstances (e.g., technology) could change the objects that fell within the unchanged textual meaning: "The bounds of [constitutional] power remain the same, but the new creations that come within its compass give it an importance which those who devised it never dreamed of." Cooley, *The Comparative Merits of Written and Prescriptive Constitutions*, 2 Harv. L. Rev. 341, 355 (1889); see also *Dist. of Columbia v. Heller*, 554 U.S. 570, 582, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008) ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, ... and the Fourth Amendment applies to modern forms of search, ... the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."); Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p. 86 ("The meaning of rules is constant. Only their application to new situations presents a novelty .... Broad language can encompass the onward march of science and technology[.]").

14  See *Black's Law Dictionary* (11th ed.) (defining "property" as, "[c]ollectively, the rights in a valued resource such as land, chattel, or an intangible" or "[a]ny external thing over which the rights of possession, use, and enjoyment are exercised").

Rafaeli, LLC v. Oakland County, 505 Mich. 429 (2020)
952 N.W.2d 434

15    *Webster's Seventh New Collegiate Dictionary* (1963); see also *The American Heritage Dictionary of the English Language* (1969) ("**1.** Ownership. **2.** A possession, or possessions collectively. **3.** Something tangible or intangible to which its owner has legal title."); 8 *Oxford English Dictionary* (1933) ("That which one owns; a thing or things belonging to or owned by some person or persons; ... [a] piece of land owned[.]").

16    Cf. [🔖]*PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 93, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980) (Marshall, J., concurring) ("Such an approach would freeze the common law as it has been constructed by the courts, perhaps at its 19th-century state of development. It would allow no room for change in response to changes in circumstance.").

17    The breadth of the opinion stems, in part, from the majority's misunderstanding about what it means for a right to be "vested." The majority suggests that the right to surplus proceeds is "vested" because "the right to collect these proceeds was beyond a mere expectancy or claim of entitlement," apparently because the proceeds can be owned. *Ante* at 459. In other words, the right is somehow vested irrespective of any individual circumstances—it is vested in the ether. But that is not how it works. "To constitute a vested right, the interest must be something more than such a mere expectation as may be based upon an anticipated continuance of the present general laws; it must have become a title, legal or equitable, to the present or future enjoyment of property ...." [🔖]*In re Certified Question*, 447 Mich. 765, 788, 527 N.W.2d 468 (1994) (quotation marks and citation omitted). "Vested" means "[h]aving become a completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute ...." *Black's Law Dictionary* (11th ed.). This requires a real person or entity and a real property right, not simply a property right in the abstract. See [🔖]*Wylie v. City Comm. of Grand Rapids*, 293 Mich. 571, 586, 292 N.W. 668 (1940) (noting, in the related context of due process, that " '[r]ights are "vested" when the right of enjoyment, present or prospective, has become the property of some particular person or persons as a present interest' ") (citation omitted); Cooley, Constitutional Limitations, p. 438 (describing vested rights in the context of an individual's rights and interests); 5 Smith & Philbin, Michigan Civil Jurisprudence, Constitutional Law (May 2020 update), § 300 (noting this definition).

For instance, I do not have a vested property right in a wild fox simply because, if I captured one, the law would recognize my ownership of it. Cf. [🔖]*Pierson v. Post*, 3 Cai. R. 175, 2 Am. Dec. 264 (1805). If, before I even don my hunting cap, the Legislature proscribes or limits ownership of foxes, no one would say I have been deprived of a vested property right in the fox I never owned or caught. At best, I had an expectation or hope. In the same way, someone who does not now own a home but would like to own one in the future does not have any vested property right in a home. As Justice Cooley stated, "[A] mere expectation of property in the future is not considered a vested right ...." Cooley, Constitutional Limitations, p. 440. And as discussed below, there is no vested right in a mere common-law rule. See *post* at nn. 20-21 and accompanying text. Thus, although the majority purports to cabin its opinion to vested rights, its misconception of those rights leads to a wider application that encompasses nonvested rights as well.

18    See *Cobleigh v. State Land Office Bd.*, 305 Mich. 434, 436-437, 9 N.W.2d 665 (1943).

19    [🔖]*Buckeye Union Fire Ins. Co. v. Michigan*, 383 Mich. 630, 639, 178 N.W.2d 476 (1970) (discussing [🔖]*Baker v. State Land Office Bd.*, 294 Mich. 587, 293 N.W. 763 (1940)); see also *Dumphey v. Hilton*, 121 Mich. 315, 317, 80 N.W. 1 (1899) ("It was held by the United States Supreme Court that the right of redemption from tax sales, although it is to be regarded favorably, does not exist, except as permitted by statute .... 'While it may well be doubted whether the legislature could enact an immediate bar to any existing right, yet it is clearly settled that to prescribe the period within which any right may be enforced is within their power.' ") (citations omitted). We had earlier said that "the equity of redemption"—which was the redemption right at common

law—"appertains to and goes with the title to the real estate, and is in law the property of the owner of the fee. It is an interest in land ...." *Case v. Ranney*, 174 Mich. 673, 681, 140 N.W. 943 (1913).

20   The New York Court of Appeals held, for example, that the legislature could "extinguish [a] property right by the simple expedient of repealing the provision which gives rise to it," but only prospectively and not as to property already vested. *Alliance of American Insurers v. Chu*, 77 N.Y.2d 573, 585-586, 571 N.E.2d 672, 569 N.Y.S.2d 364 (1991); *id.* at 589, 571 N.E.2d 672, 569 N.Y.S.2d 364 ("Nothing in our decision prevents the State from changing the law as it affects future contributions."); 29A CJS, Eminent Domain (June 2020 update), § 72 ("It has also been held that, just as a state legislature has the power to statutorily create property interests, so too may it legislatively alter or take away those same property interests, though its power to alter the rights and obligations that attach to completed transactions is not as broad as its power to regulate future transactions."). It is true that these sources refer to statutorily created property rights rather than those that arose from the common law. But this distinction is immaterial because, as explained below, the Legislature can abrogate the common law.

21   Const. 1963, art. 3, § 7 ("The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed.").

22   *Munn v. Illinois*, 94 U.S. 113, 134, 24 L. Ed. 77 (1876) (discussing due process).

23   Cf. *Bank Markazi v. Peterson*, 578 U.S. ——, ——, 136 S. Ct. 1310, 1324, 194 L. Ed. 2d 463 (2016) ("The Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of vested property rights except for a 'public use' and upon payment of 'just compensation.' ") (quotation marks and citation omitted); *In re Certified Question*, 447 Mich. at 787-788, 527 N.W.2d 468 ("One who asserts an uncompensated taking claim must first establish that a *vested* property right is affected.") (emphasis added).

24   See Cooley, Constitutional Limitations, p. 440 ("Acts of the legislature ... cannot be regarded as opposed to fundamental axioms of legislation, 'unless they impair rights which are vested; because most civil rights are derived from public laws; and if, before the rights become vested in particular individuals, the convenience of the State procures amendments or repeals of those laws, those individuals have no cause of complaint.' ") (citation omitted).

25   There is no need to decide in this case whether other constitutional provisions may limit the Legislature's ability to define property. My point is only that no such limitation may be found in the Takings Clause.

26   *Bowen v. Gilliard*, 483 U.S. 587, 607, 107 S. Ct. 3008, 97 L. Ed. 2d 485 (1987); see also Peterson, *The Taking Clause: In Search of Underlying Principles Part I—A Critique of Current Takings Clause Doctrine*, 77 Calif. L. Rev. 1299, 1313 (1989) ("In a number of other takings cases, the Court has said that unless a right created by positive law is a 'vested right,' it is not property within the meaning of the takings clause. The Court's reasoning is that when the government grants A a legal right, it normally retains the power to change the law to promote the general welfare, and thus no taking occurs when the government exercises its retained power, even though the change in the law eliminates A's rights under the prior law. As the Court expresses it, A has not lost any 'vested rights.' ").

27   *Phillips*, 524 U.S. at 164, 118 S.Ct. 1925 (quotation marks and citation omitted; emphasis added).

28   *Id.* See also *Kafka v. Montana Dep't of Fish, Wildlife & Parks*, 348 Mont. 80, 93, 2008 MT 460, 201 P.3d 8 (2008) ("Property interests themselves are not defined by the [federal] Takings Clause, or for that matter by [the state's taking clause]" but by " ' "background principles" and "rules and understandings" [that] focus on the nature of the citizen's relationship to the alleged property, such as whether the citizen had the rights to exclude, use, transfer, or dispose of the property.' ") (citations omitted); *Cheatham v. Pohle*, 789 N.E.2d 467, 473 (Ind., 2003) ("The plaintiff has no property to be taken except to the extent state law creates a property right."); *Mayor & City Council of Baltimore v. Bregenzer*, 125 Md. 78, 93 A. 425, 426 (1915) ("The section of the Constitution quoted does not define property, nor does it declare what shall be a taking. It leaves those questions to the determination of the courts upon the facts of each particular case.").

29   *Coleman v. Dist. of Columbia*, 70 F. Supp. 3d 58, 80 (D. D.C., 2014).

30   This result goes well beyond what the United States Supreme Court has done. Even with regard to vested property rights, the United States Supreme Court has recognized that "the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; '[a]s long recognized, some values are enjoyed under an implied limitation and must yield to the police power.' " *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992), quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S. Ct. 158, 67 L. Ed. 322 (1922). "And in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale)." *Lucas*, 505 U.S. at 1027-1028, 112 S.Ct. 2886. Elaborating on these points in his *Lucas* dissent, Justice Stevens observed that "[a]rresting the development of the common law" would be "a departure from our prior decisions[.]" *Id.* at 1069, 112 S. Ct. 2886 (Stevens, J., dissenting). Legislatures, he explained, "often revise the definition of property and the rights of property owners. Thus, when the Nation came to understand that slavery was morally wrong and mandated the emancipation of all slaves, it, in effect, redefined 'property.' " *Id.* All of this—in both the majority and dissent—referred to the legislature's expansive power over property a person already owned. In this case, the majority goes in the opposite direction and ties the Legislature's hands in regulating property that does not yet exist and that *no one* yet owns.

31   Const. 1963, art. 4, § 1.

32   E.g., *Hoerstman Gen. Contracting, Inc. v. Hahn*, 474 Mich. 66, 74, 711 N.W.2d 340 (2006) ("The Legislature has the authority to abrogate the common law.").

33   Emphasis added.

34   E.g., *Rusinek v. Schultz, Snyder & Steele Lumber Co.*, 411 Mich. 502, 508, 309 N.W.2d 163 (1981) ("[S]tatutes in derogation of the common law must be strictly construed ....").

35   Additionally, I believe that the majority's approach has broad implications in the realm of regulatory takings. If the ratifiers' understanding of which particular objects an individual may have property rights in is now set in stone in the Constitution, I see no reason why the ratifiers' understanding of the scope of their property rights is also not set in stone. In other words, under the majority's approach, if the ratifiers believed that their property interest entitled them to use a res in a variety of ways, each of those ways must be read into the

definition of "property" under the Takings Clause. Consequently, it would be unconstitutional for a regulation to take away any use of a res that the ratifiers would have understood their property rights to include.

36    *Ante* at 459.

37    *Ante* at 454-55. Clause 26 of the Magna Carta reads:

If at the death of a man who holds a lay 'fee' of the Crown, a sheriff or royal official produces royal letters patent of summons for a debt due to the Crown, *it shall be lawful for them to seize and list movable goods* found in the lay 'fee' of the dead man to the value of the debt, as assessed by worthy men. Nothing shall be removed until the whole debt is paid, when the residue shall be given over to the executors to carry out the dead man's will. If no debt is due to the Crown, all the movable goods shall be regarded as the property of the dead man, except the reasonable shares of his wife and children. [Johnson, *The Ancient Magna Carta and the Modern Rule of Law: 1215 to 2015*, 47 St. Mary's L. J. 1, 47 (2015) (emphasis added).]

38    See Baker, *An Introduction to English Legal History* (Dayton: LexisNexis, 2002), p. 223 ("The most fundamental distinction in the English law of property was between real property (realty) and personal property (personalty)."). Indeed, the conception of ownership of land—real property—was only just emerging in the thirteenth century from innovations within the feudal system. *Id.* at 223-237; see also Turner, *The Equity of Redemption: Its Nature, History and Connection with Equitable Estates Generally* (Cambridge: Cambridge University Press, 1931), pp. 1-3. The majority's resort to Blackstone is similarly unavailing because Blackstone's discussion of bailments deals with *goods* rather than real property. See *ante* at 454-55, citing 2 Blackstone, Commentaries on the Laws of England, p. *452.

39    *Ancient Magna Carta*, 47 St. Mary's L. J. at 47.

40    *Seaman*, 1 Doug. at 278.

41    The majority also cites *United States v. Lawton*, 110 U.S. 146, 3 S. Ct. 545, 28 L. Ed. 100 (1884), and *Nelson v. City of New York*, 352 U.S. 103, 77 S. Ct. 195, 1 L. Ed. 2d 171 (1956). See *ante* at 453 ("Significantly, *Seaman*, *Lawton*, and *Nelson* all address a former property owner's *statutory* right to recover the surplus proceeds."). See also *ante* at 453 ("*Lawton* and *Nelson* establish that the Takings Clause under the United States Constitution may afford former property owners a remedy when a tax-sale statute provides the divested property owner an interest in the surplus proceeds and the government does not honor that statutory interest.").

42    *Ante* at 456.

43    See also *Tkachik v. Mandeville*, 487 Mich. 38, 47-48, 790 N.W.2d 260 (2010) ("Unjust enrichment is defined as the unjust retention of ' "money or benefits which in justice and equity belong to another." ' "), quoting *McCreary v. Shields*, 333 Mich. 290, 294, 52 N.W.2d 853 (1952) (citation omitted).

44    *Dean v. Dep't of Natural Resources*, 399 Mich. 84, 94-95, 247 N.W.2d 876 (1976).

45    The majority also cites the brief discussion on surplus proceeds in Cooley, Law of Taxation (3d ed.), p. 952. See *ante* at 455. But Cooley never stated the right to surplus was of common-law origin. Instead, the treatise explained that "[v]arious methods are *adopted* in different states to save, *if possible*, something to the owner when his land is sold." Cooley, Law of Taxation, p. 952 (emphasis added). As the majority notes, Cooley

found support in [image]*Lawton*, 110 U.S. 146, 3 S.Ct. 545, 28 L.Ed. 100, but that is another case dealing with a statutory scheme rather than the common law. See *ante* at 455 n. 86.

46    Sutherland, *The Assize of Novel Disseisin* (Oxford: Clarendon Press, 1973), pp. 12, 138; see also Hazeltine, *General Preface*, in Turner, *The Equity of Redemption*, pp. xxiv-xxx (describing the gage as a conveyance on condition precedent); 3 Holdsworth, A History of English Law (3d ed.), pp. 128-129 (calling the interest a mortgage but differentiating it from later practices and explaining that the creditor could not dispossess the debtor if the latter had possession).

47    See *An Introduction to English Legal History*, pp. 311-312 ("[T]he mortgagor conveyed the fee to the mortgagee forthwith, on condition that he might re-enter (and regain the fee) if he paid by a certain date,... [This] gave the mortgagee a fee simple defeasible by condition subsequent (that is, payment)."); Simpson, *An Introduction to the History of the Land Law* (London: Oxford University Press, 1961), p. 225 ("[T]he mortgagor conveyed his lands outright in fee simple to the mortgagee, with a covenant for re-conveyance if the debt was repaid on time; this is the classical common law mortgage ...."); 3 Holdsworth, p. 129 ("It was probably due chiefly to the latter cause [i.e., the creditor's inability to recover the land from a debtor in possession] that the peculiar interest of the mortgagee ... disappeared. He ceased to take a peculiar interest as mortgagee, and took instead some one of the recognized estates or interests in the land—a fee simple, a life estate, or a term..., The debtor might convey the land to the creditor in fee, with a proviso that if the debt was paid by a fixed date the land should be reconveyed[.]"); Turner, *The English Mortgage of Land as a Security*, 20 Va. L. Rev. 729, 729 (1934) ("The English mortgage has developed from a form of conveyance in use in the 16th century comprising an absolute conveyance to the lender with a proviso that, on the borrower repaying the principal with interest and costs by a fixed day, the lender would reconvey the property to him."); Lloyd, *Mortgages—The Genesis of the Lien Theory*, 32 Yale L. J. 233, 234 (1923) ("If the debt was not paid on the day named, the estate of the creditor became absolute. After default no right of redemption was admitted.").

48    See Restatement Property, 3d, Mortgages, § 3.1, comment a ("The consequences of payment default were especially harsh on the mortgagor. If for any reason the payment was not made on law day, the borrower forfeited all interest in [the property]."); 5 Tiffany, Real Property (3d ed., November 2019 update), § 1518 (noting that equity intervened out of justice because "no foreclosure was necessary [under the common-law mortgage], since the mere breach of the condition vested an absolute estate in the mortgagee"); *An Introduction to English Legal History*, p. 313 (explaining that equity courts began granting relief in this situation because "[t]he moneylender was morally entitled only to the debt, and perhaps some reasonable profit, but ought not to profit unconscionably from a penal arrangement"); *An Introduction to the History of the Land Law*, pp. 226-227 ("The common law courts construed mortgage transactions strictly and unsympathetically. If the mortgage provided that the mortgagor was to lose his land through defaulting in payment upon a fixed day then that was that; it mattered nothing that he defaulted by a single day, or that the property was worth infinitely more than the debt."); 5 Holdsworth, *A History of English Law* (1924), pp. 330-331 (noting that equity granted relief because of the penal character of the forfeiture); Sugarman & Warrington, *Land Law, Citizenship, and the Invention of "Englishness": The Strange World of the Equity of Redemption*, in *Early Modern Conceptions of Property* (Brewer & Staves eds., 1995), p. 113 ("A single day's delay in tendering repayment could result in the borrower losing the entire property to the lender, even though the amount of the loan might be far less than the value of the land."); Burkhart, *Fixing Foreclosure*, 36 Yale L. & Pol'y Rev. 315, 320 (2018) (noting that this "process," as incorporated in the American colonies, "often gave lenders an especially large windfall because land values were increasing at a greater rate than had previously occurred anywhere"); Weinberger, *Tools of Ignorance: An Appraisal of Deficiency Judgments*, 72 Wash. & Lee L. Rev. 829, 849-850 (2015) (noting that the borrower was not entitled to any surplus and lost title and all interest in the property); Mattingly, *The Shift From Power to Process: A Functional Approach to Foreclosure Law*, 80 Marq. L. Rev. 77, 90 (1996) ("The pendulum of power swung towards the borrower with the intervention of the Equity Courts, which viewed the borrower's forfeiture of any interest in the property as unduly harsh.");

Wechsler, *Through the Looking Glass: Foreclosure by Sale as De Facto Strict Foreclosure—An Empirical Study of Mortgage Foreclosure and Subsequent Resale*, 70 Cornell L. Rev. 850, 856 (1985) ("Equity soon recognized the injustice of the forfeiture inherent in this situation.").

The same points are true regarding strict foreclosures, which developed along with the changes in mortgage law described above and, as in the present case, transfers title by court decree rather than automatically by extinguishment of the condition subsequent or by foreclosure sale. In strict foreclosure, as under the common-law mortgage or the statutes at issue here, the homeowner loses his or her equity in the property. Ghent, *How Do Case Law and Statute Differ? Lessons from the Evolution of Mortgage Law*, 57 J. L. & Econ. 1085, 1094 (2014) ("Strict foreclosure involved the lender going to an equity court and asking it to terminate the borrower's equity of redemption; foreclosure by sale of the property was not permitted, and any equity the borrower had in the property would be lost in the foreclosure."); Tracht, *Renegotiation and Secured Credit: Explaining the Equity of Redemption*, 52 Vand. L. Rev. 599, 607 (1999) ("Under strict foreclosure (where foreclosure vests title in the lender), there will be a forfeiture by the borrower and a windfall to the lender if the property is worth more than the debt."); Brabner-Smith, *Economic Aspects of the Deficiency Judgment*, 20 Va. L. Rev. 719, 720-721 n. 2 (1934) (Strict foreclosure "is a proceeding in which the decree finds that the mortgagee debt is due and has not been paid, that title to the property therefore is absolute in the mortgagee, and that the mortgagor is entirely divested of whatever interest he had in the premises at the time of the execution of the mortgage. There is no sale and no resulting deficiency or surplus.").

49     See 1 Coote, A Treatise on the Law of Mortgages (2d ed.), pp. 19-20 ("[Equity courts] declared it unreasonable that [the mortgagee] should retain for his own benefit, what was intended as a mere pledge; and they adjudged that the breach of the condition was in the nature of a penalty, which ought to be relieved against, and that the mortgagor had an equity to redeem on payment of principal, interest, and costs ...."); Sugarman & Warrington, *Equity of Redemption*, p. 113 ("Dating from at least the turn of the seventeenth century, the courts of equity determined that the strict date for repayment was somewhat irrelevant. Accordingly, the lender's claim to the property became subject 'to a right called the equity of redemption, which arose from the court's consideration that the real object of the transaction was the creation of a security for the debt. This entitled the [borrower] to redeem (or recover the property), even though he had failed to repay by the appointed time.' ") (citation omitted; brackets in original); Waddilove, *The "Mendacious" Common-Law Mortgage*, 107 Ky. L. J. 425, 457 (2019) ("The equity of redemption ... looked to what it deemed to be underlying substance of the mortgage agreement and gave effect to that over legal interpretation.").

The mortgagor's specific right to redeem property after foreclosure has been codified in Michigan, and the foreclosure sale purchaser's deed does not vest until the redemption period ends. See MCL 600.3240(1) and (2); MCL 600.3236. See also ⬛*People v. March*, 499 Mich. 389, 416-421, 886 N.W.2d 396 (2016).

50     As described in the Restatement Property, 3d, Mortgages, § 3.1, comment *a*, the "concept [of equitable redemption] evolved from simply a late payment rule to connote, in addition, the mortgagor's ownership interest in the land prior to the satisfaction of the mortgage. The term 'equity' became and is today the pervasively used term to describe this interest." See also *Case*, 174 Mich. at 681, 140 N.W. 943 ("As a general proposition, the equity of redemption appertains to and goes with the title to the real estate, and is in law the property of the owner of the fee. It is an interest in land ...."); *An Introduction to English Legal History*, p. 314 ("The equity of redemption had thus become a right inherent in the land .... [T]he great landowner of the seventeenth, eighteenth and nineteenth centuries was commonly in possession of his land (or some of it) only as the owner of an equity of redemption. The equity could be bought and sold, settled in tail, and even mortgaged.... [I]t had become an equitable estate[.]"); *An Introduction to the History of the Land Law*, pp. 227-228 ("[T]he equity of redemption [was] a peculiar form of property which could be dealt with by the debtor like other forms of equitable property.... In the eighteenth century the final touches were put upon the conception; the equity of redemption is spoken of as an estate in the land, and the mortgagor is regarded as

the owner in equity of the land."); Turner, *The Equity of Redemption*, pp. 66-67 (" 'An equity of redemption is considered as an estate in land[.] ... The person having the equity of redemption is considered as the owner of the land .... An equity of redemption, ... unforeclosed, is the ownership of the land, or the real estate in equity[.]' ") (citation omitted); 6 Holdsworth, *A History of English Law* (1924), p. 663 ("The result had been to make the mortgagor's equity to redeem a right of property. He had an equitable estate in the land; and, subject to the legal rights of the mortgagee, was, in equity, regarded as its owner."); 5 Holdsworth, p. 332 ("[I]t became clear that this equitable right to redeem was in substance an equitable estate in the land which could be conveyed or settled like any other estate."); Waddilove, *Why the Equity of Redemption?*, in *Land and Credit: Mortgages in the Medieval and Early Modern European Countryside* (Briggs & Zuiderduijn eds., 2018), § 5.1, pp. 1-2 ("According to the equity of redemption, a mortgagor remained the true owner of mortgaged property throughout a mortgage despite lacking legal title; a mortgagee's interest was mere security for a debt; and a mortgagor was thus entitled to redeem the property at any time ... until his or her equity of redemption was declared foreclosed by a court."); Sugarman & Warrington, *Equity of Redemption*, pp. 115-116 (noting the "shift of the equity of redemption from a 'thing' to an 'estate' in equity, that is, in conceptualizing the equity of redemption as a kind of real property rather than as a kind of chattel property," and noting further that it was "characterized ... as a title in equity" and "was proprietorial"); *Mortgages*, 32 Yale L. J, at 236 (noting that chancery "treats the equity of redemption not as a mere right but as an estate which the mortgagor may deal with in any way consistent with the rights of the mortgagee in his security").

Although the terms "equity" and "equity of redemption" now are "interchangeable," they were "not equivalent" at common law because the equity of redemption originally could not be sold. Sabella, *When Enough is Too Much: Overcollateralization as a Fraudulent Conveyance*, 9 Cardozo L. Rev. 773, 780 n. 32 (1987). Once it could be alienated, "the concept changed in meaning to one much closer to today's notion of 'equity.' " *Id.* Still, a distinction exists. In discussing the mortgagor's interest in the property, one treatise states, "[T]he term 'equity of redemption' which had previously and appropriately been applied to the mortgagor's right to get back his property after default was applied somewhat inappropriately to this entirely distinct equitable ownership before default." 1 Nelson, Real Estate Finance Law (6th ed.), § 1:3. Compare *Black's Law Dictionary* (11th ed.) (defining "equity" as "[a]n ownership interest in property"), with *id.* (defining "equity of redemption" as "[t]he right of a mortgagor in default to recover property before a foreclosure sale by paying the principal, interest, and other costs that are due"). Thus, perhaps it is more accurate to say a redemption right functions to protect a homeowner's equity interest. See, e.g., Note, *The Big Chill: Applicability of Section 548(a)(2) of the Bankruptcy Code to Noncollusive Foreclosure Sales*, 53 Fordham L. Rev. 813, 817 n. 22, 834 (1985) (observing that the equity interest was originally called the equity of redemption but noting that the "debtor can protect his equity interest in the property by paying the sale price plus costs," i.e., exercise the redemption right, and that the equity of redemption "ordinarily would serve to preserve his equity interest").

51   Sugarman & Warrington, *Equity of Redemption*, pp. 113-114; see also 2 Dunaway, Law of Distressed Real Estate (December 2019 update), § 26:29 (noting that any surplus over the foreclosing mortgagee's debt is paid to other liens and "[a]ny balance is distributed to the holder of the equity of redemption"); 5 Holdsworth, p. 331 ("About the same period therefore we get the foreclosure decree ...."); *Fixing Foreclosure*, 36 Yale L. & Pol'y Rev. at 319-320 (discussing the transition from strict foreclosure to foreclosure by public auction); *How Do Case Law and Statute Differ*, 57 J. L. & Econ. at 1094-1095 (discussing the transition from strict foreclosure to foreclosure by sale, which protected the debtor's equity); *Through the Looking Glass*, 70 Cornell L. Rev. at 859 ("Foreclosure by sale was viewed as a logical way of protecting the debtor's equity in the property ...."); *The English Mortgage*, p. 730 ("Almost as soon as the equity of redemption became established the mortgagee was given an equitable right of foreclosure[.]").

52   As the Missouri Court of Appeals stated:

[A] foreclosure sale surplus "retains the character of real estate for the purpose of determining who is entitled to receive it, and goes to the person to whom the real estate would have gone but for the conversion." *Roy v. Roy*, 233 Ala. 440, 172 So. 253, 254 (1937). Such surplus represents the owner's equity in the real estate. *Dodson v. Farm & Home Sav. Ass'n*, 208 Ga.App. 568, 430 S.E.2d 880, 881 (1993). It stands in place of the foreclosed property, subject to the same liens and interests that were attached to the land. *Timm v. Dewsnup*, 86 P.3d 699, 703 (Utah 2003). Surplus "usually arises because more land is sold ... than is necessary to satisfy the mortgage debt.... [T]he money stands for the land and the rights therein are determined as though the court were dealing with the land itself." *Morris v. Glaser*, 106 N.J. Eq. 585, 151 A. 766, 771 (N.J. Ch. 1930) *aff'd mem.*, 110 N.J. Eq. 661, 160 A. 578 (N.J. Err. & App. 1932). *See also First Fed. Sav. & Loan Ass'n v. Brown*, 78 A.D.2d 119, 434 N.Y.S.2d 306, 310 (1980) (foreclosure surplus "stands in place of the land for all purposes of distribution among persons having vested interests or liens upon the land"); *East Atlanta Bank v. Limbert*, 191 Ga. 486, 12 S.E.2d 865, 867 (1941) (quoting *Morris*)[.] [ *Grand Teton Mountain Investments, LLC v. Beach Props., LLC*, 385 S.W.3d 499, 502-503 (Mo. App., 2012).]

See also Nelson, § 7:32 ("The major underlying principle is that the surplus represents the remnant of the equity of redemption and the security that the foreclosure eliminated. Consequently, the surplus stands in the place of the foreclosed real estate ...."); Tiffany, § 1529 ("Any surplus proceeds of sale remaining after the payment of the debt secured by the mortgage are paid to the mortgagor or, if there are subsequent purchasers or incumbrancers, such surplus proceeds belong to them, in the order of priority in which their rights against the land could have been asserted. In other words, the proceeds of sale are substituted for the land itself, and become subject to outstanding liens and claims to the same extent and in the same order as the land itself was subject thereto.") (citations omitted); Nelson & Whitman, *Reforming Foreclosure: The Uniform Nonjudicial Foreclosure Act*, 53 Duke L. J. 1399, 1483 (2004) ("Sometimes a foreclosure sale yields a surplus amount in excess of what is needed to satisfy the mortgage obligation and the expenses of sale. In essence, when a surplus results, it represents what remains of the debtor's ownership or 'equity of redemption' and is conceptually a substitute res.").

It is true that some courts have found that the surplus proceeds are the property owner's general funds rather than the real estate. See *In re Schiphof*, 192 N.C. App. 696, 702, 666 S.E.2d 497 (2008) ("This Court stated that, 'the surplus funds ... did not constitute real estate. The surplus funds represented the general funds of the plaintiffs, the owners of the premises and the grantors in the deed of trust which was foreclosed.' "), quoting *Smith v. Clerk of Superior Court*, 5 N.C. App. 67, 73-74, 168 S.E.2d 1 (1969). This does not, however, have any bearing on a homeowner's entitlement to the proceeds by virtue of his or her equity in the home. As stated, " '[E]quity' is defined as 'the value of a property * * * above the total of the liens.' " *Crane*, 331 U.S. at 7, 67 S.Ct. 1047. Whether that value, realized in the surplus proceeds after a tax foreclosure, is thought of as representing the real estate or general funds, it is still a result of the right to equity.

53    *Black's Law Dictionary* (11th ed.) defines "equity" as "[a]n ownership interest in property, esp. in a business." See also *Crane*, 331 U.S. at 7, 67 S.Ct. 1047 (" '[E]quity' is defined as 'the value of a property * * * above the total of the liens.' "). Of course, there might be other liens on the property such that a landowner's equity is less than the property value minus what was owed in taxes. It is also true that equity may fluctuate as market values change. But I see no reason why a fluctuation in equity would affect whether the right is vested. Though a property owner is not guaranteed that real property will sell for a particular amount, the owner's interest still comes from his title and is more than a "mere expectation." *In re Certified Question*, 447 Mich. at 788, 527 N.W.2d 468.

54    See *In re Certified Question*, 447 Mich. at 788, 527 N.W.2d 468 ("To constitute a vested right, the interest must be something more than such a mere expectation as may be based upon an anticipated continuance of the present general laws; it must have become a title, legal or equitable, to the present or future enjoyment of property ....") (quotation marks and citation omitted).

55    See note 15 of this opinion.

56    See, e.g., *Rogner v. Rogner*, 179 Mich. App. 326, 445 N.W.2d 232 (1989) (reviewing an award of equity in the marital home).

57    See *Dorce v. City of New York*, 460 F.Supp.3d 327 (S.D.N.Y., 2020) (Docket No. 19-cv-2216) (discussing the plaintiffs' loss of "equity" in their properties in the context of a takings challenge); *Polonsky v. Bedford*, 173 N.H. 226, 227–228, 230–231, 238 A.3d 1102 (2020) (referring to the excess "equity" owed to the taxpayer and holding that when a tax deed is issued, a taking occurs "requiring that [the government] provide just compensation to the former owner when, as here, the equity in the property exceeds the amount owed");

*Automatic Art., LLC v. Maricopa Co.*, unpublished opinion of the United States District Court for the District of Arizona, issued March 18, 2010 (Case No. CV 08-1484-PHX-SRB), pp. 2, 3, 6, 2010 WL 11515708 (discussing the statutes and constitutional challenges to them as affecting the property owner's equity in the real property); *Thomas Tool Servs., Inc. v. Croydon*, 145 N.H. 218, 220, 761 A.2d 439 (2000) ("Assuming that the property is worth substantially more than the $370.26 that the defendant paid for it, the defendant has realized an enormous surplus."); *Syntax, Inc. v. Hall*, 899 S.W.2d 189, 190 n. 1 (Tex., 1995) ("The claim for excess proceeds concedes the loss of ownership and simply seeks a return of the excess value that was received at the sale."); *First NH Bank v. Windham*, 138 N.H. 319, 327, 639 A.2d 1089 (1994) (holding that the state constitution required notice of the tax deeding because, in part, the "tax deeding irreversibly deprives the owner of any equity in the property," given that no surplus proceeds were then available); *Anchorage v. Thomas*, 624 P.2d 271, 273 (Alas., 1981) (finding a statutory right to surplus proceeds and noting "the basic injustice inherent in requiring delinquent taxpayers to forfeit the total value of their property far in excess of taxes due"); *Auburn v. Mandarelli*, 320 A.2d 22, 32 (Me., 1974) ("In the absence of contrary provision by statute or constitution, a municipality's title to property acquired under the tax-lien-mortgage-foreclosure statute is absolute, and the city or town has no power to part with, nor duty to account for, any surplus value on any" equitable theory.); *Bogie v. Barnet*, 129 Vt. 46, 48, 54, 270 A.2d 898 (1970) (finding a taking of the property to the extent of the difference between the tax sale bid "and the demonstrated far greater value of the property" evidenced by a later sale); *Balthazar v. Mari Ltd.*, 301 F, Supp. 103, 106 (N.D. Ill., 1969) ("[T]he Illinois tax delinquency statutes allow all real estate owners to recover the surplus value of their land."), aff'd 396 U.S. 114, 90 S.Ct. 397, 24 L.Ed.2d 307 (1969); Note, *Someone to Lien On: Privatization of Delinquent Property Tax Liens and Tax Sale Surplus in Massachusetts*, 61 B.C. L. Rev. 667, 670, 691-694 (2020) (noting that "[e]normously inequitable outcomes occur as a result [of Massachusetts's similar tax-foreclosure law] because property owners can lose all equity in their home" and describing caselaw as addressing whether the government must return "surplus equity" left after the foreclosure sale); Note, *State Theft in Real Property Tax Foreclosure Procedures*, 54 Real Prop. Tr. & Est. L. J. 93, 105 (2019) (noting that a surplus-retention system like ours "destroys property owners' home equity and leaves them with nothing"); Bartell, *Tax Foreclosures as Fraudulent Transfers—Are Auctions Really Necessary?*, 93 Am. Bankr. L. J. 681, 706 (2019) (arguing that owners concerned about the price obtainable at a tax sale should pre-emptively "conduct a private sale that may generate enough proceeds to pay the taxes in full and provide the owner any extant equity"); Clifford, *Massachusetts Has a Problem: The Unconstitutionality of the Tax Deed*, 13 U. Mass. L. Rev. 274, 286-287 (2018) (discussing caselaw that addresses the proceeds as "surplus equity") (citation and quotation marks

omitted); Kelly, Jr., *Bringing Clarity to Title Clearing: Tax Foreclosure and Due Process in the Internet Age*, 77 U. Cin. L. Rev. 63, 72 (2008) ("The vast majority of jurisdictions rely on a combined sale and foreclosure process to make sure both that the taxes due are paid in full and that any *surplus value in the property* is made available to the stakeholders whose interests have been liquidated.") (emphasis added).

Courts and parties in Takings Clause challenges to Michigan's foreclosure system have focused on the homeowner's deprivation of equity. See *Rafaeli, LLC v. Wayne Co.*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued June 4, 2015 (Case No. 14-13958), p. 8, 2015 WL 3833159 ("Plaintiffs also claim that the excess equity in their property was taken without just compensation, in violation of the Takings Clause of the Fifth Amendment to the United States Constitution."); Petition for Writ of Certiorari at 14, *Wayside Church v. Van Buren Co.*, —— U.S. ——, 138 S. Ct. 380, 199 L.Ed.2d 278 (2017)

(No. 17-88) ("The property interest at issue here is privately generated and owned equity."); cf. Freed v. *Thomas*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued November 7, 2018 (Case No. 17-CV-13519), p. 2, 2018 WL 5831013 ("The heart of plaintiff's complaint is that this statutory scheme is unconstitutional because it provides no mechanism for the return to the delinquent taxpayer of the 'surplus equity' (i.e., the difference between the equity and the tax bill) or, in the event that the property is sold for less than fair market value, for the return to the delinquent taxpayer of the difference between the sale proceeds and the tax bill.").

A few cases addressing whether a statute provides for surplus to the homeowner do not mention "equity," but these cases are not deciding whether a nonstatutory basis exists for the property right in surplus proceeds; thus, they do not contradict the regnant interpretation of "surplus" as stemming from equity. See, e.g., Lake *Co. Auditor v. Burks*, 802 N.E.2d 896 (Ind., 2004) (finding statutory avenues for recovering surplus); Kelly *v. Boston*, 348 Mass. 385, 204 N.E.2d 123 (1965) (finding no statutory right to surplus). In addition, a handful of opinions rejecting constitutional challenges to tax-foreclosure statutes like the one here have not mentioned "equity," but they did not examine in any detail the potential sources of the property right at issue. See Miner *v. Clinton Co.*, 541 F.3d 464, 474-475 (C.A. 2, 2008) (rejecting a due-process claim because the notices were adequate and an equal-protection claim because no discrimination occurred); Reinmiller v. Marion *Co.*, unpublished opinion of the United States District Court for the District of Oregon, issued October 16, 2006 (Case No. CV 05-1926-PK), 2006 WL 2987707 (rejecting a takings claim and stating that Oregon law did not provide any property right entitling the homeowner to the proceeds, but only discussing the relevant tax-foreclosure statutes rather than common law). In a few cases with more detailed constitutional analyses, surplus or excess proceeds are mentioned without regard to the homeowner's equity; nonetheless, the cases do not hold that these proceeds are property without regard to equity. See Sheehan v. Suffolk Co., 67 N.Y.2d 52, 59, 60, 490 N.E.2d 523, 499 N.Y.S.2d 656 (1986) ("There is no constitutional prohibition against such a full forfeiture" of the "surplus."); Ritter v. Ross, 207 Wis. 2d 476, 484, 558 N.W.2d 909 (App., 1996) ("We thus consider whether the Ritters had a property interest in the excess proceeds of the foreclosure sale ...."); *Oosterwyk v. Milwaukee Co.*, 31 Wis. 2d 513, 517, 143 N.W.2d 497 (1966) (rejecting an unjust-enrichment claim for surplus proceeds).

58    Plaintiffs' brief states, "The private property interest at issue in this case is privately generated and owned equity." Plaintiffs' Brief on Appeal (February 13, 2019) at 11. The majority dismisses this argument, saying that plaintiffs "conflate equity with surplus proceeds, suggesting that they are one in the same." Further, the majority criticizes my analysis as stating both that the equity of redemption represents an owner's equity and also acknowledging that the two are distinct. I see nothing inconsistent with noting the fact that, on one hand, the "equity of redemption" came to represent the homeowner's interest in the property, i.e., the equity, but, on

the other hand, that there were and are certain distinctions between the two concepts, such as alienability, see note 50 of this opinion.

The majority goes on to say that it is unnecessary to discuss whether a property right to equity exists here because the question is whether the former property owner may collect surplus proceeds. However, it is necessary to begin the analysis with a vested right in the equity because, as explained above, there is no such thing as a vested right in surplus proceeds independent of the right to equity. Additionally, for the reasons we discuss below, even taken on its own terms, the right to surplus proceeds set forth in the majority's opinion is evanescent given that it can be so easily taken away.

59    *Coleman*, 70 F. Supp. 3d at 80 (emphasis added).

60    *Id.*

61    *Id.* at 80-81.

62    See, e.g., *id.*

63    Defendants have not raised the argument that the Legislature abrogated the common-law right to equity. See *Mich. Gun. Owners, Inc. v. Ann Arbor Pub. Sch.*, 502 Mich. 695, 709-710; 918 N.W.2d 756 (2018) (noting that parties raise the arguments in our adversary system). Under the regnant interpretive principle noted above, " 'legislative amendment of the common law is not lightly presumed,' " and the "Legislature 'should speak in no uncertain terms' when it exercises its authority to modify the common law." *Dawe v. Dr. Reuven Bar-Levav & Assoc., P.C.*, 485 Mich. 20, 28, 780 N.W.2d 272 (2010) (citation omitted). Like the majority's view that the Legislature cannot abrogate common-law property rights extant before 1963, this principle raises separation-of-powers concerns as well. See *A Matter of Interpretation*, pp. 27-28. But it is longstanding, and no party has challenged it here. Under this canon, it is reasonably apparent that the Legislature left untouched the taxpayer's common-law right to equity. Nothing in the statute clearly displaces that right. The same could not be said, however, for the majority's separate right to surplus proceeds, which the Legislature very clearly attempted to extinguish in the GPTA. In any event, the parties' failure to address this argument means that it should not be resolved in this case.

64    MCL 211.78k(5). These dates are for uncontested cases. The judgment in contested cases becomes effective 10 days after the hearing, and 21 days after entry of the judgment the taxpayer loses his or her redemption rights and absolute title vests in the government. MCL 211.78k(5) and (6). In contested cases, the government obtains the right to possession 22 days after judgment enters. MCL 211.78g(1).

65    MCL 211.78k(5) and (6).

66    MCL 211.78g(1).

67    MCL 211.78m(16)(a).

68    MCL 211.78m(1).

69    *Id.*

70    *Id.*

Rafaeli, LLC v. Oakland County, 505 Mich. 429 (2020)
952 N.W.2d 434

71    *Id.*

72    MCL 211.78m(2).

73    *Id.*

74    *Id.*

75    MCL 211.78m(3).

76    MCL 211.78m(5).

77    MCL 211.78m(6) and (7).

78    *Knick v. Scott Twp.*, 588 U.S. ——, ——, 139 S. Ct. 2162, 2170, 204 L. Ed. 2d 558 (2019).

79    Of course, the majority might counter that this is a question for another day because the properties here were sold. But it is hard to imagine what the majority would do in such a case besides either denying the takings claim under the theory it adopts here or reconsidering whether it is based on the taxpayer's right to the equity in his or her property.

80    See *Polonsky*, 173 N.H. at 230–231, 238 A.3d 1102 (noting that the statutory scheme did not require the government to sell the foreclosed property but that, in those cases, the government has conflicts with the Takings Clause by failing to pay over the equity).

81    See note 52 of this opinion and accompanying text.

82    *Dep't of Transp. v. Tomkins*, 481 Mich. 184, 198, 749 N.W.2d 716 (2008) (citation omitted).

83    See note 52 of this opinion.

84    See *State Theft*, 54 Real Prop. Tr. & Est. L. J. at 126 (noting that limiting the taxpayer to the surplus might cause him or her to lose some equity but arguing that this result might be consistent with the "just compensation" requirement).

85    See *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123, 70 S. Ct. 547, 94 L. Ed. 707 (1950) ("Fair market value has normally been accepted as a just standard. But when market value has been too difficult to find, or when its application would result in manifest injustice to owner or public, courts have fashioned and applied other standards.... [T]he dominant consideration always remains the same: What compensation is 'just' both to an owner whose property is taken and to the public that must pay the bill?") (citation omitted); *In re State Hwy. Comm'r*, 249 Mich. 530, 535, 229 N.W. 500 (1930) ("Just compensation should neither enrich the individual at the expense of the public nor the public at the expense of the individual.").

86    See *Tax Foreclosures*, 93 Am. Bankr. L. J. at 706-707 (arguing that courts reviewing whether foreclosure laws protect the debtor's "equity" should consider that the debtor's "right of redemption provides to the owner of the property the opportunity to realize the full fair market value of the property" less the taxes owed, and the debtor's failure to avail themselves of this relief constitutes agreement to the "price obtained by the state foreclosure process").

**Rafaeli, LLC v. Oakland County, 505 Mich. 429 (2020)**

952 N.W.2d 434

87    The majority seems untroubled by the possibility that what it might have taken away with one hand—i.e., the
      Legislature's authority to prospectively abrogate the supposed common-law right to surplus proceeds—it has
      given with the other by defining the right so that the Legislature can shrink or erase those surplus proceeds.

---

**End of Document**                                       © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Peter Avery, et al v Kent County, et al

Case No. 23- _____-CV

# EXHIBIT C

## To Plaintiffs' Complaint

565 F.Supp.3d 928
United States District Court, E.D.
Michigan, Southern Division.

Tawanda HALL, et al., Plaintiffs,

v.

Oakland County Treasurer Andrew MEISNER,
Oakland County, Southfield Non-Profit Housing
Corporation, and City of Southfield, et al., Defendants,

Case No. 20-12230
|
Signed 10/04/2021

**Synopsis**
**Background:** Former property owners filed proposed class action complaint against multiple defendants, including neighborhood revitalization organization, nonprofit housing corporation, and corporation's director and treasurer, for violation of takings clause of United States and Michigan Constitutions, inverse condemnation, and unjust enrichment, among other claims against other defendants, after property owners' properties were foreclosed for non-payment of property taxes, and properties were sold to organization, which was created by the nonprofit housing corporation, and organization rehabilitated and sold properties. Organization, corporation, and corporation's director and treasurer moved to dismiss.

**Holdings:** The District Court, Paul D. Borman, J., held that:

[1] under Michigan law, res judicata barred owners' claims against organization;

[2] under Michigan law, res judicata did not bar owners' claims against corporation;

[3] under Michigan law, one alleged former property owner did not have standing to bring action against organization, corporation, and corporation's director and treasurer;

[4] owners could not bring claim against organization, corporation, and corporation's director and treasurer for unjust enrichment;

[5] conclusory references to director and treasurer were insufficient for owners to plead against director and treasurer;

[6] allegations of nonprofit housing corporation's involvement with other defendants in general allegations in complaint constituted were sufficient for owners to bring claims against corporation; and

[7] owners' allegations that they were entitled to proceeds of homes sold by organization did not constitute takings claim under United States or Michigan Constitutions.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim; Motion to Dismiss for Lack of Standing.

West Headnotes (31)

[1] **Federal Civil Procedure** ⚬= Matters deemed admitted; acceptance as true of allegations in complaint

When reviewing a motion to dismiss for failure to state a claim, the court need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference. Fed. R. Civ. P. 12(b)(6).

[2] **Federal Civil Procedure** ⚬= Insufficiency in general

In order to survive a motion to dismiss for failure to state a claim, a plaintiff must provide more than a formulaic recitation of the elements of a cause of action, and his or her factual allegations must be enough to raise a right to relief above the speculative level. Fed. R. Civ. P. 12(b)(6).

[3] **Federal Civil Procedure** ⚬= Motion and proceedings thereon

It is the defendant who has the burden of showing that the plaintiff has failed to state a claim for relief, on a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

[4]     **Evidence** ⟜ Public records and documents in
        general

        **Evidence** ⟜ Matters referred to or
        incorporated by pleadings

        **Federal Civil Procedure** ⟜ Matters
        considered in general

        In ruling on a motion to dismiss, the court may
        consider the complaint as well as (1) documents
        that are referenced in the plaintiff's complaint and
        that are central to plaintiff's claims, (2) matters
        of which a court may take judicial notice, (3)
        documents that are a matter of public record,
        and (4) letters that constitute decisions of a
        governmental agency.

[5]     **Federal Civil Procedure** ⟜ Exhibits

        Where the plaintiff's claims rely on the existence
        of a written agreement, and plaintiff fails to
        attach the written instrument to the complaint,
        the defendant may introduce the pertinent
        exhibit, which is then considered part of the
        pleadings.

[6]     **Judgment** ⟜ Dismissal and nonsuit

        Under Michigan law, res judicata barred former
        property owners' claims against neighborhood
        rejuvenation organization, which purchased
        properties following foreclosure for owners'
        nonpayment of property taxes, for violation of
        takings clause of Michigan Constitution, inverse
        condemnation, and unjust enrichment; dismissal
        in prior state court lawsuit was adjudication on
        the merits, it involved the same core set of facts,
        issues in instant case were, or could have been,
        resolved in prior suit, organization was defendant
        in both actions, and there was no change in
        legal landscape regarding owners' claims. Mich.
        Const. art. 10, § 2.

[7]     **Judgment** ⟜ Dismissal and nonsuit

        Under Michigan law, res judicata did not
        bar former property owners' claims against
        nonprofit housing corporation, which owned
        neighborhood rejuvenation organization that

        purchased properties following foreclosure for
        owners' nonpayment of property taxes, and
        corporation's director and treasurer for violation
        of takings clause of Michigan Constitution,
        inverse condemnation, and unjust enrichment,
        although prior state court suit dismissed owners'
        claims against organization; corporation and
        its director and treasurer did not show that
        they were in privity with organization through
        agency principles to be substantially identical for
        purposes of res judicata. Mich. Const. art. 10, § 2.

[8]     **Judgment** ⟜ Operation and effect in general

        Federal court must give to state court judgment
        same preclusive effect as would be given that
        judgment under law of state in which judgment
        was rendered.

[9]     **Res Judicata** ⟜ Claims or Causes of Action
        in General

        Under Michigan law, doctrine of res judicata
        is employed to prevent multiple suits litigating
        same cause of action.

[10]    **Res Judicata** ⟜ Res Judicata

        Under Michigan law, the doctrine of res judicata
        bars a second, subsequent action when (1) the
        prior action was decided on the merits, (2) both
        actions involve the same parties or their privies,
        and (3) the matter in the second case was, or
        could have been, resolved in the first.

[11]    **Res Judicata** ⟜ Claims or Causes of Action
        in General

        **Res Judicata** ⟜ Claims or causes of action in
        general

        Michigan law takes a broad approach to the
        doctrine of res judicata, holding that it bars
        not only claims already litigated, but also every
        claim arising from the same transaction that the
        parties, exercising reasonable diligence, could
        have raised but did not.

**[12]** Res Judicata ⟜ Act, occurrence, or transaction

Under Michigan law the determinative question, for purposes of res judicata, is whether the claims in the instant case arose as part of the same transaction as did the claims in the first action.

**[13]** Res Judicata ⟜ Act, occurrence, or transaction

Under Michigan law, whether a factual grouping constitutes a transaction for purposes of res judicata is to be determined pragmatically, by considering whether the facts are related in time, space, origin or motivation, and whether they form a convenient trial unit.

**[14]** Res Judicata ⟜ Identity

Under Michigan law, parties are substantially identical for purposes of res judicata when a party in a second suit is so identified in interest with a party from the first suit that he or she represents the same legal right.

**[15]** Res Judicata ⟜ Intervening Change in Law or Facts, Effect of

Under Michigan law, an intervening change of law precludes the application of res judicata only when it alters the legal principles on which the court will resolve the subsequent case.

**[16]** Eminent Domain ⟜ Persons entitled to sue

Implied and Constructive Contracts ⟜ Persons entitled

Under Michigan law, one alleged former property owner did not have standing to bring action against neighborhood revitalization organization, nonprofit housing corporation, and corporation's director and treasurer for violation of takings clause of Michigan Constitution, inverse condemnation, and unjust enrichment after property was foreclosed for nonpayment of property taxes and sold to organization; property

at issue had been owned by alleged owner's former spouse, who was alleged owner's legal guardian, and owner executed quit claim deed from herself to alleged owner two years after foreclosure of property, when owner had no interest in the property to transfer. U.S. Const. art. 3, § 2, cl. 1; Mich. Const. art. 10, § 2.

**[17]** Forfeitures ⟜ Standing; Parties

To satisfy the Article III standing requirement in a civil forfeiture action, a claimant must alleged a colorable ownership, possessory, or security interest in at least a portion of the property in interest. U.S. Const. art. 3, § 2, cl. 1.

**[18]** Federal Courts ⟜ Forfeiture

Forfeitures ⟜ Standing; Parties

To determine whether a party has standing in a civil forfeiture action, courts generally look to the law of the jurisdiction that created the property right to determine the party's legal interest. U.S. Const. art. 3, § 2, cl. 1.

**[19]** Property ⟜ Ownership, Possession, and Incidents Thereof in General

Real Property Conveyances ⟜ Deeds in general

Real Property Conveyances ⟜ Contracts for Sale or Transfer of Real Property

In Michigan, an interest in real property can only be created by act or operation of law, or by a deed or conveyance in writing.

**[20]** Implied and Constructive Contracts ⟜ Unjust enrichment

Former owners of property could not bring claim against neighborhood revitalization organization, nonprofit housing corporation, and corporation's director and treasurer for unjust enrichment for "surplus equity" after properties were sold to organization following foreclosure for owners' nonpayment of property taxes and organization sold properties after

rehabilitating them; no surplus proceeds were realized from tax-foreclosure sale, owners failed to demonstrate property right or amount that was unjustly taken from them, and properties were lawfully foreclosed on under Michigan's General Property Tax Act (GPTA) and purchased by organization. Mich. Comp. Laws Ann. § 211.1 et seq.

[21] **Implied and Constructive**
**Contracts** ⬅ Unjust enrichment

Under Michigan law, "unjust enrichment" is defined as the unjust retention of money or benefits which in justice and equity belong to another.

[22] **Implied and Constructive**
**Contracts** ⬅ Unjust enrichment

Under Michigan law, a plaintiff alleging unjust enrichment must establish two elements: (1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant.

[23] **Taxation** ⬅ Surplus

Under Michigan law, a plaintiff's only property interest surviving a tax foreclosure is not in the real property itself, but only in the surplus proceeds resulting from the tax-foreclosure sale, if any, resulting from the sale of the property at an auction.

1 Case that cites this headnote

[24] **Implied and Constructive**
**Contracts** ⬅ Unjust enrichment

Under Michigan law, for a claim of unjust enrichment, there must be more than a benefit received by a party; the party is liable to pay therefore only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it.

[25] **Eminent Domain** ⬅ Petition or complaint
**Implied and Constructive**
**Contracts** ⬅ Unjust enrichment

Conclusory references to director and treasurer of nonprofit housing corporation were insufficient for former property owners to plead violation of takings clause of United States or Michigan Constitutions, inverse condemnation, or unjust enrichment; allegations did not plead how either director or treasurer was allegedly liable to owners under any claims pleaded. U.S. Const. Amend. 5; Mich. Const. art. 10, § 2.

[26] **Eminent Domain** ⬅ Petition or complaint
**Implied and Constructive**
**Contracts** ⬅ Unjust enrichment

Allegations of nonprofit housing corporation's involvement with other defendants in general allegations in complaint constituted claims for violation of takings clause of United States and Michigan Constitutions, inverse condemnation, and unjust enrichment, after properties were sold to organization following foreclosure for owners' nonpayment of property taxes, although owners failed to specifically include allegations against corporation in any count in compliant; former property owners alleged that corporation provided funds to city to purchase properties at issue, and that city officials were involved with corporation. U.S. Const. Amend. 5; Mich. Const. art. 10, § 2.

[27] **Eminent Domain** ⬅ Taxes, licenses, assessments, and users' fees in general
**Taxation** ⬅ Surplus

Former property owners' allegations that they were entitled to proceeds of homes sold by neighborhood revitalization organization, after organization purchased owners' properties following foreclosure for owners' nonpayment of property taxes did not constitute takings claim under United States or Michigan Constitutions against organization, nonprofit housing corporation that created organization, and corporation's director and treasurer;

properties were not sold at auction, and no surplus proceeds were generated at sale, and, thus, no surplus proceeds should have been returned to owners, and no authority entitled owners to recover proceeds from sale of properties years after foreclosure and rehabilitation and repair of the properties by corporation and organization. U.S. Const. Amend. 5; Mich. Const. art. 10, § 2.

[28]    Civil Rights ⟳ Availability, Adequacy, Exclusivity, and Exhaustion of Other Remedies
Section 1983 is the exclusive remedy for constitutional violations. 🔲 42 U.S.C.A. § 1983.

[29]    Civil Rights ⟳ Actions directly under Constitution
Civil Rights ⟳ Right of Action; Nature and Grounds
Federal Civil Procedure ⟳ Alternate, Hypothetical and Inconsistent Claims
Former property owners could not bring claims against neighborhood revitalization organization, nonprofit housing corporation, and corporation's director and treasurer for violation of takings clause of United States and Michigan Constitutions and for inverse condemnation; owners did not bring claims under § 1983, and inverse condemnation claim was encompassed by takings claim. U.S. Const. Amend. 5; Mich. Const. art. 10, § 2; 🔲 42 U.S.C.A. § 1983.

[30]    Constitutional Law ⟳ Fifth Amendment
Takings Clause of the Fifth Amendment applies to state governments through Fourteenth Amendment. U.S. Const. Amends. 5, 14.

[31]    Eminent Domain ⟳ Property and Rights Subject of Compensation
The existence of a property interest, for purposes of Takings Clause of Fifth Amendment, is determined by reference to existing rules or

understandings that stem from an independent source such as state law. U.S. Const. Amend. 5.

**Attorneys and Law Firms**

**\*932** Scott F. Smith, Smith Law Group, Farmington Hills, MI, Adam T. Schnatz, Jayson E. Blake, McAlpine PC, Mark L. McAlpine, McAlpine & McAlpine, Auburn Hills, MI, for Plaintiffs.

Michael A. Knoblock, T. Joseph Seward, Seward Henderson PLLC, Royal Oak, MI, for Defendant Frederick Zorn.

**OPINION AND ORDER GRANTING DEFENDANTS SOUTHFIELD NON-PROFIT HOUSING CORPORATION, SOUTHFIELD NEIGHBORHOOD REVITALIZATION INITIATIVE, LLC, MITCHELL SIMON, AND E'TOILE LIBBETT'S MOTION TO DISMISS (ECF NO. 31)**

Paul D. Borman, United States District Judge

On August 18, 2020, Plaintiffs, former real property owners in the City of Southfield, **\*933** Michigan, filed a proposed class action complaint against 13 defendants. The defendants can be separated into four groups: (1) Oakland County Treasurer Andrew Meisner ("Treasurer") and Oakland County (collectively, the "Oakland County Defendants"); (2) City of Southfield ("Southfield"), City Manager Frederick Zorn, Mayor Kenson Siver, Former City Attorney Susan Ward-Witkowski, Gerald Witkowski (Code Enforcement and Eviction Administrator for SNRI), and Treasurer Irvin Lowenberg (collectively, the "Southfield Defendants"); (3) Southfield Neighborhood Revitalization Initiative ("SNRI"), Southfield Nonprofit Housing Corporation ("SNPHC"), Director E' Toile Libbett ("Director SNRI"), and Mitchel Simon ("Treasurer SNPHC") (collectively, the "SNRI Defendants"); and (4) Habitat for Humanity of Oakland County, Inc. ("Habitat"). (ECF No. 1, Complaint.)

The Complaint contains seven counts: Count I – Taking Without Just Compensation – Fifth Amendment, under 🔲 42 U.S.C. § 1983, against the Oakland County Defendants and Southfield Defendants only; Count II – Inverse Condemnation – Fifth Amendment; Count III – Violation of the Takings Clause of the Michigan Constitution; Count IV

– Eighth Amendment Violation – Excessive Fine Forfeiture, against Oakland County only; Count V – Procedural Due Process, against Southfield and Oakland County Treasurer only; Count VI – Substantive Due Process, against Southfield and Oakland County Treasurer only; and Count VII (mislabeled "Count VI") – Unjust Enrichment, against all Defendants except Oakland County. (Compl.) Plaintiffs ask the Court to award them the "taken and/or forfeited equity" in their foreclosed properties along with money damages for the alleged constitutional violations and claim of unjust enrichment. (*Id.*, Relief Requested, PageID.30-31.)

Now before the Court is Defendants Southfield Non-Profit Housing Corporation, Southfield Neighborhood Revitalization Initiative, LLC, Mitchell Simon, and E'Toile Libbett's (the "SNRI Defendants") Motion to Dismiss Complaint. (ECF No. 31.)[1] The Court held a hearing using Zoom videoconference technology on Tuesday, September 28, 2021, at which counsel for Plaintiffs and Defendants appeared. For the reasons that follow, the Court GRANTS the SNRI Defendants' Motion to Dismiss Complaint.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

The eight named Plaintiffs in this action allege that they previously owned real property located in the City of Southfield, Michigan. All named Plaintiffs failed to pay property taxes and their properties were foreclosed by Defendant Oakland County Treasurer on the basis of non-payment of taxes pursuant to Michigan's General Property Tax Act ("GPTA"), Mich. Comp. Laws § 211.1 *et seq.* (Compl. ¶ 1, PageID.2.)

The GPTA permits the recovery of unpaid real-property taxes, penalties, interest, and fees through the foreclosure and sale of the property on which there is a tax delinquency. *See* Mich. Comp. Laws § 211.1 *et seq.* Under the Act, the county treasurer may elect to act as the collection agent for the municipality where the property **\*934** is located when taxpayers become delinquent on their property taxes. Mich. Comp. Laws § 211.78(8). After three years of delinquency, multiple notices and various hearings, tax-delinquent properties are forfeited to the county treasurer; foreclosed on after a judicial foreclosure hearing by the circuit court and title to the forfeited property is transferred to the county treasurer; and, if the property is not timely redeemed by March 31 of that year, fee simple title is vested absolutely

in the county treasurer, without any further redemption rights available to the delinquent taxpayer. Mich. Comp. Laws § 211.78 *et seq.* As the Act applied during the time periods relevant to this action, after foreclosure, the property is then disposed of as follows:

(1) The state or municipality where the property is located has the right to claim the property in exchange for the payment to the county of unpaid taxes, interest and other costs (the "minimum bid");[2] or

(2) If the state or municipality does not exercise their right of first refusal, the property is put up for sale at a public auction in July and, if not sold, again in October.

[2] Mich. Comp. Laws § 211.78m.

Plaintiffs in this case allege that a judgment of foreclosure was entered against each of them and pertaining to each Plaintiff's property, by the Oakland County Circuit Court. (Compl. ¶¶ 21-28, PageID.5-7.) Specifically, Plaintiffs allege:

- Plaintiff Tawanda Hall owed $22,642.00 in delinquent property taxes.[3] The Oakland County Treasurer foreclosed, issued a tax deed in favor of the City of Southfield for the minimum amount due under the GPTA, and the City quit claimed the property to SNRI for $1.00. The property was subsequently sold for $308,000.00.

- Plaintiff Carolyn Miller owed $29,759.00 in delinquent property taxes. The Oakland County Treasurer foreclosed, issued a tax deed in favor of the City of Southfield for the minimum amount due under the GPTA, and the City quit claimed the property to SNRI for $1.00. The property was subsequently sold for $120,000.00.

- Plaintiff American Internet Group, LLC owed $9,974.00 in delinquent property taxes. The Oakland County Treasurer foreclosed, issued a tax deed in favor of the City of Southfield for the minimum amount due under the GPTA, and the City quit claimed the property to SNRI for $1.00. The property was subsequently sold for $149,900.00.

- Plaintiff Anthony Akande owed $2,415.00 in delinquent property taxes. **\*935** The Oakland County Treasurer foreclosed, issued a tax deed in favor of the City of Southfield for the minimum amount due under the

GPTA, and the City quit claimed the property to SNRI for $1.00. The property was subsequently sold for $152,500.00.

* Plaintiffs **Curtis Lee** and **Coretha Lee** owed $30,547.00 in delinquent property taxes. The Oakland County Treasurer foreclosed, issued a tax deed in favor of the City of Southfield for the minimum amount due under the GPTA, and the City quit claimed the property to SNRI for $1.00. The property was subsequently sold for $155,000.00.

* Plaintiff **Marcus Byers** alleges he had "equitable title with his court appointed guardian" in the subject property and owed $4,113.00 in delinquent property taxes. The Oakland County Treasurer foreclosed, issued a tax deed in favor of the City of Southfield for the minimum amount due under the GPTA, and the City quit claimed the property to SNRI for $1.00, which still holds title to the property. Plaintiffs allege the property has a fair market value of $90,000.00.

* Plaintiff **Kristina Govan** owed $45,350.00 in delinquent property taxes. The Oakland County Treasurer foreclosed, issued a tax deed in favor of the City of Southfield for the minimum amount due under the GPTA, and the City quit claimed the property to SNRI for $1.00, which still holds title to the property. Plaintiffs allege the property "is worth in excess of the amount owed in taxes."

(Compl. ¶¶ 21-27, PageID.5-7.)

Plaintiffs assert that "[m]ost of the Plaintiffs had entered into delinquent property installment agreements [with the County]," even though "[t]he Treasurer knew the Circuit Court had already entered a Judgment of foreclosure prior to entering the delinquent property tax payment plans with Plaintiffs ... which purportedly prevented foreclosure." (*Id.* ¶¶ 31-32, PageID.7.) Plaintiffs claim that they "made a payment to the Treasurer with the promise that such payment would prevent tax foreclosure," and "in many instances ... made substantial payments of 1-2 years of property taxes prior to March 31st of the year of foreclosure," but that the County still foreclosed on their properties. (*Id.* ¶¶ 31, 33-34, PageID.7.)

As a result of the foreclosures, Plaintiffs lost all title and interest in their properties, and title in fee vested in the foreclosing government unit ("FGU"), in this case, the

Oakland County Treasurer. (*Id.* ¶¶ 21-28, PageID.5-7.) *See* Mich. Comp. Laws § 211.78k(6). Pursuant to Mich. Comp. Laws § 211.78m(1) (as it existed at that time), the Oakland County Treasurer offered the properties to the City of Southfield under the City's right of first refusal. (*Id.* ¶ 29, PageID.7.) In each case, the City paid the Treasurer the minimum amount due under the statute – the delinquent tax amount – with funds provided by Defendant Southfield Nonprofit Housing Corporation ("SNPHC"). (*Id.* ¶¶ 21-27, 83(e), PageID.5-7, 16.) The City in turn conveyed each of the properties to Defendant Southfield Neighborhood Revitalization Initiative, LLC ("SNRI") for $1.00. (*Id.*)

SNRI was created by Defendant SNPHC, and the SNPHC is the sole member of SNRI. (ECF No. 31, SNRI Defs.' Mot. at p. 3, PageID.182.) SNRI was formed for the purpose of purchasing tax foreclosed and other properties, improving such properties, selling such properties to persons of low to moderate income when possible, and improving housing and homeownership opportunities in the City of *936 Southfield, and to otherwise restore tax-foreclosed properties on the tax-roll. (*Id.*, citing ECF No. 31-2, SNRI Operating Agreement.)

According to Defendants, under this initiative, SNRI entered into an agreement to work with Defendant Habitat for Humanity ("Habitat"), to rehabilitate the homes that are salvageable. (SNRI Defs.' Mot. at p. 3, PageID.182; ECF No. 24, Habitat Def.'s Mot. at p. 1, PageID.145.) Plaintiffs allege that Habitat received "close to $300,000 in funds from SNRI in 2016, [and] was paid over 1 million dollars from SNRI since its inception in June of 2016 by being the recipient of often needless repairs, as well as the conveyance of property from SNRI, City of Southfield, and the SNPHC for less than full consideration." (Compl. ¶ 46, PageID.9.)

Plaintiffs assert that the City of Southfield, SNPHC and the SNRI have identical and interchangeable governance. Plaintiffs allege that Southfield Mayor Kenson Siver is a board member of SNPHC and that Southfield City Manager Fred Zorn is "a managing member of SNRI and ... also a board member of SNPHC." (Compl. ¶¶ 7, 49, PageID.3, 10.) Mayor Siver is listed as the President of SNPHC, which is the sole member of SNRI, and Zorn, Mitchell Simon (a CPA), and E'toile Libbett (a realtor) are listed as managers of SNRI. (SNRI Operating Agreement, PageID.210.) Plaintiffs allege that Defendants Siver, Zorn, City Attorney Susan Ward-Witkowski, and Gerald Witkowski "used power under the GPTA for personal economic gain," that they understood

"that they would personally benefit and utilize their power to benefit the SNRI and SNPHC," and "knew their acts would remove the subject properties from the tax rolls of Southfield for the gain of SNRI." (Compl. ¶¶ 64, 67, 71, PageID.12-13.)

### B. The Michigan Supreme Court's Decision in
Rafaeli, LLC v. Oakland County

On July 17, 2020, the Michigan Supreme Court issued its opinion in Rafaeli, LLC v. Oakland County, 505 Mich. 429, 952 N.W.2d 434 (2020). In Rafaeli, two former property owners brought an action against Oakland County and its Treasurer, Andrew Meisner, alleging due process and equal-protection violations as well as an unconstitutional taking by selling their tax-foreclosed properties at public auction in satisfaction of their tax debts and then retaining the surplus proceeds from that sale of their properties. Id. at 438-40, 952 N.W.2d 434.

The Oakland County Circuit Court had previously granted summary disposition to defendants Oakland County and its treasurer, Andrew Meisner, finding that defendants did not "take" plaintiffs' properties "because plaintiffs forfeited all interests they held in their properties when they failed to pay the taxes due on the properties." Id. at 440, 952 N.W.2d 434. Plaintiffs appealed, and the Michigan Court of Appeals affirmed the circuit court's opinion and "rejected plaintiffs' argument that the GPTA's 'scheme' allows for unconstitutional takings," holding that "defendants acquired their interest in plaintiffs' properties 'by way of a statutory scheme that did not violate due process' and thus defendants were not required to compensate plaintiffs for property that was lawfully obtained." Id. at 441, 952 N.W.2d 434. Plaintiffs sought leave to appeal to the Michigan Supreme Court, which granted plaintiffs' application and ordered the parties to address the issue of "whether defendants violated the Takings Clause of the United States Constitution, the Michigan Constitution, or both by retaining the proceeds from the sale of tax-foreclosed property that exceeded the amount of the *937 taxes, penalties, interest, and fees owed on the property." Id.

The Michigan Supreme Court concluded that a property owner does not lose all rights to the property during the tax foreclosure proceedings. The Court first explained that "forfeiture" under the GPTA simply permits the county and county treasurer to seek a judgment of foreclosure, but "does not affect title, nor does it give the county treasurer ... any rights, titles, or interests to the forfeited property. Therefore, we reject the premise that plaintiffs 'forfeited' all rights, titles, and interests they had in their properties by failing to pay their real-property taxes." Id. at 448-49, 952 N.W.2d 434.

The Court next addressed plaintiffs' due process concerns, noting that "the GPTA explicitly states its intent to comply with minimum requirements of due process and not create new rights beyond those prescribed in the Constitutions of our nation or this state." Id. at 451, 952 N.W.2d 434. The Court stated:

> As long as defendants comply with these due-process considerations, plaintiffs may not contest the legitimacy of defendants' authority to foreclose on their properties for unpaid tax debts, *nor may plaintiffs contest the sale of their properties to third-party purchasers.*

Id. (emphasis added); see id. at 451, 952 N.W.2d 434 ("The remedy for a taking of private property is just compensation, while the remedy for being deprived of property without due process of law is the return of the property.").

The Michigan Supreme Court held that Michigan's "common law recognizes a former property owner's property right to collect the surplus proceeds that are realized from the tax-foreclosure sale of the property." Id. at 470, 952 N.W.2d 434. The Court also found that Michigan's 1963 Constitution "protects a former owner's property right to collect the surplus proceeds following a tax-foreclosure sale under Article 10, § 2." Id. at 473, 952 N.W.2d 434. Because the common-law interest was protected by Michigan's Takings Clause, the GPTA could not abrogate that common law interest. Id. (explaining that "[w]hile the Legislature is typically free to abrogate the common law, it is powerless to override a right protected by Michigan's Takings Clause.").

Finally, the Michigan Supreme Court held that Oakland County's retention of the proceeds of the auction sale that

exceeded the amount of property taxes owed and other charges and fees constituted an unconstitutional taking.

> Once defendants foreclosed on plaintiffs' properties, obtained title to those properties, and sold them to satisfy plaintiffs' unpaid taxes, interest, penalties, and fees related to the foreclosures, any surplus resulting *from those sales* belonged to plaintiffs. That is, after the sale proceeds are distributed in accordance with the GPTA's order of priority, any surplus that remains is the property of plaintiffs, and defendants were required to return that property to plaintiffs. Defendants' retention of those surplus proceeds under GPTA amounts to a taking of a vested property right requiring just compensation. To the extent the GPTA permits defendants to retain these surplus proceeds and transfer them into the county general fund, the GPTA is unconstitutional as applied to former property owners whose properties were sold at a tax-foreclosure sale for more than the amount owed in unpaid property taxes, interest, penalties, and fees related to the forfeiture, foreclosure, and sale of their properties.

*Id.* at 474-75, 952 N.W.2d 434 (emphasis added). *See also* *id.* at 476, 952 N.W.2d 434 (stating that the surplus proceeds of the sale "is a separate property right that **\*938** survives the foreclosure process"). The Court clarified that "a former property owner has a compensable takings claim *if and only if* the tax-foreclosure sale produces a surplus." *Id.* at 477, 952 N.W.2d 434 (emphasis added).

The Michigan Supreme Court defined "just compensation" as "the amount of surplus proceeds generated from the tax foreclosure sale." *Id.* at 481-82, 952 N.W.2d 434 ("mak[ing] clear, the property 'taken' is the surplus proceeds

from the tax-foreclosure sale of plaintiffs' properties to satisfy their tax debts"). The Court expressly "reject[ed] the premise that just compensation requires that plaintiffs be awarded the fair market value of their properties so as to be put in as good of [a] position had their properties not been taken at all" because "this would run contrary to the general principle that just compensation is measured by the value of the property *taken*," and "plaintiffs are largely responsible for the loss of their properties' value by failing to pay their taxes on time and in full" and "[i]f plaintiffs were entitled to collect more than the amount of the surplus proceeds, not only would they be taking money away from the public as a whole, but they would themselves benefit from their tax delinquency." *Id.* at 483, 952 N.W.2d 434 (emphasis in original); *see also* *id.* fn. 134 ("[W]e are unaware of any authority affirming a vested right to equity held in property generally.").

> Accordingly, when property is taken to satisfy an unpaid tax debt, just compensation requires the foreclosing governmental unit to return any proceeds from the tax-foreclosure sale in excess of the delinquent taxes, interest, penalties, and fees reasonably related to the foreclosure and sale of the property – *no more, no less.*

*Id.* at 483-84, 952 N.W.2d 434 (emphasis added); *see* *id.* at 477, 952 N.W.2d 434 ("Indeed, a former property owner *only* has a right to collect the surplus proceeds from the tax-foreclosure sale; that is, a former property owner has a compensable takings claim *if and only if* the tax-foreclosure sale produces a surplus.") (emphases added).

The Michigan Supreme Court then held:

> Plaintiffs, former property owners whose properties were foreclosed and sold to satisfy delinquent real-property taxes, have a cognizable, vested property right to the surplus proceeds resulting from the tax-foreclosure sale of their properties. This right continued to exist even

after fee simple title to plaintiffs' properties vested with defendants, and therefore, defendants' retention and subsequent transfer of those proceeds into the county general fund amounted to a taking of plaintiffs' properties under Article 10, § 2 of our 1963 Constitution. Therefore, plaintiffs are entitled to just compensation, which in the context of a tax-foreclosure sale is commonly understood as the surplus proceeds.

*Id.* at 484-85, 952 N.W.2d 434.

### C. The SNRI Defendants' Motion to Dismiss

The SNRI Defendants filed a motion to dismiss in this case, arguing that Plaintiffs' claims against them, and specifically their claim for unjust enrichment, is legally and factually deficient and must be dismissed under Fed. R. Civ. P. 12(b)(6), (ECF No. 31, SNRI Defs.' Mot.) The SNRI Defendants initially argue that Plaintiffs Carolyn Miller, American Internet Group, LLC, and Anthony Akande's claims are barred by res judicata for having previously litigated post-foreclosure claims against the SNRI Defendants relating to the loss of their properties, and that Plaintiff Marcus Byers lacks standing to bring any claims, because he did not own the subject property. The SNRI Defendants next argue that there is no basis for them to be liable to Plaintiffs under a theory of unjust enrichment, *939 and further assert that Plaintiffs fail to state claims against Defendants SNPHC, Simon, and Libbett because those defendants are not named in any of the Counts in the Complaint.

Plaintiffs filed a Response in opposition to the SNRI Defendants' motion to dismiss. (ECF No. 47, Pls.' Resp.) Plaintiffs argue that Plaintiffs Tawanda Hall, Miller, American Internet Group, and Akande's claims are not barred by res judicata, and that Plaintiff Byers does have standing in this action because he had an "equitable interest" in the subject property. Plaintiffs further assert that they have stated a Fifth Amendment Takings claim and a claim under the Michigan Constitution against all SNRI Defendants (Counts I-III), as well as a claim under 42 U.S.C. § 1983 against these Defendants. Finally, Plaintiffs contend that they

have stated an unjust enrichment claim against the SNRI Defendants as well.

The SNRI Defendants filed a reply brief in support of their motion to dismiss. (ECF No. 50, SNRI Defs.' Reply.) The SNRI Defendants argue that Plaintiffs fails to state an unjust enrichment claim against them post-tax foreclosure. The SNRI Defendants further contend that Plaintiffs' takings claims fail because there is no claim under Michigan law for taking "surplus equity," and Plaintiffs fail to plead that the SNRI Defendants are "state actors." Finally, the SNRI Defendants state that Plaintiffs have abandoned their claims against SNPHC, Simon, and Libbett because they failed to respond to the SNRI Defendants' argument with regard to these defendants.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. To state a claim, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]he complaint 'does not need detailed factual allegations' but should identify 'more than labels and conclusions.' " *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

[1] [2] [3] When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012). The court "need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference." *Id.* at 539 (internal citations and quotation marks omitted); *see also Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)). In other words, a plaintiff must provide more than a "formulaic recitation of the elements of a cause of action" and his or her "[f]actual allegations must be enough to raise a right to

relief above the speculative level." *Twombly*, 550 U.S. at 555-56, 127 S.Ct. 1955. The Sixth Circuit has explained that "[t]o survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). It is the defendant who "has the burden of showing that the plaintiff has failed to state a claim **\*940** for relief." *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015).

[4] [5] In ruling on a motion to dismiss, the Court may consider the complaint as well as: (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims; (2) matters of which a court may take judicial notice; (3) documents that are a matter of public record; and (4) letters that constitute decisions of a governmental agency. *Thomas v. Noder-Love*, 621 F. App'x 825, 829 (6th Cir. 2015) ("Documents outside of the pleadings that may typically be incorporated without converting the motion to dismiss into a motion for summary judgment are public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.") (internal quotation marks and citations omitted); *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("We have taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings.... [C]ourts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies."); *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (finding that documents attached to a motion to dismiss that are referred to in the complaint and central to the claim are deemed to form a part of the pleadings). Where the claims rely on the existence of a written agreement, and plaintiff fails to attach the written instrument, "the defendant may introduce the pertinent exhibit," which is then considered part of the pleadings. *QQC, Inc. v. Hewlett-Packard Co.*, 258 F.Supp.2d 718, 721 (E.D. Mich. 2003). "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document." *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997), *abrogated on other grounds by*

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

## III. ANALYSIS

### A. Plaintiffs Miller, AIG, and Akande' Claims Against Defendant SNRI are Barred by Res Judicata, But Plaintiffs' Claims Against Defendants SNPHC, Simon and Libbett are not Barred

[6] [7] The SNRI Defendants argue that the claims of three of the eight named Plaintiffs – Carolyn Miller, American Internet Group, LLC, and Anthony Akande – are barred by res judicata because those plaintiffs have previously litigated post-foreclosure claims in state court against the SNRI Defendants based on the "same facts and occurrences of the tax foreclosure of their properties." (SNRI Defs.' Mot. at pp. 4-8, PageID.183-87.) Plaintiffs respond that Plaintiffs Miller, American Internet Group, and Akande's claims are not barred by res judicata, asserting that their prior litigation "was an unfair housing case based on racial discrimination in 2018" and that the "scheme to strip Plaintiffs' equity" alleged in this case was "not known at the time of the state suit." (Pls.' Resp. at p. 6, PageID.1705.)

[8] [9] [10] [11] "[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). "The doctrine of res judicata is employed to prevent multiple suits litigating the same cause of action." *Adair v. State*, 470 Mich. 105, 121, 680 N.W.2d 386 (2004). Under Michigan law, "the doctrine bars a second, subsequent action when (1) the **\*941** prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first." *Id.* Michigan thus "take[s] a broad approach to the doctrine of res judicata, holding that it bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not." *Id.*

In this case, Plaintiff Miller claims her property was foreclosed on for a $29,759.00 tax debt. (Compl. ¶ 22, PageID.5.) After foreclosure the City purchased the property from Oakland County for the $29,759.00 tax debt amount

and deeded the property to the SNRI for $1.00. (Compl. PageID.39.) Plaintiff American Internet Group claims its property was foreclosed for $9,974.00 of delinquent property taxes. (Compl. ¶ 23, PageID.5-6.) The City also purchased this property for the tax debt and transferred it to the SNRI for $1.00. (Compl. PageID.42.) Similarly, Plaintiff Akande's property was allegedly foreclosed for $2,415.00, and the City purchased the property for that amount and transferred it to the SNRI for $1.00. (Compl. ¶ 24, PageID.6, 45.)

The SNRI Defendants explain that, after the foreclosures and transfers in 2016, Plaintiffs Miller, American Internet Group, and Akande, and others, filed suit in Oakland County Circuit Court in 2017 against the Oakland County Treasurer, the City of Southfield, and SNRI, alleging various discriminatory housing practices claims in relation to the foreclosure of their properties. (See ECF No. 34-2, Southfield Defs.' Mot Ex. 1, Complaint in *Ronald Hayes, et al. v. Oakland County Treasurer's Office, et al.*, Case No. 2017-157366-CZ (Michigan Sixth Judicial Circuit, 2017).) That state court complaint was based on the same premise as this case – that the County, City, and SNRI created a "scheme" to divest Southfield citizens of their homes and procure a profit through application of Michigan's tax-foreclosure process. (*See id.*, PageID.457.) That complaint alleged that "once certain properties owned by African-Americans were foreclosed upon for non-payment of delinquent real estate taxes, systematically the officials of the City of Southfield that designed this discriminatory scheme made sure that these properties were requested to be held-back from public auction by the Oakland County Treasurers Office and subsequently designated for purchase by the City of Southfield, Non-Profit Housing Corporation," and "[t]hat immediately upon the City of Southfield reacquiring the real estate foreclosed upon ... then after placed the properties out-of-the-reach of the previous owners by transferring by Quit Claim Deed to an agency known as the Southfield Neighborhood Revitalization Initiative, LLC, a for profit limited liability company..." (*Id.* ¶¶ 9-10, PageID.460-61 (emphasis in original).) The complaint further alleged "the City of Southfield through the scheme alleged in the common allegations ... targeted [plaintiff's] homes for designation for non-bid transfer to the Southfield Non-Profit Housing Commission" and that "the transfer of these non-bid homes ... were actually transferred to a 'for profit' organization-SNRI, LLC, for the ultimate personal gain of yet to be exposed individuals." (*Id.* ¶¶ 43-44, PageID.467-68.) The complaint

sought, in part, "the loss of equity (FMV) in their residential properties." (*Id.* PageID.469.)

Those state court plaintiffs then moved to amend the complaint to "remove the discrimination counts and add allegations that Plaintiffs made timely payments that were rejected by Defendant Oakland County Treasurer[.]" (ECF No. 32-4, State Court Motion to Amend, PageID.389-90.) In that motion to amend, the plaintiffs *942 alleged that "Southfield did not purchase the property for the minimum bid. Southfield quit claimed its interest to SNRI for no consideration. SNRI's Directors and/or Officers are City of Southfield officials who used their inside knowledge about these mortgage-free properties to acquire the properties for their own personal benefit and not for public purpose." (*Id.* PageID.394.)

All of the state court defendants moved to dismiss that action, and the state court judge dismissed the case with prejudice because "the claims alleged are clearly unenforceable as a matter of law," and denied the plaintiffs' motion to amend because the plaintiffs failed to provide the court with a proposed amended complaint and because any amendment would be futile. (SNRI Defs.' Mot. at p. 6, PageID.185, citing Ex. 3, ECF No. 31-4, Order on Summary Disposition, PageID.217-19.) This dismissal constitutes an adjudication on the merits for purposes of res judicata. 🔲*Chakan v. City of Detroit*, 998 F. Supp. 779 (E.D. Mich. 1998); *ABB Paint Finishing v. Nat'l Fire Ins.*, 223 Mich. App. 559, 567 N.W.2d 456 (1997).

The SNRI Defendants contend that "Plaintiffs' current claims arise from the exact set of facts and circumstances as their prior cases – their failure to pay taxes, subsequent foreclosure by the OCT and subsequent transfers of the tax foreclosed properties," and that their claims therefore are barred by res judicata because they "rely on the same core operative facts and issues." (SNRI Defs.' Mot. at pp. 7-8, PageID.186.)

Plaintiffs respond that their present claims "were not known at the time of the state suit," that "the landscape of the law has shifted" and "[t]his action could have not been resolved at the time of the state court case because the Michigan Constitution had not established the right to the equity/surplus proceeds from a tax foreclosure," and that "the parties were not identical." (Pls.' Resp. at pp. 6-7, PageID.1705-06.) [4]

First, as previously found by this Court in its prior Opinion and Order (ECF No. 62, PageID.2198), Plaintiffs' state

court lawsuit was based on essentially the same alleged "scheme" to induce tax foreclosures and transfer properties to SNRI for a profit. (See State Court Complaint, PageID.457 (alleging the "scheme" was to "re-direct foreclosure upon homes to a private 'for profit organization' – Southfield Neighborhood Revitalization Initiative, LLC so as to deny African-Americans to bid at a public auction an opportunity to reacquire their homes") (emphasis in original).) That state court complaint alleged that "the City of Southfield through the scheme alleged in the common allegations ... targeted [plaintiff's] homes for designation for non-bid transfer to the Southfield Non-Bid Housing Commission" and that "the transfer of these non-bid homes ... were actually transferred to a 'for *943 profit' organization-SNRI, LLC, for the ultimate personal gain of yet to be exposed individuals." (Id. ¶¶ 43-44, PageID.467-68.) The complaint sought as relief, in part, "the loss of equity (FMV) in their residential properties." (Id. PageID.469.) Moreover, when those state court plaintiffs moved to amend the complaint, the plaintiffs alleged that "Southfield did not purchase the property for the minimum bid. Southfield quit claimed its interest to SNRI for no consideration. SNRI's Directors and/or Officers are City of Southfield officials who used their inside knowledge about these mortgage-free properties to acquire the properties for their own personal benefit and not for public purpose." (Mot. to Amend, PageID.343.)

[12]  [13] The Michigan Supreme Court "has taken a broad approach" to the question of whether the claims precluded were or could have been decided in the prior action, embracing the "transactional" test, under which res judicata "bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not." 🔲 Adair, 470 Mich. at 121, 124, 680 N.W.2d 386. "[T]he determinative question is whether the claims in the instant case arose as part of the same transaction as did the claims in" the first action. See 🔲 id. at 125, 680 N.W.2d 386. "Whether a factual grouping constitutes a transaction for purposes of res judicata is to be determined pragmatically, by considering whether the facts are related in time, space, origin or motivation, [and] whether they form a convenient trial unit...." 🔲 Id. (citation omitted). Applying this framework, the Court here finds that the prior state court lawsuit and this suit involve the same core set of facts, and the issues in this case were, or could have been, resolved in the prior suit.

[14]  Second, Plaintiffs summarily assert that the parties in the two actions "were not identical," but they do not otherwise develop this argument. (Pls.' Resp. at p. 7, PageID.1176.) The SNRI Defendants fail to otherwise argue that the parties to the prior litigation and this action are identical or substantially identical. (See SNRI Defs.' Mot. at pp. 6-8, PageID.185-87.) An undeveloped argument is deemed waived. 🔲 Hensley v. Gassman, 693 F.3d 681, 688 n. 6 (6th Cir. 2012); 🔲 Kennedy v. Comm'r of Soc. Sec., 87 F. App'x. 464, 466 (6th Cir. 2003) ("issues which are 'adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived' ") (quoting 🔲 United States v. Elder, 90 F.3d 1110, 1118 (6th Cir. 1996)). SNRI is a defendant in both actions. However, Defendants SNPHC, Simon and Libbett were not named parties in the prior state court action. Parties are substantially identical when a party in a second suit is "so identified in interest with [a party from the first suit] that he or she represents the same legal right." 🔲 Viele v. D.C.M.A., 167 Mich. App. 571, 580, 423 N.W.2d 270 (1988) (citation omitted). The SNRI Defendants have failed to meet their burden to demonstrate that SNRI, SNPHC, Simon, and Libbett are in privity through agency principles, and thus are substantially identical for purposes of res judicata. See Lyons v. Washington, No. 212516, 2000 WL 33407429, at *1 (Mich. App. Aug. 18, 2000) (citing 🔲 Viele, 167 Mich. App. at 580, 423 N.W.2d 270). Accordingly, the Court finds that Plaintiffs' claims against Defendants SNPHC, Simon, and Libbett are not precluded by res judicata.

[15]  Continuing as to Plaintiffs' claims against Defendant SNRI only, Plaintiffs argue that "the landscape of the law has shifted" and "[t]his action have not been resolved at the time of the state court case because the Michigan Constitution *944 had not established the right to the equity/ surplus proceeds from a tax foreclosure." (Pls.' Resp. at pp. 7-8, PageID.1706-07.) Plaintiffs contend that, before the Michigan Supreme Court's decision in 🔲 Rafaeli, LLC v. Oakland County, 505 Mich. 429, 952 N.W.2d 434 (2020), "there were no common law property rights that existed unambiguously in the equity/surplus proceeds after a property tax foreclosure," and "it would have been largely futile to bring most of the present claims." (Id.) However, "an intervening change of law" precludes the application of res judicata only when it "alters the legal principles on which the court will resolve the subsequent case.' " In re Bibi Guardianship, 315 Mich. App. 323, 334, 890 N.W.2d 387 (2016) (citation omitted). As discussed more fully infra,

[📄]*Rafaeli* does not recognize a right to recover alleged equity in property after a foreclosure, and thus does not represent a change to the legal landscape regarding Plaintiffs' claims in this case.

Interestingly, in a seeming admission of the failure of their takings claim in this case, Plaintiffs admit in their Response that:

> There still is no adequate remedy or procedure to address the unlawful conduct in this case until the Michigan Legislature finds [📄]*Rafaeli, LLC, supra,* retroactive. Even then, ambiguity will persist (see Justice Viviano's Concurrence in [📄]*Rafaeli, LLC, supra.*[)]

(Pls.' Resp. at p. 7, PageID.1706.) As will be discussed further *infra*, Justice Viviano recognized in his concurrence that "the majority's view of the case would seemingly be that if the property does not sell at auction and is simply transferred to a governmental unit, the taxpayer is out of luck: no proceeds, let alone a surplus, have been produced or retained by the government." [📄]*Id.* at 518, 952 N.W.2d 434 (Viviano, J., concurring). [5]

Based on all the above, the Court finds that Plaintiffs Miller, American Internet Group, and Akande's claims against Defendant SNRI are barred by res judicata, but that Plaintiffs' claims against Defendants SNPHC, Simon, and Libbett are not so barred. However, even if these plaintiffs' claims were not barred by res judicata, they would nevertheless fail for the reasons stated *infra*.

**B. Plaintiff Marcus Byers Lacks Standing**

[16] Plaintiff Marcus Byers alleges that he held "equitable title" with his guardian in property that was foreclosed on for $4,113.00 in delinquent taxes. (Compl. ¶ 26, PageID.6.) However, the records Plaintiffs attach to the Complaint indicate that the property was owned by, and foreclosed under, the ownership of Debbie Byers, who is not a named Plaintiff. (Compl. PageID.51.) After the foreclosure, the property was sold to the City for the tax debt amount, and then transferred to SNRI for $1.00. (*Id.*)

[17] [18] [19] To satisfy the Article III standing requirement in a civil forfeiture action, "a claimant must alleged a colorable ownership, possessory, or security interest in a least a portion of" the property in interest. [📄]*U.S. v. Real Prop. Located at 4527-4535 Michigan Ave., Detroit, Mich.*, 489 F. App'x 855, 857 (6th Cir. 2012) (citing [📄] **\*945** *U.S. v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 497 (6th Cir. 1998)). The courts generally look to "the law of the jurisdiction that created the property right to determine the petitioner's legal interest." [📄]*U.S. v. Salti*, 579 F.3d 656, 668 (6th Cir. 2009) (citation omitted). In Michigan, "an interest in real property can only be created 'by act or operation of law, or by a deed or conveyance in writing.' " [📄]*Real Prop.*, 489 F. App'x at 857 (citing Mich. Comp. Laws § 566.106) (finding that the claimants lacked standing because the deed to the clubhouse property was not in their name and no other writing existed showing their interest in the property).

The SNRI Defendants explain that Plaintiff Marcus Byers' former spouse, and the former owner of the property at issue in this action (21666 Hidden Rivers Drive property), Debbie Byers, previously filed a lawsuit in the Oakland County Circuit Court against the Oakland County Treasurer and SNRI on February 25, 2019, challenging the tax foreclosure and seeking reinstatement of title. (SNRI Defs.' Mot. at p. 6, PageID.185, citing Ex. 4, ECF No. 31-5, Debbie Byers' Verified Petition, PageID.220-32.) The Circuit Court granted both defendants' motions for summary disposition, finding that Debbie Byers failed to state a claim against either defendant and that she received constitutionally proper notice of the foreclosure under the GPTA. (Ex. 5, ECF No. 31-6, Opinion and Order Granting Summary Disposition, PageID.233-39.) Debbie Byers appealed the circuit court's opinion, arguing that she was entitled to "just compensation," but the Michigan Court of Appeals denied her appeal on February 26, 2020. (SNRI Defs.' Mot. at pp. 6-7, PageID.185-86, citing Ex. 6, ECF No. 31-7, Debbie Byers' Appeal Packet, PageID.240-49, and Ex. 7, ECF No. 31-8, Court of Appeals Order Denying Application for Leave to Appeal, PageID.250.) Debbie Byers then filed for Chapter 13 bankruptcy on August 3, 2020, and initiated an Adversary Complaint against Defendants Oakland County Treasurer and SNRI on September 30, 2020. (SNRI Defs.' Mot. at p. 7, PageID.186, citing Ex. 8, ECF No. 31-9, Debbie Byers' Adversary Compl., PageID.251-68.) The adversary

complaint raises claims challenging the tax foreclosure, the subsequent conveyance of the property including SNRI's title, and a "Post Taking Claim for Just Compensation [ ] Under the Fifth Amendment – Inverse Condemnation," and seeks a monetary judgment of the "surplus equity" in the property. (*Id.*)[6]

The SNRI Defendants assert that Plaintiff Marcus Byers lacks standing to bring suit against them because he was not the owner of the Hidden Rivers Drive property. (SNRI Defs.' Mot. at pp. 8-9, PageID.187-88.) Rather, all former title and interest in that property prior to the tax foreclosure was held by Marcus Byers' former spouse, Debbie Byers, who purchased the property from Wells Fargo Bank in 2008 and who is presently litigating claims in Bankruptcy Court. (*Id.* citing Ex. 9, ECF No. 31-10, Deed, PageID.269-70, Ex. 10, ECF No. 31-11, Judgment of Divorce, PageID.271-73.)

Plaintiffs respond only that Marcus Byers has a closed head injury since 1998 and that Debbie Byers "purchased a house with his money and has been his legal guardian," that "[t]he equity in or from the property belongs to Mr. Byer[s]," and "Byers' equitable interest meets the threshold for standing as an injury in fact." (Pls.' Resp. at pp. 9-10, PageID.1708-09.) Plaintiffs rely on expired guardianship papers naming "Kiara Napier" as Byers' *946 guardian and an unrecorded Quit Claim deed from Debbie Byers to herself and Marcus Byers, dated July 30, 2020, to try to assert that Byers somehow had an interest in the property in 2018. (*Id.* citing Ex. L, ECF No. 42-12, PageID.928-31.)

However, Debbie Byers could only convey the interest she had in 2020, which, following the 2018 foreclosure of the property, was none. Without an interest in the subject property when the foreclosure and transfer occurred, the Court finds that Plaintiff Marcus Byers lacks standing in this case and dismisses his claims with prejudice.

## C. Plaintiffs' Unjust Enrichment Claim Against the SNRI Defendants

[20] The SNRI Defendants contend that Plaintiff's only claim against them appears to be the unjust enrichment claim in Count VII. (SNRI Defs.' Mot. at p. 10, PageID.189.) The Defendants argue that Plaintiffs fail to state such a claim. (*Id.* at pp. 10-17, PageID.189-96.)

Plaintiffs' unjust enrichment claim in Count VII of their complaint alleges that "SNRI obtained the surplus equity

and or equity from the tax foreclosure" "in a prearranged transfer for inadequate value," and that "[t]he retention of the benefits [surplus equity] by SNRI (or subsequent non-bona fide purchasers) of the property rights, equity and/or surplus equity amounts to unjust enrichment to the SNRI." (Compl. ¶¶ 145-48, PageID.29.) Plaintiffs allege that "[t]he surplus equity and or equity in justice and equity belongs to the Plaintiffs[ ] individually and to the Class Members," and that "Plaintiffs[ ] individually and as class representatives have been damaged by their loss of equity." (*Id.* ¶¶ 149-50, PageID.30.)

[21] [22] Under Michigan law, "[u]njust enrichment is defined as the unjust retention of money or benefits which in justice and equity belong to another." 🔲 *Tkachik v. Mandeville*, 487 Mich. 38, 48, 790 N.W.2d 260 (2010) (citation omitted). A plaintiff alleging unjust enrichment must establish two elements: "(1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant." 🔲 *Belle Isle Grill Corp. v. City of Detroit*, 256 Mich. App. 463, 478, 666 N.W.2d 271 (2003).

The SNRI Defendants first contend that Plaintiffs have failed to show that the SNRI Defendants received a "benefit" from Plaintiffs. They argue that the Michigan Supreme Court in 🔲 *Rafaeli* did not establish a cause of action for Plaintiffs to sue the SNRI Defendants in this case for the return of "surplus equity." (SNRI Defs.' Mot. at p. 10, PageID.189.)

They explain that the Michigan Supreme Court in 🔲 *Rafaeli* limited the plaintiffs' claims in that case against the county and the county treasurer to the excess proceeds realized from the tax foreclosure sale (the auction) (i.e., the proceeds realized in excess of the delinquent taxes, interest, penalties, and fees), "no more, no less." (*Id.*, citing 🔲 *Rafaeli*, 505 Mich. at 484, 952 N.W.2d 434). *See also* 🔲 *Rafaeli*, 505 Mich. at 477, 952 N.W.2d 434 ("[A] former property owner has a compensable takings claim *if and only if* the tax-foreclosure sale produces a surplus.") (emphasis added).

[23] In this case, the Plaintiffs' properties were not sold at auction, but were purchased after foreclosure from the Oakland County Treasurer by the City of Southfield for the minimum bid. Accordingly, it is undisputed that no "surplus proceeds" were realized from a "tax-foreclosure sale," and Plaintiffs have failed to demonstrate a property right or amount or benefit that was "unjustly" taken from

them by anyone, much less than by the SNRI Defendants, the subsequent transferee who properly acquired the properties **\*947** from the City after proper tax-foreclosure proceedings.

The Michigan Supreme Court made clear in □*Rafaeli* that a plaintiff's only "property interest" surviving a tax-foreclosure is not in the real property itself, but only in the surplus proceeds resulting from the tax-foreclosure sale, if any, resulting from the sale of the property at an auction. In this case, there are no such surplus proceeds.

The SNRI Defendants next contend that Plaintiffs seek to create a cause of action that would allow former property owners to claim monetary damages from a subsequent transferee of property previously foreclosed on the basis of non-payment of taxes. (SNRI Defs.' Mot. at p. 12, PageID.191.) Such a theory, they assert, "would in fact yield unjust results to any party obtaining tax foreclosed property, and result in perpetual uncertainty as to the insurability of title with respect to [ ] tax foreclosed properties" by "enabl[ing] those who have failed to pay real property taxes and failed to timely redeem the assessed real estate after entry of a judgment of foreclosure to maintain an interest in the property notwithstanding the foreclosure process." (*Id.* at pp. 12-13, PageID.191-92.) The SNRI Defendants state that their program, in which they worked with Habitat to rehabilitate buildings which are salvageable, is a lawful program and consistent with the public policy for the GPTA:

> The legislature finds that there exists in this state a continuing need to strengthen and revitalize the economy of this state and its municipalities by encouraging the efficient and expeditious return to productive use of property returned for delinquent taxes. Therefore, the powers granted in this act relating to the return of property for delinquent taxes constitute the performance by this state or a political subdivision of this state of essential public purposes and functions.

Mich. Comp. Laws § 211.78(1). In fact, the SNRI Defendants point out that the City of Southfield/SNRI program and partnership is not unique, as other communities have engaged

in similar programs, which have been upheld by Michigan courts. (SNRI Defs.' Mot. at pp. 13-14, PageID.192-93.)

For example, the City of Grand Rapids entered into an agreement with the Kent County Land Bank Authority ("KCLBA") to purchase tax-foreclosed properties from the Kent County Treasurer, whereby the KCLBA placed money in escrow for the City to purchase properties from the Treasurer for the minimum bid, which were then transferred to the KCLBA for that same amount, plus the cost of recording fees. *See Rental Props. Owners Ass'n of Kent Cnty. v. Kent Cnty. Treasurer*, 308 Mich. App. 498, 505-06, 866 N.W.2d 817 (2014). The plaintiffs in that case argued that the process through which the KCLBA obtained title to the foreclosed properties was in violation of the law. *Id.* at 507-08, 866 N.W.2d 817. The plaintiffs argued that "Grand Rapid's purchase of the properties was a 'ruse' to disguise the violation, that the KCLBA inappropriately funded Grand Rapid's purchase of the properties from the Kent County Treasurer, and that the Legislature did not intend for local governmental units to act as a 'straw man' to avoid a public sale of the properties." *Id.* at 515, 866 N.W.2d 817. The Michigan Court of Appeals disagreed and concluded that:

> Grand Rapids purchased the properties as part of its obligation to provide for the health, safety, and welfare of its community and then conveyed them to the KCLBA to fulfill the public purpose of restoring blighted properties and neighborhoods and to provide housing on tax-foreclosed properties. Language cannot be read into □MCL 211.78m to proscribe how Grand Rapids chooses to **\*948** effectuate the public purpose. Although Grand Rapids entered into an agreement with the KCLBA before purchasing the properties from the Kent County Treasurer, and the KCLBA placed the money in escrow for Grand Rapids to purchase the properties from the Kent County Treasurer, it does not follow from the □*Rutland Twp. [v. City of Hastings*, 413 Mich. 560, 321 N.W.2d 647 (1982)] analysis that the transactions

should be invalidated under MCL 124.755(6) as a "sham."

*Id.* at 516, 866 N.W.2d 817. "Other than the restriction that the purchase be for a public purpose, the Legislature did not restrict in any way how Grand Rapids may convey the property thereafter. MCL 211.78m." *Id.* at 517, 866 N.W.2d 817. *See also City of Bay City v. Bay Cnty. Treasurer,* 292 Mich. App. 156, 159, 167, 807 N.W.2d 892 (2011) (finding the City's stated public purpose – "to reduce the number of vacant tax reverted properties within [its] limits thereby minimizing the real and present dangers they present and to remove certain blighted conditions present on the subject properties" and thus "ensure a healthy and growing tax base" – sufficient, noting "it is not for the courts to read into MCL 211.78m(a) restrictions or conditions on what constitutes a public purpose that are not within the language of the statute itself and that essentially usurp the Legislature's authority to determine what constitutes a public purpose").

The GPTA creates a scheme whereby the foreclosing governmental unit must offer the tax-foreclosed properties for sale to the state first, then the city, village, or township (as in this case), then the county in which the property is located. MCL 211.78m(1). Any purchase by the city, village, township, or county must be for a public purpose. MCL 211.78m(1). The Michigan Court of Appeals explained in *Rental Properties Owners* that the GPTA otherwise does not "place restrictions on, or even address, a local governmental unit's use or subsequent sale of such properties." *Id.* at 514, 866 N.W.2d 817. As the SNRI Defendants explain in their reply brief, "there was nothing unlawful with the OCT's tax foreclosure of Plaintiffs' properties, the City's exercise of its right of first refusal, or SNRI's purchase of the Properties [from the City]." (SNRI Defs.' Reply at p. 2, PageID.1975.)

The SNRI Defendants thus contend that there is no legal basis for a claim of unjust enrichment against them because they acquired the subject properties through the actions of the Oakland County Treasurer and the City, not from the Plaintiffs, and thus did not receive a benefit from Plaintiffs. They rely in part on *Karaus v. Bank of New York Mellon,* 300 Mich. App. 9, 831 N.W.2d 897 (2012), for the proposition that when a defendant receives a benefit from a third party, and not through the actions of the plaintiff directly, there is no receipt of a benefit by the defendant from the plaintiff

as required for a claim of unjust enrichment. (SNRI Defs.' Mot. at pp. 15-16, PageID.194-95.)[7] However, courts have **949** found that this *Karaus* holding "does not stand for the proposition that a plaintiff may prevail against a defendant on an unjust enrichment theory only if the plaintiff directly conferred the benefit upon the defendant. On the contrary, the court in *Karaus* recognized the possibility that a plaintiff may recover from a defendant upon whom he did not confer a benefit if the defendant has engaged in misleading conduct that led to the plaintiff's loss." *Kerrigan v. ViSalus, Inc.,* 112 F. Supp. 3d 580, 614 (E.D. Mich. 2015).

**[24]** Defendants contend that Plaintiffs have pleaded no allegations of misconduct, wrongdoing or misleading conduct by the SNRI Defendants, but instead complain of Defendants' lawful use of the Michigan foreclosure law. Plaintiffs claim that "the recipients of the 'unjust consideration' were not only involved with the transfer of the surplus proceeds/ equity from Plaintiffs, but orchestrated and participated in a scheme or a conspiracy to strip the equity of plaintiffs' properties through concerted action." (Pls.' Resp. at p. 22, PageID.1721.) However, Plaintiffs offer only conclusory allegations in support of their unjust enrichment claim. To the extent Plaintiffs assert that the SNRI Defendants are liable to them for unjust enrichment because they were involved in a "scheme" or "conspiracy" to "strip the equity from Plaintiffs' properties," that claim fails because, as explained above, there is nothing improper or unlawful with the Oakland County Treasurer's foreclosure of Plaintiffs' properties, the City's exercise of its statutory right of first refusal, or SNRI's purchase of the properties. *See Rental Prop. Owners,* 308 Mich. App. at 516-17, 866 N.W.2d 817. "There must be more than a benefit received by a party, the party 'is liable to pay therefore only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it.' " *Hoving v. Transnation Title Ins. Co.,* 545 F. Supp. 2d 662, 669 (E.D. Mich. 2008) (quoting *Dumas v. Auto Club Ins. Ass'n,* 437 Mich. 521, 546, 473 N.W.2d 652 (1991)). Accordingly, for all of these reasons, Plaintiffs fail to state an unjust enrichment claim against the SNRI Defendants, and that claim is dismissed.

**D. Whether Plaintiffs Have Stated Any Claims Against Defendants SNPHC, Simon and Libbett Individually**

[25]  [26] The SNRI Defendants further assert that Plaintiffs' Complaint must be dismissed against Defendants SNPHC, Simon and Libbett because there is not a single reference to these three defendants in any of Plaintiffs' Counts in their Complaint. (SNRI Defs.' Mot. at pp. 18-20, PageID.197-99.) The SNRI Defendants contend that there is in fact only limited, one or two paragraph references to these three defendants throughout the Complaint. (*Id.*)

Plaintiffs failed to respond to this argument. (See Pls.' Resp.) The SNRI Defendants argue that Plaintiffs therefore have abandoned their claims against SNPHC, Simon and Libbett by failing to respond to this argument. (SNRI Defs.' Reply at pp. 6-7, PageID.1979-80.) *See Cruz v. Capital One, N.A.*, 192 F. Supp. 3d 832, 838-39 (E.D. Mich. 2016) ("A plaintiff abandons undefended claims.") (citing 🔲*Doe v. Bredesen*, 507 F.3d 998, 1007-08 (6th Cir. 2007)); 🔲*Mekani v. Homecomings Fin., LLC*, 752 F. Supp. 2d 785, 797 (E.D. Mich. 2010) (explaining that where a plaintiff fails to respond to an argument in a motion to *950 dismiss, "the Court assumes he concedes this point and abandons the claim.").

First, Defendants are correct that there is no reference to Defendants SNPHC, Simon or Libbett in any of the Counts in Plaintiffs' Complaint. The SNRI Defendants are also correct that Defendants Simon and Libbett are only mentioned in two paragraphs each in Plaintiffs' 150 paragraph Complaint. Specifically, Defendant Simon appears when discussing the parties' identities in paragraph 10 ("Defendant Mitchell Simon is a CPA and the Treasurer of the SNPHC and Board member of SNPHC.") and in the General Allegations in paragraph 71 ("Meisner, Zorn, Simon, Susan Ward - Witkowski and Siver knew that their acts would remove the subject properties from the tax rolls of Southfield for the gain of SNRI."). (Compl. ¶¶ 10, 71, PageID.3, 13.) Defendant Libbett appears only in paragraph 11 ("Defendant E'toile Libbett is a real estate broker and board member of SNRI.") and paragraph 68 ("Defendants Zorn, Siver, Libbett entered into a conspiracy which to engage in a scheme that conducted a pattern of unlawful activity affecting interstate commerce."). (Compl., ¶¶ 11, 68, PageID.3, 12.) Further, Defendants Simon and Libbett's names are only even mentioned one time each in the body of Plaintiffs' Response brief, at page 3 ("Former Southfield official Gerald Witkowski as well as SNPHC Treasurer Mitchell Simon received proceeds from the equity of Plaintiffs' properties."), and at page 24 ("Likewise, the SNRI has as its three members Zorn, Siver and a politically connected Realtor Defendant

E'Toile Libbett."). (Pls.' Resp. at pp. 3, 24, PageID.1702, 1723.)

The Court agrees with Defendants that these limited, conclusory allegations as to Defendants Simon and Libbett fail to state a claim against these two defendants. A plaintiff's complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." 🔲*Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 🔲*Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. Plaintiffs' Complaint does not meet these standards with respect to their allegations against Defendants Simon and Libbett. Plaintiffs' Complaint fails to plead how either defendant is allegedly liable to Plaintiffs under any of the claims pleaded, and Plaintiffs' claims against Defendants Simon and Libbett therefore are dismissed.

However, while the SNRI Defendants contend in their motion that "the only reference to Defendant SNPHC appears when discussing the parties' identities" and that "[t]his lone allegation is no basis to impose liability against the SNPHC, let alone sufficient to state a cause of action against," (SNRI Defs.' Mot. at pp. 18-19, PageID.197-98), that is not correct. While it is true that Defendant SNPHC is not named in any of the Counts in Plaintiffs' Complaint, SNPHC is named in multiple paragraphs in the General Allegations section of Plaintiffs' Complaint, generally alleging that SNPHC provided funds to the City of Southfield to purchase foreclosed properties pursuant to its statutory right of first refusal, and complaining of the City officials' involvement with SNPHC. (Compl. ¶¶ 44, 46, 48-50, 61, 67, and 83(e), PageID.9-10, 12, 16.) Defendant SNPHC is also discussed in Plaintiffs' Response brief, primarily with regard to allegations that SNPHC provided funds to the City of Southfield to purchase foreclosed properties from the Oakland County Treasurer, which were then transferred to Defendant SNRI, as part of a "scheme" to unconstitutionally take Plaintiffs' property rights. (See Pls.' Resp. at pp. 2, 3, 14, 15, 18, 19, *951 24, PageID.1701-02, 1713-14, 1717-18, 1723.)

Although the Court could find that Plaintiffs waived any opposition to Defendants' motion with regard to Defendant SNPHC by failing to respond to it, *see* 🔲*Mekani*, 752 F. Supp. 2d at 797 (explaining that where a plaintiff fails to respond to an argument in a motion to dismiss, "he Court assumes he concedes this point and abandons the

claim."), the Court finds that, even though Plaintiffs failed to specifically include allegations against Defendant SNPHC in any of Plaintiffs' Counts, they have sufficiently alleged SNPHC's involvement with the other defendants in the General Allegations section of their Complaint, and thus will decline to dismiss Defendant SNPHC on this basis.

### E. Whether Plaintiffs Have Stated a Takings Claim Against the SNRI Defendants Under the United States or Michigan Constitutions

[27]    [28]    [29] Plaintiffs argue in their Response brief that they have stated a Fifth Amendment Takings claim and a claim under the Michigan Constitution against all SNRI Defendants. (Pls.' Resp. at pp. 10-21, PageID.1709-20.) Plaintiffs' counsel stated that the hearing that they assert this claim in Count II of their Complaint. The Court notes that while the takings claim in Count I (Fifth Amendment and Fourteenth Amendment/§ 1983 claim) is expressly asserted "Against Oakland County, Andrew Meisner, City of Southfield, Fred Zorn, Ken Siver, Susan Witkowski and Gerald Witkowski Only" (Compl. PageID.18), Count II (Post Taking Claim for Just Compensation Under the Fifth Amendment – Inverse Condemnation) is not similarly expressly limited. However, Count II only contains allegations against the Oakland County and Southfield Defendants, and does not include any allegations against any of the SNRI Defendants, and this takings claim could be dismissed against the SNRI Defendants for this reason. [8]

Assuming that Plaintiffs have asserted a constitutional taking claim against the SNRI Defendants in their Complaint, those defendants contend that such a claim fails for several reasons: (1) there is no recognizable claim for taking of "surplus **952 equity;" (2) Plaintiffs failed to plead the SNRI Defendants are state actors; and (3) Plaintiffs failed to plead that SNRI Defendants deprived Plaintiffs of any constitutional right. (SNRI Defs.' Reply at pp. 3-6, PageID.1976-79.)

[30]    [31] The Takings Clause of the Fifth Amendment prohibits taking "private property ... for public use, without just compensation." U.S. Const. amend. V. The clause applies to state governments through the Fourteenth Amendment. *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). The Sixth Circuit has articulated a two-part test in evaluating claims that a governmental action constitutes a taking of private property without just compensation. First, "the court must examine whether the claimant has established a cognizable property

interest for the purposes of the Just Compensation Clause." *Coalition for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 481 (6th Cir. 2004) (internal quotation marks omitted); *see also Raceway Park, Inc. v. Ohio*, 356 F.3d 677, 683 (6th Cir. 2004) ("[T]here is no taking if there is no private property in the first place."). Second, "where a cognizable property interest is implicated, the court must consider whether a taking occurred." *Coalition for Gov't Procurement*, 365 F.3d at 481. "[T]he existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law." *Phillips v. Washington Legal Found.*, 524 U.S. 156, 164, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998) (internal quotation marks omitted).

First, as discussed above, and as explained in this Court's prior Opinion and Order (ECF No. 62), the Michigan Supreme Court made clear in *Rafaeli* that a plaintiff's only "property interest" surviving a tax-foreclosure is not in the real property itself, but only in the surplus proceeds, if any, resulting from the post-foreclosure sale of the property at an auction. *Rafaeli*, 505 Mich. at 484, 952 N.W.2d 434. *Rafaeli* did not confer a cause of action for a taking as to "surplus equity," explaining that "when property is taken to satisfy an unpaid tax debt, just compensation requires *the foreclosing government unit* to return any proceeds from the tax-foreclosure sale *in excess* of the delinquent taxes, interest, penalties, and fees reasonably related to the foreclosure and sale of the property – *no more, no less.*" *Id.* at 483-84, 952 N.W.2d 434 (emphases added). The Court expressly "reject[ed] the premise that just compensation requires that plaintiffs be awarded the fair market value of their properties so as to be put in as good of position had their properties not been taken at all." *Id.* at 483, 952 N.W.2d 434. The Court noted that the *Rafaeli* plaintiffs (like the Plaintiffs here) "conflate equity with surplus proceeds," but that the Court is "unaware of any authority affirming a vested property right to equity held in property generally." *Id.* at 484 n.134, 952 N.W.2d 434 ("The question presented is whether a former property owner retains the ability to collect any surplus proceeds that might result after the government seizes title to real property for failure to pay taxes *and then sells that property for more than the tax delinquency.*") (emphasis added). Plaintiffs concede in their Response brief that *Rafaeli* "does not address the exact fact situation that is

presented by the instant action because it did not opine on the remedy for a taking violation when there is no auction." (Pls.' Resp. at p. 13, PageID.1712.)

In this case, the Plaintiffs' properties were not sold at an auction (like in *Rafaeli*) and no "surplus proceeds" were generated when the Oakland County Treasurer sold the properties to the City of Southfield for the minimum bid. The Oakland *953 County Treasurer, the "foreclosing government unit," thus did not obtain any "surplus proceeds" that should be returned to Plaintiffs under *Rafaeli.* Plaintiffs allege that the City then conveyed the properties to SNRI for $1.00. (Compl. ¶¶ 21-27, PageID.5-7.) Some, but not all, of the subject properties were then rehabilitated and sold by Defendant SNRI, one to two years later, to individual buyers. Plaintiffs cite no authority for permitting them to recover proceeds from the sale of the properties, years after the foreclosure and after rehabilitation and repair of the properties by the non-profit Defendants.

Plaintiffs have failed to plead that the SNRI Defendants denied Plaintiffs a right guaranteed by the United States or Michigan Constitutions, and thus fail to state a takings claim against the SNRI Defendants. [9]

## IV. CONCLUSION

For the reasons set forth above, the Court **GRANTS** the SNRI Defendants' Motion to Dismiss and **DISMISSES WITH PREJUDICE** Plaintiffs' claims against Defendants Southfield Neighborhood Revitalization Initiative ("SNRI"), Southfield Nonprofit Housing Corporation ("SNPHC"), Director E'toile Libbett, and Mitchell Simon. [10]

IT IS SO ORDERED

**All Citations**

565 F.Supp.3d 928

## Footnotes

1 The three other groups of Defendants also filed separate motions to dismiss. The Court granted Defendant Habitat for Humanity's Motion to Dismiss on April 20, 2021 (ECF No. 58), and the Oakland County Defendants' Motion to Dismiss on May 21, 2021. (ECF No. 62). The Southfield Defendants' motion to dismiss will be addressed separately by the Court. (See ECF No. 34, Southfield Defendants' Motion to Dismiss.)

2 The longstanding ability for municipalities to purchase tax foreclosed properties for an amount equal to the taxes and penalties due and owing has since been eliminated as a result of a recent amendment to the GPTA, Mich. Comp. Laws § 211.78m, which became effective on January 1, 2021. The amended GPTA now allows the state and/or municipalities to purchase tax foreclosed properties "at the greater of the minimum bid or its fair market value[.]" Mich. Comp. Laws § 211.78m(1). While this amendment will affect the manner in which future tax foreclosure sales are handled, it does not provide a basis for liability against the defendants in this action. The Act provides that any retroactive effect is dependent upon a decision of the Michigan Supreme Court that "its decision in Rafaeli, LLC v. Oakland County, docket no. 156849, applies retroactively." Mich. Comp. Laws § 211.78t(1)(b)(i). There has been no such decision from the Michigan Supreme Court.

3 Plaintiffs plead that this amount includes the "delinquent property taxes, interest penalties, and fees." (Compl. ¶ 21, PageID.5.)

4 Plaintiffs rely, in part, on a state court order declining to accept reassignment of a class action from another court, to support their argument against res judicata in this case. (Pls.' Resp. at p. 7, PageID.1706, citing Ex. G, ECF No. 42-7, PageID.797-98.) However, that state court order declining reassignment is not persuasive authority. In that case, the defendants moved to have the case reassigned from Judge Denise Langford-Morris to Judge Hala Jarbou because Judge Jarbou handled the 2017 foreclosure case. Judge Jarbou

declined reassignment as improper under the local court rule regarding assignment of cases, finding "the instant action does not arise out of the same transaction and occurrent that was before th[at] Court in 2016 [a bulk foreclosure action]" because "not all of the Plaintiffs' properties were foreclosed in 2017 by this Court" and thus "the instant action does not 'arise out of the same transaction and occurrence.' " (ECF No. 42-7, PageID.797-98.) In this case, the properties at issue are identical.

5   In addition, Plaintiffs' citation to Judge Tarnow's May 31, 2020 decision in *Johnson v. Meisner*, Case No. 19-11569, 2020 WL 2832253 (E.D. Mich. 2020), is misplaced because Judge Tarnow declined to apply res judicata to the plaintiffs' claims in that case because the prior dismissal was under Rule 12(b)(1), for lack of jurisdiction, not Rule 12(b)(6), and Rule 12(b)(1) dismissals are not dismissals on the merits and thus do not have preclusive effect. (ECF No. 42-9, PageID.900-01.)

6   The SNRI Defendants argue that Debbie Byers claims would be barred by res judicata. However, Debbie Byers is not a plaintiff in this action and so that argument need not be addressed.

7   In *Karaus*, a homeowner borrowed money from a bank to finance construction on his house and, in return, the homeowner granted a mortgage to the bank. The plaintiff performed construction work on the home, but the homeowner did not pay the plaintiff in full. The plaintiff then brought an unjust enrichment claim against the bank that held the mortgage. The Michigan Court of Appeals affirmed judgment in favor of the bank on the grounds that the bank did not obtain a benefit directly from the plaintiff. *Karaus*, 300 Mich. App. at 23, 831 N.W.2d 897. The court noted that the bank was "completely uninvolved" with the agreement between the plaintiff and the homeowner, and it found no evidence that the bank "requested any of the work performed by plaintiff or misled plaintiff to receive any benefit." *Id.* ("The mere fact that a third person benefits from a contract between two other persons does not make such third person liable in quasi-contract, unjust enrichment, or restitution").

8   The Court further notes that Count II is titled as a "Post Taking Claim for Just Compensation Under the Fifth Amendment – Inverse Condemnation." Section 1983 is the "exclusive remedy for constitutional violations," *Foster v. Michigan*, 573 F. App'x 377, 391 (6th Cir. 2014), and Plaintiffs cannot proceed "directly" against these defendants under the Fifth and Fourteenth Amendments. *Thomas v. Shipka*, 818 F.2d 496, 499 (6th Cir. 1987) (holding that "in cases where a plaintiff states a constitutional claim under 42 U.S.C. § 1983, that statute is the exclusive remedy for the alleged constitutional violations"), *vacated and remanded on other grounds*, 488 U.S. 1036, 109 S.Ct. 859, 102 L.Ed.2d 984 (1989); *Woods Cove, III, LLC v. City of Akron*, No. 5:16-CV-1016, 2018 WL 4104186, at *5 n.15 (N.D. Ohio Aug. 29, 2018) ("Therefore, to the extent plaintiffs are attempting to assert a direct constitutional claim under the Fifth Amendment, that is grounds enough for failure of the claim."). Count II thus can be dismissed on this basis, or can be subsumed with Count I.

To the extent Plaintiffs seek to assert an inverse condemnation claim under state law, such a claim is encompassed by Count III of Plaintiffs' Complaint, asserting a taking claim under the Michigan Constitution, Article X, Section 2. *See Biff's Grills, Inc. v. Michigan State Highway Comm'n*, 75 Mich. App. 154, 156-57, 254 N.W.2d 824 (1977) (recognizing that an inverse condemnation claim is the "means of enforcing the constitutional ban on uncompensated takings of property"); *see also Fox v. Cnty. of Saginaw*, No. 19-CV-11887, 2021 WL 120855, at *13 (E.D. Mich. Jan. 13, 2021) (reaching the same conclusion); *Arkona, LLC v. Cnty. of Cheboygan*, No. 19-CV-12372, 2021 WL 148006, at *9 (E.D. Mich. Jan. 15, 2021) (same). Count II can be dismissed for this reason as well.

9    In light of this ruling, the Court need not address the SNRI Defendants' argument that Plaintiffs have failed to plead or allege that Defendants SNRI, SNPHC, Simon or Libbett are state actors.

10    The Court concurs, for the most part, with the Michigan Court of Appeals in footnote 6 in *Jackson v. Southfield Neighborhood Revitalization Initiative, LLC, Fred Zorn, E'toile Libbett, Michael A. Mandelbaum, City of Southfield, Ken Siver, Oakland County Treasurer, Southfield Non-Profit Housing Corporation, Susan Ward Witkowski, Gerald Witkowski, and Andrew Meisner*, No. 344058, 2019 WL 6977831 (Mich. Ct. App. Dec. 19, 2019), *vacated in part by the Michigan Supreme Court*, 953 N.W.2d 402 (Mich. 2021), that "[a]lthough we find no basis for plaintiffs' substantive due process claims, we can appreciate their suspicion surrounding defendants' behavior. While the record before us does not provide evidentiary support for plaintiffs' claim that defendants sought to defraud these plaintiffs out of equity in their homes, the fact that elected officials were using their political status ... by obtaining properties before they could go to auction following tax foreclosure is, at a minimum, troubling. Clearly, defendants, particularly the elected officials, have even attempted to avoid the appearance of impropriety, as a clear conflict of interest exists regarding their involvement with SNPHC and SNRI. This type of behavior is not only shocking to the consc[ience], but also rightfully breeds distrust among their electorate. Regardless, the instant lawsuit is regrettably the incorrect vehicle to further explore the legality of defendants' actions."

---

**End of Document**                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Peter Avery, et al v Kent County, et al

Case No. 23- _____-CV

# EXHIBIT D

### To Plaintiffs' Complaint

143 S.Ct. 1369
Supreme Court of the United States.

Geraldine TYLER, Petitioner
v.
HENNEPIN COUNTY, MINNESOTA, et al.

No. 22-166
|
Argued April 26, 2023
|
Decided May 25, 2023

**Synopsis**

**Background:** Taxpayer brought action against county in state court alleging county's retention of the $25,000 in excess proceeds from the sale of her condominium for $40,000 to satisfy her delinquent $15,000 property tax bill was a taking of property without just compensation, in violation of the Fifth Amendment. Following removal, the United States District Court for the District of Minnesota, Patrick J. Schiltz, Chief Judge, 505 F.Supp.3d 879, granted county's motion to dismiss, and taxpayer appealed. The United States Court of Appeals for the Eighth Circuit, Colloton, Circuit Judge, 26 F.4th 789, affirmed. Certiorari was granted.

**Holdings:** In a unanimous opinion, the Supreme Court, Chief Justice Roberts, held that:

[1] taxpayer plausibly pleaded a classic pocketbook injury sufficient to give her standing to sue;

[2] county's retention of the money remaining after the condominium was sold was a classic taking for which taxpayer was entitled to just compensation; and

[3] taxpayer did not constructively abandon her condominium by failing to pay property taxes.

Reversed.

Justice Gorsuch filed a concurring opinion in which Justice Jackson joined.

**Procedural Posture(s):** Petition for Writ of Certiorari; On Appeal; Motion to Dismiss for Failure to State a Claim.

West Headnotes (15)

[1] **Eminent Domain** ⬌ Persons entitled to sue

Taxpayer plausibly pleaded on the face of her complaint that she suffered financial harm from county's action in allegedly illegally appropriating, pursuant to Minnesota law, the $25,000 surplus from its sale, for $40,000, of her condominium in order to satisfy her delinquent $15,000 property tax bill, and thus, she alleged a classic pocketbook injury sufficient to give her standing to sue the county for taking her property without just compensation, in violation of the Fifth Amendment, even if there were encumbrances on the home worth more than the surplus; had taxpayer received the surplus from the tax sale, she could have at the very least used it to reduce any such liability. U.S. Const. Amend. 5; Minn. Stat. Ann. §§ 281.18, 282.08.

[2] **Federal Civil Procedure** ⬌ In general; injury or interest

**Federal Civil Procedure** ⬌ Causation; redressability

To bring suit, a plaintiff must plead an injury in fact attributable to the defendant's conduct and redressable by the court.

[3] **Federal Civil Procedure** ⬌ Matters deemed admitted; acceptance as true of allegations in complaint

On a motion to dismiss for failure to state a claim, the court takes the facts in the complaint as true.

[4] **Federal Civil Procedure** ⬌ Pleading

At the motion to dismiss stage of a case, the plaintiff need not definitively prove her injury or disprove the defendant's defenses to plausibly plead an injury for standing purposes.

2023 Daily Journal D.A.R. 4853, 29 Fla. L. Weekly Fed. S 851

[5]  **Eminent Domain** ⬅ Taxes, licenses, assessments, and users' fees in general

**Taxation** ⬅ Sale of Land for Nonpayment of Tax

County's retention, pursuant to Minnesota law, of the $25,000 that was remaining after it had seized and sold taxpayer's condominium for $40,000 to satisfy her $15,000 delinquent property tax debt was a classic taking, in which the government directly appropriated private property for its own use, for which taxpayer was entitled to just compensation; the county had the power to sell taxpayer's home to recover the unpaid property taxes, but it could not use the toehold of the tax debt to confiscate more property than was due.

U.S. Const. Amend. 5; ▨Minn. Stat. Ann. § 282.08.

[6]  **Eminent Domain** ⬅ Taxes, licenses, assessments, and users' fees in general

**Taxation** ⬅ Nature of property tax

State property taxes are not themselves a taking under the Fifth Amendment, but are a mandated contribution from individuals for the support of the government for which they receive compensation in the protection which government affords. U.S. Const. Amend. 5.

[7]  **Taxation** ⬅ Interest and fees

**Taxation** ⬅ Sale of Land for Nonpayment of Tax

In collecting property taxes, the State may impose interest and late fees, and it may also seize and sell property, including land, to recover the amount owed.

[8]  **Eminent Domain** ⬅ Property and Rights Subject of Compensation

To define property for purposes of the Takings Clause, the court draws on existing rules or understandings about property rights. U.S. Const. Amend. 5.

[9]  **Eminent Domain** ⬅ Property and Rights Subject of Compensation

State law is one important source for defining property for purposes of the Takings Clause, but state law cannot be the only source; otherwise, a State could sidestep the Takings Clause by disavowing traditional property interests in assets it wishes to appropriate. U.S. Const. Amend. 5.

1 Case that cites this headnote

[10]  **Eminent Domain** ⬅ Property and Rights Subject of Compensation

To define property for purposes of the Takings Clause, the Supreme Court looks to traditional property law principles, plus historical practice and the Court's precedents. U.S. Const. Amend. 5.

1 Case that cites this headnote

[11]  **Abandoned and Lost Property** ⬅ Acts and omissions constituting abandonment

**Eminent Domain** ⬅ Persons entitled to sue

**Taxation** ⬅ Surplus

Taxpayer did not constructively abandon her condominium by failing to pay property taxes, and thus, she was not precluded from obtaining just compensation for county's taking, pursuant to Minnesota law, of the $25,000 that was remaining after it had seized and sold her condominium for $40,000 to satisfy her $15,000 delinquent property tax debt; Minnesota's forfeiture scheme was not about abandonment at all, as it gave no weight to taxpayer's use of the

property. U.S. Const. Amend. 5; ▨Minn. Stat. Ann. § 282.08.

[12]  **Abandoned and Lost Property** ⬅ Abandonment and Abandoned Property in General

Abandonment of property requires the surrender or relinquishment or disclaimer of all rights in the property.

[13] **Abandoned and Lost Property** ⇐ Acts and omissions constituting abandonment

It is the owner's failure to make any use of property—and for a lengthy period of time—that causes the lapse of the property right through abandonment.

[14] **Eminent Domain** ⇐ Necessity of making compensation in general

The Takings Clause was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole. U.S. Const. Amend. 5.

1 Case that cites this headnote

[15] **Taxation** ⇐ Amount of payment

The taxpayer must render unto Caesar what is Caesar's, but no more.

**West Codenotes**

**Held Unconstitutional**

Minn. Stat. Ann. § 282.08

**\*1371** *Syllabus* *

Geraldine Tyler owned a condominium in Hennepin County, Minnesota, that accumulated about $15,000 in unpaid real estate taxes along with interest and penalties. The County seized the condo and sold it for $40,000, keeping the $25,000 excess over Tyler's tax debt for itself. Minn. Stat. §§ 281.18, 282.07, 282.08. Tyler filed suit, alleging that the County had unconstitutionally retained the excess value of her home above her tax debt in violation of the Takings Clause of the Fifth Amendment and the Excessive Fines Clause of the

Eighth Amendment. The District Court dismissed the suit for failure to state a claim, and the Eighth Circuit affirmed.

*Held:* Tyler plausibly alleges that Hennepin County's retention of the excess value of her home above her tax debt violated the Takings Clause. Pp. 1374 – 1381.

(a) Tyler's claim that the County illegally appropriated the $25,000 surplus constitutes a classic pocketbook injury sufficient to give her standing. *TransUnion LLC* v. *Ramirez*, 594 U. S. ——, ——, 141 S.Ct. 2190, 210 L.Ed.2d 568. Even if there are debts on her home, as the County claims, Tyler still plausibly alleges a financial harm, for the County has kept $25,000 that she could have used to reduce her personal liability for those debts. Pp. 1374 – 1375.

(b) Tyler has stated a claim under the Takings Clause, which provides that "private property [shall not] be taken for public use, without just compensation." Whether remaining value from a tax sale is property protected under the Takings Clause depends on state law, "traditional property law principles," historical practice, and the Court's precedents. *Phillips* v. *Washington Legal Foundation*, 524 U.S. 156, 165–168, 118 S.Ct. 1925, 141 L.Ed.2d 174. Though state law is an important source of property rights, it cannot be the only one because otherwise a State could "sidestep the Takings Clause by disavowing traditional property interests" in assets it wishes to appropriate. *Id.*, at 167, 118 S.Ct. 1925. History and precedent dictate that, while the County had the power to sell Tyler's home to recover the unpaid property taxes, it could not use the tax debt to confiscate more property than was due. Doing so effected a "classic taking in which the government directly appropriates private property for its own use." *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*, 535 U.S. 302, 324, 122 S.Ct. 1465, 152 L.Ed.2d 517 (internal quotation marks omitted).

The principle that a government may not take from a taxpayer more than she owes is rooted in English law and can trace its origins at least as far back as the Magna Carta. From the founding, the new Government of the United States could seize and sell only "so much of [a] tract of land ... as may be necessary to satisfy the taxes due thereon." Act of July 14, 1798, § 13, 1 Stat. 601. Ten States adopted similar statutes around the same time, and the consensus that a government could not take more property than it was owed held true through the ratification of the Fourteenth Amendment. Today, most States and the Federal Government require excess value

Tyler v. Hennepin County, Minnesota, 143 S.Ct. 1369 (2023)

2023 Daily Journal D.A.R. 4853, 29 Fla. L. Weekly Fed. S 851

to be returned to the taxpayer whose property is sold to satisfy outstanding tax debt.

The Court's precedents have long recognized the principle that a taxpayer is entitled to the surplus in excess of the debt owed. See *United States v. Taylor*, 104 U.S. 216, 26 L.Ed. 721; *United States v. Lawton*, 110 U.S. 146, 3 S.Ct. 545, 28 L.Ed. 100. *Nelson v. City of New York*, 352 U.S. 103, 77 S.Ct. 195, 1 L.Ed.2d 171, did not change that. The ordinance challenged there did not "absolutely preclud[e] an owner from obtaining the surplus proceeds of a judicial sale," but instead simply defined the process through which the owner could claim the surplus. *Id.*, at 110, 77 S.Ct. 195. Minnesota's scheme, in comparison, provides no opportunity for the taxpayer to recover the excess value from the State.

Significantly, Minnesota law itself recognizes in many other contexts that a property owner is entitled to the surplus in excess of her debt. If a bank forecloses on a mortgaged property, state law entitles the homeowner to the surplus from the sale. And in collecting past due taxes on income or personal property, Minnesota protects the taxpayer's right to surplus. Minnesota may not extinguish a property interest that it recognizes everywhere else to avoid paying just compensation when the State does the taking. *Phillips*, 524 U.S., at 167, 118 S.Ct. 1925. Pp. 1374 – 1379.

(c) The Court rejects the County's argument that Tyler has no property interest in the surplus because she constructively abandoned her home by failing to pay her taxes. Abandonment requires the "surrender or relinquishment or disclaimer of" all rights in the property, *Rowe v. Minneapolis*, 49 Minn. 148, 51 N.W. 907, 908. Minnesota's forfeiture law is not concerned about the taxpayer's use or abandonment of the property, only her failure to pay taxes. The County cannot frame that failure as abandonment to avoid the demands of the Takings Clause. Pp. 1379 – 1381.

26 F.4th 789, reversed.

ROBERTS, C. J., delivered the opinion for a unanimous Court. GORSUCH, J., filed a concurring opinion, in which JACKSON, J., joined.

**Attorneys and Law Firms**

Christina M. Martin, Palm Beach Gardens, FL, for Petitioner.

Erica L. Ross for the United States, as amicus curiae, by special leave of the Court, supporting neither party.

Neal K. Katyal, Washington, DC, for Respondents.

Lawrence G. Salzman, Deborah J. La Fetra, David J. Deerson, Joshua W. Polk, Pacific Legal Foundation, Sacramento, CA, Christina M. Martin, Counsel of Record, Pacific Legal Foundation, Palm Beach Gardens, FL, Charles R. Watkins, Guin, Stokes & Evans, LLC, Oak Park, IL, Garrett D. Blanchfield, Roberta A. Yard, Reinhardt Wendorf & Blanchfield, St. Paul, MN, Vildan Teske, Teske Law, PLLC, Minneapolis, MN, for Petitioner.

Neal Kumar Katyal, Katherine B. Wellington, Reedy C. Swanson, Nathaniel A.G. Zelinsky, Ezra P. Louvis, Hogan Lovells US LLP, Washington, DC, Rebecca L.S. Holschuh, Counsel of Record, Kelly K. Pierce, Jeffrey M. Wojciechowski, Jonathan P. Schmidt, Hennepin County, Attorney's Office, Minneapolis, MN, for Respondents.

**Opinion**

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

**\*1373** Hennepin County, Minnesota, sold Geraldine Tyler's home for $40,000 to satisfy a $15,000 tax bill. Instead of returning the remaining $25,000, the County kept it for itself. The question presented is whether this constituted a taking of property without just compensation, in violation of the Fifth Amendment.

I

Hennepin County imposes an annual tax on real property. Minn. Stat. § 273.01 (2022). The taxpayer has one year to pay before the taxes become delinquent. § 279.02. If she does not timely pay, the tax accrues interest and penalties, and the County obtains a judgment against the property, transferring limited title to the State. See §§ 279.03, 279.18, 280.01. The delinquent taxpayer then has three years to redeem the property and regain title by paying all the taxes and late fees. §§ 281.17(a), 281.18. During this time, the taxpayer remains the beneficial owner of the property and can continue

to live in her home. See § 281.70. But if at the end of three years the bill has not been paid, absolute title vests in the State, and the tax debt is extinguished. §§ 281.18, 282.07. The State may keep the property for public use or sell it to a private party. § 282.01 subds. 1a, 3. If the property is sold, any proceeds in excess of the tax debt and the costs of the sale remain with the County, to be split between it, the town, and the school district. § 282.08. The former owner has no opportunity to recover this surplus.

*1374 Geraldine Tyler is 94 years old. In 1999, she bought a one-bedroom condominium in Minneapolis and lived alone there for more than a decade. But as Tyler aged, she and her family decided that she would be safer in a senior community, so they moved her to one in 2010. Nobody paid the property taxes on the condo in Tyler's absence and, by 2015, it had accumulated about $2300 in unpaid taxes and $13,000 in interest and penalties. Acting under Minnesota's forfeiture procedures, Hennepin County seized the condo and sold it for $40,000, extinguishing the $15,000 debt. App. 5. The County kept the remaining $25,000 for its own use.

Tyler filed a putative class action against Hennepin County and its officials, asserting that the County had unconstitutionally retained the excess value of her home above her tax debt. As relevant, she brought claims under the Takings Clause of the Fifth Amendment and the Excessive Fines Clause of the Eighth Amendment.

The District Court dismissed the suit for failure to state a claim. 505 F.Supp.3d 879, 883 (Minn. 2020). The Eighth Circuit affirmed. 26 F.4th 789, 790 (2022). It held that "[w]here state law recognizes no property interest in surplus proceeds from a tax-foreclosure sale conducted after adequate notice to the owner, there is no unconstitutional taking." Id., at 793. The court also rejected Tyler's claim under the Excessive Fines Clause, adopting the District Court's reasoning that the forfeiture was not a fine because it was intended to remedy the State's tax losses, not to punish delinquent property owners. Id., at 794 (citing 505 F.Supp.3d at 895–899).

We granted certiorari. 598 U. S. ——, 143 S.Ct. 644, 214 L.Ed.2d 382 (2023).

II

[1] [2] [3] The County asserts that Tyler does not have standing to bring her takings claim. To bring suit, a plaintiff must plead an injury in fact attributable to the defendant's conduct and redressable by the court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). This case comes to us on a motion to dismiss for failure to state a claim. At this initial stage, we take the facts in the complaint as true. Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Tyler claims that the County has illegally appropriated the $25,000 surplus beyond her $15,000 tax debt. App. 5. This is a classic pocketbook injury sufficient to give her standing. TransUnion LLC v. Ramirez, 594 U. S. ——, ——, 141 S.Ct. 2190, 2204, 210 L.Ed.2d 568 (2021).

The County objects that Tyler does not have standing because she did not affirmatively "disclaim the existence of other debts or encumbrances" on her home worth more than the $25,000 surplus. Brief for Respondents 12–13, and n. 5. According to the County, public records suggest that the condo may be subject to a $49,000 mortgage and a $12,000 lien for unpaid homeowners' association fees. See ibid. The County argues that these potential encumbrances exceed the value of any interest Tyler has in the home above her $15,000 tax debt, and that she therefore ultimately suffered no financial harm from the sale of her home. Without such harm she would have no standing.

But the County never entered these records below, nor has it submitted them to this Court. Even if there were encumbrances on the home worth more than the surplus, Tyler still plausibly alleges a financial harm: The County has kept $25,000 that belongs to her. In Minnesota, a tax sale extinguishes all other liens on a property. See Minn. Stat. § 281.18; County of Blue Earth v. Turtle, 593 N.W.2d 258, 261 (Minn. App. 1999). That sale does not extinguish *1375 the taxpayer's debts. Instead, the borrower remains personally liable. See St. Paul v. St. Anthony Flats Ltd. Partnership, 517 N.W.2d 58, 62 (Minn. App. 1994). Had Tyler received the surplus from the sale, she could have at the very least used it to reduce any such liability.

[4] At this initial stage of the case, Tyler need not definitively prove her injury or disprove the County's defenses. She

has plausibly pleaded on the face of her complaint that she suffered financial harm from the County's action, and that is enough for now. See *Lujan*, 504 U.S., at 561, 112 S.Ct. 2130.

### III

### A

[5] [6] [7] The Takings Clause, applicable to the States through the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation." U. S. Const., Amdt. 5. States have long imposed taxes on property. Such taxes are not themselves a taking, but are a mandated "contribution from individuals ... for the support of the government ... for which they receive compensation in the protection which government affords." *County of Mobile v. Kimball*, 102 U.S. 691, 703, 26 L.Ed. 238 (1881). In collecting these taxes, the State may impose interest and late fees. It may also seize and sell property, including land, to recover the amount owed. See *Jones v. Flowers*, 547 U.S. 220, 234, 126 S.Ct. 1708, 164 L.Ed.2d 415 (2006). Here there was money remaining after Tyler's home was seized and sold by the County to satisfy her past due taxes, along with the costs of collecting them. The question is whether that remaining value is property under the Takings Clause, protected from uncompensated appropriation by the State.

[8] [9] [10] The Takings Clause does not itself define property. *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998). For that, the Court draws on "existing rules or understandings" about property rights. *Ibid.* (internal quotation marks omitted). State law is one important source. *Ibid.*; see also *Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Protection*, 560 U.S. 702, 707, 130 S.Ct. 2592, 177 L.Ed.2d 184 (2010). But state law cannot be the only source. Otherwise, a State could "sidestep the Takings Clause by disavowing traditional property interests" in assets it wishes to appropriate. *Phillips*, 524 U.S., at 167, 118 S.Ct. 1925; see also *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980); *Hall v. Meisner*, 51 F.4th 185, 190

(CA6 2022) (Kethledge, J., for the Court) ("[T]he Takings Clause would be a dead letter if a state could simply exclude from its definition of property any interest that the state wished to take."). So we also look to "traditional property law principles," plus historical practice and this Court's precedents. *Phillips*, 524 U.S., at 165–168, 118 S.Ct. 1925; see, e.g., *United States v. Causby*, 328 U.S. 256, 260–267, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001–1004, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

Minnesota recognizes a homeowner's right to real property, like a house, and to financial interests in that property, like home equity. Cf. *Armstrong v. United States*, 364 U.S. 40, 44, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (lien on boats); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 590, 55 S.Ct. 854, 79 L.Ed. 1593 (1935) (mortgage on farm). Historically, Minnesota also recognized that a homeowner whose property has been sold to satisfy delinquent property taxes had an interest in the excess value of her home. *1376 above the debt owed. See *Farnham v. Jones*, 32 Minn. 7, 11, 19 N.W. 83, 85 (1884). But in 1935, the State purported to extinguish that property interest by enacting a law providing that an owner forfeits her interest in her home when she falls behind on her property taxes. See 1935 Minn. Laws pp. 713–714, § 8. This means, the County reasons, that Tyler has no property interest protected by the Takings Clause.

History and precedent say otherwise. The County had the power to sell Tyler's home to recover the unpaid property taxes. But it could not use the toehold of the tax debt to confiscate more property than was due. By doing so, it effected a "classic taking in which the government directly appropriates private property for its own use." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 324, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (internal quotation marks and alteration omitted). Tyler has stated a claim under the Takings Clause and is entitled to just compensation.

### B

The principle that a government may not take more from a taxpayer than she owes can trace its origins at least as far back as Runnymeade in 1215, where King John swore in the

Magna Carta that when his sheriff or bailiff came to collect any debts owed him from a dead man, they could remove property "until the debt which is evident shall be fully paid to us; and the residue shall be left to the executors to fulfil the will of the deceased." W. McKechnie, Magna Carta, A Commentary on the Great of King John, ch. 26, p. 322 (rev. 2d ed. 1914) (footnote omitted).

That doctrine became rooted in English law. Parliament gave the Crown the power to seize and sell a taxpayer's property to recover a tax debt, but dictated that any "Overplus" from the sale "be immediately restored to the Owner." 4 W. & M., ch. 1, § 12, in 3 Eng. Stat. at Large 488–489 (1692). As Blackstone explained, the common law demanded the same: If a tax collector seized a taxpayer's property, he was "bound by an implied contract in law to restore [the property] on payment of the debt, duty, and expenses, before the time of sale; or, when sold, to render back the overplus." 2 Commentaries on the Laws of England 453 (1771).

This principle made its way across the Atlantic. In collecting taxes, the new Government of the United States could seize and sell only "so much of [a] tract of land ... as may be necessary to satisfy the taxes due thereon." Act of July 14, 1798, § 13, 1 Stat. 601. Ten States adopted similar statutes shortly after the founding. [1] For example, Maryland required that only so much land be sold "as may be sufficient to discharge the taxes thereon due," and provided that if the sale produced more than needed for the taxes, "such overplus of money" shall be paid to the owner. 1797 Md. Laws ch. 90, §§ 4–5. This Court enforced one such state statute against a Georgia tax collector, reasoning that "if a whole tract of land was sold when a small part of it would have been sufficient for the taxes, which at present appears to be the case, the collector unquestionably exceeded his authority." *1377 *Stead's Executors* v. *Course*, 4 Cranch 403, 414, 2 L.Ed. 660 (1808) (Marshall, C. J., for the Court).

Like its sister States, Virginia originally provided that the Commonwealth could seize and sell "so much" of the delinquent tracts "as shall be sufficient to discharge the said taxes." 1781 Va. Acts p. 153, § 4. But about a decade later, Virginia enacted a new scheme, which provided for the forfeiture of any delinquent land to the Commonwealth. Virginia passed this harsh forfeiture regime in response to the "loose, cheap and unguarded system of disposing of her public lands" that the Commonwealth had adopted immediately following statehood. *McClure v. Maitland*, 24 W.Va. 561, 564 (1884). To encourage settlement, Virginia

permitted "any person [to] acquire title to so much ... unappropriated lands as he or she shall desire to purchase" at the price of 40 pounds per 100 acres. 1779 Va. Acts p. 95, § 2. Within two decades, nearly all of Virginia's land had been claimed, much of it by nonresidents who did not live on or farm the land but instead hoped to sell it for a profit. *McClure*, 24 W.Va., at 564. Many of these nonresidents "wholly neglected to pay the taxes" on the land, *id.*, at 565, so Virginia provided that title to any taxpayer's land was completely "lost, forfeited and vested in the Commonwealth" if the taxpayer failed to pay taxes within a set period, 1790 Va. Acts p. 5, § 5. This solution was short lived, however; the Commonwealth repealed the forfeiture scheme in 1814 and once again sold "so much only of each tract of land ... as will be sufficient to discharge the" debt. 1813 Va. Acts p. 21, § 27. Virginia's "exceptional" and temporary forfeiture scheme carries little weight against the overwhelming consensus of its sister States. See *Martin v. Snowden*, 59 Va. 100, 138 (1868).

The consensus that a government could not take more property than it was owed held true through the passage of the Fourteenth Amendment. States, including Minnesota, continued to require that no more than the minimum amount of land be sold to satisfy the outstanding tax debt. [2] The County identifies just three States that deemed delinquent property entirely forfeited for failure to pay taxes. See 1836 Me. Laws p. 325, § 4; 1869 La. Acts p. 159, § 63; 1850 Miss. Laws p. 52, § 4. [3] Two of these laws did not last. Maine amended its law a decade later to permit the former owner to recover the surplus. 1848 Me. Laws p. 56, § 4. And Mississippi's highest court promptly struck down its law for violating the Due Process and Takings Clauses of the Mississippi Constitution. See *Griffin v. Mixon*, 38 Miss. 424, 439, 451–452 (Ct. Err. & App. 1860). Louisiana's statute remained on the books, but the County cites no case showing that the statute was actually enforced against a taxpayer to take his entire property.

*1378 The minority rule then remains the minority rule today: Thirty-six States and the Federal Government require that the excess value be returned to the taxpayer.

C

Our precedents have also recognized the principle that a taxpayer is entitled to the surplus in excess of the debt owed.

2023 Daily Journal D.A.R. 4853, 29 Fla. L. Weekly Fed. S 851

In [📷]*United States v. Taylor*, 104 U.S. 216, 26 L.Ed. 721 (1881), an Arkansas taxpayer whose property had been sold to satisfy a tax debt sought to recover the surplus from the sale. A nationwide tax had been imposed by Congress in 1861 to raise funds for the Civil War. Under that statute, if a taxpayer did not pay, his property would be sold and "the surplus of the proceeds of the sale [would] be paid to the owner." Act of Aug. 5, 1861, § 36, 12 Stat. 304. The next year, Congress added a 50 percent penalty in the rebelling States, but made no mention of the owner's right to surplus after a tax sale. See Act of June 7, 1862, § 1, 12 Stat. 422. Taylor's property had been sold for failure to pay taxes under the 1862 Act, but he sought to recover the surplus under the 1861 Act. Though the 1862 Act "ma[de] no mention of the right of the owner of the lands to receive the surplus proceeds of their sale," we held that the taxpayer was entitled to the surplus because nothing in the 1862 Act took "from the owner the right accorded him by the act of 1861, of applying for and receiving from the treasury the surplus proceeds of the sale of his lands." [📷]*Taylor*, 104 U.S., at 218–219.

We extended a taxpayer's right to surplus even further in [📷]*United States v. Lawton*, 110 U.S. 146, 3 S.Ct. 545, 28 L.Ed. 100 (1884). The property owner had an unpaid tax bill under the 1862 Act for $170.50. [📷]*Id.*, at 148, 3 S.Ct. 545. The Federal Government seized the taxpayer's property and, instead of selling it to a private buyer, kept the property for itself at a value of $1100. [📷]*Ibid.* The property owner sought to recover the excess value from the Government, but the Government refused. [📷]*Ibid.* The 1861 Act explicitly provided that any surplus from tax sales to private parties had to be returned to the owner, but it did not mention paying the property owner the excess value where the Government *kept* the property for its own use instead of selling it. See 12 Stat. 304. We held that the taxpayer was still entitled to the surplus under the statute, just as if the Government had sold the property. [📷]*Lawton*, 110 U.S., at 149–150, 3 S.Ct. 545. Though the 1861 statute did not explicitly provide the right to the surplus under such circumstances, "[t]o withhold the surplus from the owner would be to violate the Fifth Amendment to the Constitution and to deprive him of his property without due process of law, or to take his property for public use without just compensation." [📷]*Id.*, at 150, 3 S.Ct. 545.

The County argues that [📷]*Taylor* and [📷]*Lawton* were superseded by [📷]*Nelson v. City of New York*, 352 U.S. 103, 77 S.Ct. 195, 1 L.Ed.2d 171 (1956), but that case is readily distinguished. There New York City foreclosed on properties for unpaid water bills. Under the governing ordinance, a property owner had almost two months after the city filed for foreclosure to pay off the tax debt, and an additional 20 days to ask for the surplus from any tax sale. [📷]*Id.*, at 104–105, n. 1, 77 S.Ct. 195. No property owner requested his surplus within the required time. The owners later sued the city, claiming that it had denied them due process and equal protection of the laws. [📷]*Id.*, at 109, 77 S.Ct. 195. In their reply brief before this Court, the owners also argued for the first time that they had been denied just compensation under the Takings Clause. [📷]*Ibid.*

**\*1379** We rejected this belated argument. [📷]*Lawton* had suggested that withholding the surplus from a property owner always violated the Fifth Amendment, but there was no specific procedure there for recovering the surplus. [📷]*Nelson*, 352 U.S., at 110, 77 S.Ct. 195. New York City's ordinance, in comparison, permitted the owner to recover the surplus but required that the owner have "filed a timely answer in [the] foreclosure proceeding, asserting his property had a value substantially exceeding the tax due." [📷]*Ibid.* (citing *New York v. Chapman Docks Co.*, 1 App.Div.2d 895, 149 N.Y.S.2d 679 (1956)). Had the owners challenging the ordinance done so, "a separate sale" could have taken place "so that [they] might receive the surplus." [📷]352 U.S., at 110, 77 S.Ct. 195. The owners did not take advantage of this procedure, so they forfeited their right to the surplus. Because the New York City ordinance did not "absolutely preclud[e] an owner from obtaining the surplus proceeds of a judicial sale," but instead simply defined the process through which the owner could claim the surplus, we found no Takings Clause violation. [📷]*Ibid.*

Unlike in [📷]*Nelson*, Minnesota's scheme provides no opportunity for the taxpayer to recover the excess value; once absolute title has transferred to the State, any excess value always remains with the State. The County argues that the delinquent taxpayer could sell her house to pay her tax debt before the County itself seizes and sells the house. But requiring a taxpayer to sell her house to avoid a taking is not

the same as providing her an opportunity to recover the excess value of her house once the State has sold it.

### D

Finally, Minnesota law itself recognizes that in other contexts a property owner is entitled to the surplus in excess of her debt. Under state law, a private creditor may enforce a judgment against a debtor by selling her real property, but "[n]o more shall be sold than is sufficient to satisfy" the debt, and the creditor may receive only "so much [of the proceeds] as will satisfy" the debt. Minn. Stat. §§ 550.20, 550.08 (2022). Likewise, if a bank forecloses on a home because the homeowner fails to pay the mortgage, the homeowner is entitled to the surplus from the sale. § 580.10.

In collecting all other taxes, Minnesota protects the taxpayer's right to surplus. If a taxpayer falls behind on her income tax and the State seizes and sells her property, "[a]ny surplus proceeds ... shall ... be credited or refunded" to the owner. §§ 270C.7101, 270C.7108, subd. 2. So too if a taxpayer does not pay taxes on her personal property, like a car. § 277.21, subd. 13. Until 1935, Minnesota followed the same rule for the sale of real property. The State could sell only the "least quantity" of land sufficient to satisfy the debt, 1859 Minn. Laws p. 58, § 23, and "any surplus realized from the sale must revert to the owner," *Farnham*, 32 Minn., at 11, 19 N.W., at 85.

The State now makes an exception only for itself, and only for taxes on real property. But "property rights cannot be so easily manipulated." *Cedar Point Nursery v. Hassid*, 594 U. S. ——, ——, 141 S.Ct. 2063, 2076, 210 L.Ed.2d 369 (2021) (internal quotation marks omitted). Minnesota may not extinguish a property interest that it recognizes everywhere else to avoid paying just compensation when it is the one doing the taking. *Phillips*, 524 U.S., at 167, 118 S.Ct. 1925.

### IV

**[11]** The County argues that Tyler has no interest in the surplus because she constructively abandoned her home by failing *1380 to pay her taxes. States and localities have long imposed "reasonable conditions" on property ownership. *Texaco, Inc. v. Short*, 454 U.S. 516, 526, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982). In Minnesota, one of those conditions

is paying property taxes. By neglecting this reasonable condition, the County argues, the owner can be considered to have abandoned her property and is therefore not entitled to any compensation for its taking. See Minn. Stat. § 282.08.

The County portrays this as just another example in the long tradition of States taking title to abandoned property. We upheld one such statutory scheme in *Texaco*. There, Indiana law dictated that a mineral interest automatically reverted to the owner of the land if not used for 20 years. *Id.*, 454 U.S., at 518, 102 S.Ct. 781. Use included excavating minerals, renting out the right to excavate, paying taxes, or simply filing a "statement of claim with the local recorder of deeds." *Id.*, at 519, 102 S.Ct. 781. Owners who lost their mineral interests challenged the statute as unconstitutional. We held that the statute did not violate the Takings Clause because the State "has the power to condition the permanent retention of [a] property right on the performance of reasonable conditions that indicate a *present intention to retain the interest.*" *Id.*, at 526, 102 S.Ct. 781 (emphasis added). Indiana reasonably "treat[ed] a mineral interest that ha[d] not been used for 20 years and for which no statement of claim ha[d] been filed as abandoned." *Id.*, at 530, 102 S.Ct. 781. There was thus no taking, for "after abandonment, the former owner retain[ed] no interest for which he may claim compensation." *Ibid.*

**[12]** **[13]** The County suggests that here, too, Tyler constructively abandoned her property by failing to comply with a reasonable condition imposed by the State. But the County cites no case suggesting that failing to pay property taxes is itself sufficient for abandonment. Cf. *Krueger v. Market*, 124 Minn. 393, 397, 145 N.W. 30, 32 (1914) (owner did not abandon property despite failing to pay taxes for 30 years). Abandonment requires the "surrender or relinquishment or disclaimer of" all rights in the property. *Rowe v. Minneapolis*, 49 Minn. 148, 157, 51 N.W. 907, 908 (1892). "It is the owner's failure to make *any* use of the property"—and for a lengthy period of time—"that causes the lapse of the property right." *Texaco*, 454 U.S., at 530, 102 S.Ct. 781 (emphasis added). In *Texaco*, the owners lost their property because they made *no* use of their interest for 20 years and then failed to take the simple step of filing paperwork indicating that they still claimed ownership over the interest. In comparison, Minnesota's forfeiture scheme

is not about abandonment at all. It gives no weight to the taxpayer's use of the property. Indeed, the delinquent taxpayer can continue to live in her house for years after falling behind in taxes, up until the government sells it. See § 281.70. Minnesota cares only about the taxpayer's failure to contribute her share to the public fisc. The County cannot frame that failure as abandonment to avoid the demands of the Takings Clause.

\* \* \*

**[14]** **[15]** The Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong*, 364 U.S., at 49, 80 S.Ct. 1563. A taxpayer who loses her $40,000 house to the State to fulfill a $15,000 tax debt has made a far greater contribution to the public fisc than she owed. The taxpayer must render unto Caesar what is Caesar's, but no more.

**\*1381** Because we find that Tyler has plausibly alleged a taking under the Fifth Amendment, and she agrees that relief under "the Takings Clause would fully remedy [her] harm," we need not decide whether she has also alleged an excessive fine under the Eighth Amendment. Tr. of Oral Arg. 27. The judgment of the Court of Appeals for the Eighth Circuit is reversed.

*It is so ordered.*

Justice GORSUCH, with whom Justice JACKSON joins, concurring.

The Court reverses the Eighth Circuit's dismissal of Geraldine Tyler's suit and holds that she has plausibly alleged a violation of the Fifth Amendment's Takings Clause. I agree. Given its Takings Clause holding, the Court understandably declines to pass on the question whether the Eighth Circuit committed a further error when it dismissed Ms. Tyler's claim under the Eighth Amendment's Excessive Fines Clause. *Ante*, at 1380 – 1381. But even a cursory review of the District Court's excessive-fines analysis—which the Eighth Circuit adopted as "well-reasoned," 26 F.4th 789, 794 (2022)—reveals that it too contains mistakes future lower courts should not be quick to emulate.

*First*, the District Court concluded that the Minnesota tax-forfeiture scheme is not punitive because "its primary purpose" is "remedial"—aimed, in other words, at

"compensat[ing] the government for lost revenues due to the non-payment of taxes." 505 F.Supp.3d 879, 896 (Minn. 2020). That primary-purpose test finds no support in our law. Because "sanctions frequently serve more than one purpose," this Court has said that the Excessive Fines Clause applies to *any* statutory scheme that "serv[es] *in part* to punish." *Austin v. United States*, 509 U.S. 602, 610, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) (emphasis added). It matters not whether the scheme has a remedial purpose, even a predominantly remedial purpose. So long as the law "cannot fairly be said *solely* to serve a remedial purpose," the Excessive Fines Clause applies. *Ibid.* (emphasis added; internal quotation marks omitted). Nor, this Court has held, is it appropriate to label sanctions as "remedial" when (as here) they bear " 'no correlation to any damages sustained by society or to the cost of enforcing the law,' " and "any relationship between the Government's actual costs and the amount of the sanction is merely coincidental." *Id.*, at 621–622, and n. 14, 113 S.Ct. 2801.

*Second*, the District Court asserted that the Minnesota tax-forfeiture scheme cannot "be punitive because it actually confers a windfall on the delinquent taxpayer when the value of the property that is forfeited is less than the amount of taxes owed." 505 F.Supp.3d, at 896. That observation may be factually true, but it is legally irrelevant. Some prisoners better themselves behind bars; some addicts credit court-ordered rehabilitation with saving their lives. But punishment remains punishment all the same. See Tr. of Oral Arg. 61. Of course, no one thinks that an individual who profits from an economic penalty has a *winning* excessive-fines claim. But nor has this Court ever held that a scheme producing fines that punishes some individuals can escape constitutional scrutiny merely because it does not punish others.

*Third*, the District Court appears to have inferred that the Minnesota scheme is not "punitive" because it does not turn on the "culpability" of the individual property owner. 505 F.Supp.3d, at 897. But while a focus on "culpability" can sometimes make a provision "look more like punishment," this Court has never endorsed the converse view. *Austin*, 509 U.S., at 619, 113 S.Ct. 2801. Even without emphasizing culpability, this Court has **\*1382** said a statutory scheme may still be punitive where it serves another "goal of punishment," such as "[d]eterrence" *United States v. Bajakajian*, 524 U.S. 321, 329, 118 S.Ct. 2028, 141 L.Ed.2d

314 (1998). And the District Court expressly approved the Minnesota tax-forfeiture scheme in this case in large part because " 'the ultimate possibility of loss of property serves as a *deterrent* to those taxpayers considering tax delinquency.' " 505 F.Supp.3d, at 899 (emphasis added). Economic penalties imposed to deter willful noncompliance with the law are fines by any other name. And the Constitution has something to say about them: They cannot be excessive.

**All Citations**

143 S.Ct. 1369, 2023 Daily Journal D.A.R. 4853, 29 Fla. L. Weekly Fed. S 851

## Footnotes

\*     The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1     1796 Conn. Acts p. 356–357, §§ 32, 36; 1797 Del. Laws p. 1260, § 26; 1791 Ga. Laws p. 14; 1801 Ky. Acts pp. 78–79, § 4; 1797 Md. Laws ch. 90, §§ 4–5; 1786 Mass. Acts pp. 360–361; 1792 N. H. Laws p. 194; 1792 N. C. Sess. Laws p. 23, § 5; 1801 N. Y. Laws pp. 498–499, § 17; 1787 Vt. Acts & Resolves p. 126. Kentucky made an exception for unregistered land, or land that the owner had "fail[ed] to list ... for taxation," with such land forfeiting to the State. 1801 Ky. Acts p. 80, § 5.

2     Many of these new States required that the land be sold to whichever buyer would "pay [the tax debt] for the least number of acres" and provided that the land forfeited to the State only if it failed to sell "for want of bidders" because the land was worth less than the taxes owed. 1821 Ohio pp. 27–28, §§ 7, 10; see also 1837 Ark. Acts pp. 14–17, §§ 83, 100; 1844 Ill. Laws pp. 13, 18, §§ 51, 77; 1859 Minn. Laws pp. 58, 61, §§ 23, 38; 1859 Wis. Laws Ch. 22, pp. 22–23, §§ 7, 9; cf. Iowa Code pp. 120–121, §§ 766, 773 (1860) (requiring that property be offered for sale "until all the taxes shall have been paid"); see also *O'Brien* v. *Coulter*, 2 Blackf. 421, 425 (Ind. 1831) (*per curiam*) ("[S]o much only of the defendant's property shall be sold at one time, as a sound judgment would dictate to be sufficient to pay the debt.").

3     North Carolina amended its laws in 1842 to permit the forfeiture of unregistered "swamp lands," 1842 N. C. Sess. Laws p. 64, § 1, but otherwise continued to follow the majority rule, see 1792 N. C. Sess. Laws p. 23, § 5.

**End of Document**                                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.